**FILED**

Jeanne A. Naughton, CLERK

**October 5, 2021**

United States Bankruptcy Court
Newark, NJ

By: *Juan Filgueiras*

Juan Filgueiras, Court Room Deputy

| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY | |
| In Re<br><br>TRI HARBOR HOLDINGS CORPORATION, *et al.*,<br><br>     Debtor. | Case No.:  19-13448 (VFP)<br><br>Chapter:  11 |
| KAVOD PHARMACEUTICALS LLC (*f/k/a* RISING PHARMACEUTICALS, LLC, *f/k/a* RISING PHARMACEUTICALS, INC.) and TRI HARBOR HOLDINGS CORPORATION (*f/k/a* ACETO CORPORATION),<br><br>     Plaintiffs,<br><br>v.<br><br>SIGMAPHARM LABORATORIES, LLC,<br><br>     Defendant. | Adv. Pro. No.: 19-2053 (VFP)<br><br><br><br>Judge Vincent F. Papalia |

## OPINION

### APPEARANCES

LOWENSTEIN SANDLER
Wojciech F. Jung, Esq.
Reynold Lambert, Esq.
Gavin J. Rooney, Esq.
One Lowenstein Drive
Roseland, NJ  07068
Attorneys for Plaintiffs

ELLIOTT GREENLEAF, PC
Henry F. Siedzikowski, Esq.
Timothy Myers, Esq.
Andrew Estepani, Esq.
925 Harvest Drive, Ste. 300
Blue Bell, PA  19422
Attorneys for Defendant, Sigmapharm Laboratories, LLC

## I.    **INTRODUCTION**

These matters are before the Court on two separate motions for summary judgment. First, Plaintiffs Kavod Pharmaceuticals LLC, f/k/a Rising Pharmaceuticals, LLC f/k/a Rising Pharmaceuticals, Inc. ("Rising"), and Tri Harbor Holdings Corp., f/k/a Aceto Corporation ("Aceto"), seek partial summary judgment (the "Plaintiffs' Motion") on certain counts of their Complaint against Defendant Sigmapharm Laboratories, LLC ("Sigmapharm" or "Sigma") and certain of Sigmapharm's Counterclaims against Rising and Aceto.[1] Rising and Aceto are sometimes collectively referred to in this Opinion as the "Plaintiffs" or "Rising/Aceto." Next, Defendant Sigmapharm moved for summary judgment seeking dismissal of Plaintiffs' Complaint in its entirety (the "Sigmapharm Motion").[2] Because of the close factual and legal relationship between the two Motions, both were argued and are being decided at the same time.

## II.    **JURISDICTIONAL STATEMENT**

The Court has jurisdiction over these matters under 28 U.S.C. § 1334(b) and the Standing Orders of Reference entered by the United States District Court on July 10, 1984 and amended on September 18, 2012. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (C) and (O). In its Answer, Sigmapharm admitted this Court's core jurisdiction.[3] Venue is proper in this Court under 28 U.S.C. § 1408. The Court issues the following findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052. To the extent that any of the findings of fact might constitute

---

[1] Pls.' Mot., Dkt. No. 17. Plaintiffs are two of the nine liquidating Debtors in these cases. The remaining seven Debtors, apart from Rising and Aceto, are: (i) Tri Harbor Chemical Holdings LLC (f/k/a Aceto Agricultural Chemicals LLC, f/k/a Aceto Agricultural Chemicals Corporation); (ii) Tri Harbor Realty LLC (f/k/a Aceto Realty LLC); (iii) Kavod Health LLC (f/k/a Rising Health, LLC); (iv) Kavris Health LLC (f/k/a Acetris Health, LLC); (v) KAVACK Pharmaceuticals LLC (f/k/a PACK Pharmaceuticals, LLC); (vi) Arsynco, Inc.; and (vii) Acci Realty Corp. All nine Debtors are collectively referred to as the "Debtors."
[2] Sigmapharm Mot., Dkt. No. 41.
[3] Compl. ¶¶ 15-17 (Plaintiffs' statement of jurisdiction and venue), Dkt. No. 1; Answer ¶¶ 15-17, Dkt. No. 5. Sigmapharm admits this Court's "core" jurisdiction and venue, as pleaded by Plaintiffs.

conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law

constitute findings of fact, they are adopted as such.

## III.    STATEMENT OF RELEVANT FACTS[4]

### A. General Background

(i)    The Agreement at the Center of These Motions

The dispute underlying these Motions and the litigation between the parties arise from a

*Master Product Development and Collaboration Agreement* (the "Agreement") entered on June

22, 2006 between Sigmapharm and Rising Pharmaceuticals, Inc. ("Rising," which is sometimes

referred to as "Old Rising" or "RP").  The Agreement was entered into approximately three and

one-half years before Rising was acquired by a wholly owned subsidiary of Aceto (Sun

Acquisition Corp.) in or about December 2010.[5] Sigmapharm is a Pennsylvania limited liability

corporation with its principal place of business at 3375 Program  Drive, Bensalem, Pennsylvania.[6]

Under the Agreement, Sigmapharm and Rising contracted to collaborate on the

development of generic pharmaceuticals, with Sigmapharm developing the products and obtaining

FDA approvals and Rising doing the marketing, accounting for essential matters, such as "Net

Sales" and "Net Profits" (as defined in the Agreement), and serving as exclusive distributor for

Sigmapharm.[7] The Agreement generally provided that:  (i) Sigmapharm would be paid the cost

---

[4] Both sides took issue with each other's Statement of Undisputed Material Facts ("SUMF").  Plaintiffs' original SUMF was narrowly focused and provided limited history of the parties' dealings. (Pls.' SUMF, Dkt. No. 17-1).  In Sigmapharm's SUMF ("Sigma SUMF"), each paragraph was detailed but combined multiple factual statements, interpretations and legal conclusions, deficits which Plaintiffs noted and addressed in its response to Sigma's SUMF. Sigma SUMF, Dkt. No. 41-1; Pls.' Resp., Dkt. No. 49.  Plaintiffs provided additional details in their response, objection, supplemental SUMF and sequence of certifications that it filed on May 5, 2021.  Pls.' Objs., Dkt. Nos. 48-53.  Sigmapharm responded to Plaintiffs' supplemental SUMF at Dkt. No 58.

[5] Declaration of Reynold Lambert, Esq., Agreement, Ex. A, Dkt. No. 17-2 ("Lambert Decl.").  For simplicity, the second declaration from Mr. Lambert, called "Lambert Litigation Decl." by Plaintiffs, is also called "Lambert Decl." in these footnotes and is distinguished from the first by its docket entry, Dkt. No. 51, as opposed to Dkt. No. 17-2, and its denotation of exhibits by numerals rather than by letters.

[6] Compl. ¶ 14, Dkt. No. 1.  In its Answer, Sigmapharm did not admit that this address is its principal place of business, but the company's current website shows this to be its only address.  Answer ¶ 14, Dkt. No. 5.

[7] Pls.' Suppl. SUMF ¶¶ 6-8, 11-12, Dkt. No. 50.

of manufacture plus 55% of the Net Profits; and (ii) Rising would be paid for the cost of distribution plus 45% of the Net Profits, as calculated in accordance with the Agreement.[8] Additionally, Rising/Aceto was entitled to an administrative fee for its services under the Agreement pursuant to § 1.52, which was subsequently amended.[9]

Sigmapharm asserts that Rising had "complete control" over the accounting for both parties pursuant to the Agreement.[10] Rising disputes that it had complete control over accounting,[11] but does state that it:

> took primary responsibility for managing the inventory; marketing and selling the drugs to the major pharmaceutical wholesalers; and handling the complex accounting process required in the business of generic drug distribution. ([Agreement] §§ 5.5 - 5.7.) Stated otherwise, the collaboration leveraged the respective strengths of each company—Sigmapharm, in product development and manufacture; and Rising, in the sale and marketing of the products to wholesalers.[12]

In their Supplemental SUMF, Plaintiffs devoted one-and-one-half pages (paragraphs 11-18) to describing the computation of Net Sales and Net Profits under the Agreement ("[t]he calculation . . . is complicated and performed using formulas that take into consideration multiple factors and components").[13]

---

[8] Lambert Decl., Agreement § 1.53, Ex. A, Dkt. No. 17-2; Sigma SUMF ¶¶ 4, 6, Dkt. No. 41-1. Eugene Hughes, Senior Vice President of Finance at Rising from June 12, 2017 to Apr. 19, 2019 ("Hughes") declared that Rising had about 25 partners like Sigmapharm and sold about 500 generic pharmaceutical product stock keeping units ("SKUs"), of which Sigmapharm manufactured about 18. Declaration of Eugene Hughes ¶ 6, Dkt. No. 52 ("Hughes Decl."). This formula applied to "Rising Projects," as defined in the Agreement. "Sigmapharm Projects" were subject to a different formula. Agreement at §§ 1.53 and 1.55.

[9] In Claim Nos. 155-2 and 162-1 (at ¶ 11 in each), Sigmapharm demanded the return of an $11.6 million "administrative fee" collected by Rising from sale proceeds from 2009 to about 2017. Sigmapharm attributes this fee in the Agreement to §§ 1.36 ("Net Profits"); 1.37 ("Net Sales"); 1.52 ("Rising's Fee") (a sliding-scale fee arising from costs of (i) distribution and (ii) marketing and sales); 8.1.2 ("Cost Sharing") (a subparagraph therein); and 8.6 ("Maintenance of Records; Audits"). Section 1.52 of the Agreement was replaced and restated in full in the Sept. 4, 2008 Amendment, which is an exhibit to each claim. Lambert Decl., Claim Nos. 155-2 and 166-1, ¶ 11 and Sept. 4, 2008 Amendment, Exs. H, K, Dkt. No. 17-2.

[10] Sigma SUMF ¶ 6, Dkt. No. 41-1. However, this asserted fact is disputed, and it is unclear to this Court as to how or whether Rising/Aceto could have complete control over Sigmapharm's information, such as the cost of the goods Sigmapharm developed and manufactured. See Pls.' Resp. ¶ 6, Dkt. No. 49.

[11] Pls.' Resp. ¶ 6, Dkt. No. 49.

[12] Pls.' Br., at 6, Dkt. No. 17.

[13] Pls.' Suppl. SUMF ¶¶ 11-18, Dkt. No. 50.

Both Motions require reference to certain specific provisions of the Agreement that define and describe the Parties to the Agreement, how and when the Agreement may be terminated, including the notice required to declare a breach and termination, and the effect of termination, as is discussed in more detail below.

(ii)    <u>The Parties as Defined in the Agreement and the Governing Law</u>

The Preamble to the Agreement identified Rising, as a contracting Party, to include its "subsidiaries and Affiliates."[14]  The Agreement at § 1.4 defined "Affiliate" as follows:

> 1.4.   "Affiliate" of any Party shall mean any corporation, partnership, association, trust, or other business entity or organization, directly or indirectly Controlling, Controlled by, or under common Control with such Party.[15]

The Agreement at § 1.11 also defined "Control":

> 1.11.   "Control" shall mean:  (i) in the case of corporate entities, direct or indirect ownership of more than fifty percent (50%) of the stock or shares having the right to vote for the election of directors; and (ii) in the case of non-corporate entities, direct or indirect ownership of at least fifty percent (50%) of the equity interest with the power to direct the management and policies of such non-corporate entity.[16]

The Agreement at § 14.9 ("Governing Law; Jurisdiction") further provided that New Jersey law would govern the interpretation of the Agreement in all events:

> 14.9.   Governing Law; Jurisdiction.  This Agreement shall be governed by and interpreted in accordance with the substantive laws of the State of New Jersey, without regard to conflict of law principles thereof, and the Parties consent to and agree to submit to the jurisdiction of the courts of the State of New Jersey, state and federal, with respect to actions and proceedings relating to or arising out of this Agreement.[17]

---

[14] Lambert Decl., Agreement, Preamble, Ex. A, Dkt. No. 17-2.  Rising and Sigmapharm were each identified as a "Party" and collectively as "Parties."  The capitalization in the quoted material is correct: "Affiliate" is a defined term; "subsidiaries" is not.

[15] Lambert Decl., Agreement § 1.4, Ex. A, Dkt. No. 17-2.

[16] Lambert Decl., Agreement § 1.11, Ex. A, Dkt. No. 17-2.

[17] Lambert Decl., Agreement § 14.9, Ex. A, Dkt. No. 17-2.

(iii)    Aceto's Acquisition of Rising and the Assignment of the Agreement

As noted above, in or about December 2010, Rising was acquired by Sun Acquisition Corp. ("Sun").  Ron Gold ("Mr. Gold"), then President and CEO of Rising, described Sun as a wholly owned subsidiary of Aceto Corporation.[18]  Pursuant to that transaction, the Agreement was assigned to Sun, which eventually changed its name back to "Rising," and was sometimes referred to as "New Rising."  This acquisition and assignment are evidenced in the exhibits by a December 20, 2010 letter from Gold to Sigmapharm describing the transaction:

> Rising Pharmaceuticals, Inc. ("RP") has entered into a definitive agreement under which Sun Acquisition Corp., a wholly owned subsidiary of Aceto Corporation, will acquire substantially all of the assets of RP (the "Transaction"). Sun Acquisition Corp., which will change its name to Rising Pharmaceuticals, Inc. upon the closing of the Transaction (the "Closing"), is referred to herein as "New Rising". We have agreed to assign to New Rising, and New Rising has agreed to assume from RP, the agreement, dated February 2, 2006, between you and RP (the "Agreement"), effective as of the Closing. We will inform you of the date of the Closing, which is anticipated to be prior to December 31, 2010.[19]

The December 20, 2010 letter asked Sigmapharm to indicate its consent to the assignment by countersigning the letter.  Spiro Spireas, Ph.D. ("Dr. Spireas"), Chairman and CEO of Sigmapharm, did so on January 6, 2011.[20]  This transaction, the definitions of Affiliate and Control, and the December 20, 2010 letter are central to Sigmapharm's argument that the December 20, 2010 assignment renders Aceto liable as the parent corporation and "Affiliate" of "New Rising" for the damages that Sigmapharm now claims against both Aceto and Rising, as well as Plaintiffs' efforts to rebut that argument.  Sigmapharm argues that, under the terms of the Agreement, at the Preamble, § 1.4 ("Affiliate") and § 1.11 ("Control"), Aceto, with a 100% controlling interest in Rising, became a "Party" to the Agreement, without being a signatory.[21]

---

[18] Lambert Decl., Dec. 20, 2010 Gold letter, Ex. O, Dkt. No. 17-2.
[19] Lambert Decl., Dec. 20, 2010 Gold letter, Ex. O, Dkt. No. 17-2.  All parties appear to assume and agree that the February 2, 2006 Agreement referred to in this letter is the June 22, 2006 Agreement that is the subject of this action.
[20] Lambert Decl., Dec. 20, 2010 Gold letter, Ex. O, Dkt. No. 17-2.
[21] Lambert Decl., Agreement, Preamble and §§1.4 and 1.11, Ex. A, Dkt. No. 17-2.  The September 4, 2008 Amendment to the Agreement, attached as an Exhibit to Claim Nos. 155-2 and 166-1 filed by Sigmapharm, primarily amended the

Plaintiffs argue principally that only Rising is potentially liable under the Agreement because only Rising signed the December 20, 2010 letter and that Sigmapharm's interpretation would render meaningless the Assignment provision (§ 14.1) of the Agreement as applied to Affiliates.[22] Plaintiffs also argue that the Agreement's Indemnification provision (§ 13) describes when an Affiliate may be liable under the Agreement, showing an intent that Affiliates are not liable in all cases.[23]

      (iv)    <u>The Required Notice to Declare a Breach and Terminate the Agreement</u>

The provisions in the Agreement for "Term and Termination" (§ 12) and "Correspondence and Notices" (§ 14.4) are also particularly relevant to these Motions. The term of the Agreement was indefinite, unless terminated by either Party as provided in the Agreement (§ 12.1).[24] The Agreement at § 12.2 ("Termination for Cause") described the termination procedure that is at issue on these Motions (the "Termination provision"):

> 12.2. Termination for Cause. This Agreement, as it relates to a particular Product, may be terminated **effective immediately by written notice by either Party** at any time during the Term of this Agreement (i) for **material breach** by the other Party, **which breach remains uncured for ninety (90) days measured from the date written notice of such breach is given to the breaching Party**, provided, however, that if such breach is not cured within the stated period and the breaching Party uses diligent good faith efforts to cure such breach, the stated period will be extended by an additional ninety (90) days. . . .[25]

(emphasis supplied).

The Agreement established a two-tiered notice standard, one for "Ordinary Notices" and another for "Extraordinary Notices" at §§ 14.4.1 and 14.4.2 (the "Notice provisions").

---

fee structure to Rising and provided for adjustment to distribution of Net Profits if any Rising estimates of its fees were incorrect. Lambert Decl., Claim Nos. 155-2 and 162-1, Exs. H, K, Dkt. No. 17-2.

[22] Lambert Decl., Agreement § 14.1, Ex A, Dkt. No. 17-2.

[23] Pls.' Reply Br., at 14-15, Dkt. No. 57.

[24] Lambert Decl., Agreement § 12.1, Ex. A, Dkt. No. 17-2. If all products and schedules had been terminated, then either party could terminate the Agreement on thirty days' notice to the other (§ 12.1).

[25] Lambert Decl., Agreement § 12.2, Ex. A, Dkt. No. 17-2. The other grounds for termination for cause were appointment of a receiver; assignment for benefit of creditors; bankruptcy (*cf.* 11 U.S.C. § 365(e)(1)); and patent infringement litigation, cross-referenced to § 9.5.1.

Section 14.4.2 (titled "Extraordinary Notices") expressly required either Party to give notice of

breach of the Agreement and its termination as follows:

> 14.4.2.    Extraordinary    Notices.    Extraordinary notices and other
> communications hereunder (including, without limitation, any notice of force
> majeure, **breach, termination,** change of address, exercise of rights to negotiate
> additional agreements, etc.) shall be in writing and shall be deemed given if
> delivered personally or by facsimile transmission (receipt verified), mailed by
> registered or certified mail (return receipt requested), postage prepaid, or sent by
> nationally recognized express courier service, to the Parties at the following address
> (or at such other address for a Party as shall be specified by like notice, provided,
> however, that notices of a change of address shall be effective only upon receipt
> thereof):
>
> All correspondence to Rising shall be addressed as follows:
>
> Rising Pharmaceuticals, Inc.
> 3 Pearl Court
> Suite A/B
> Allendale, New Jersey 07401
> Attn: Mr. Ronald Gold, President
> Fax: 201-961-1234
>
> All correspondence to SigmaPharm shall be addressed to the following locations:
>
> SigmaPharm Laboratories, LLC          SigmaPharm Laboratories, LLC
> 860 Town Center Drive                 3375 Progress Drive
> Langhorne, PA 19047                   Bensalem, PA 19020
> Attn: Spiro Spireas, Ph.D., Chairman & CEO   Attn: Spiro Spireas, Ph.D., Chairman & CEO
> Fax: (215) 891-0775                   Fax: [blank]

(emphasis supplied).[26]

Significantly, the Agreement provided for a different, less stringent and less formal notice

procedure for other types of notices at § 14.4.1 (titled "Ordinary Notices"), which states as follows:

> 14.4.1.  Ordinary Notices.  Correspondence, reports, documentation, and
> any other communication in writing between the Parties in the course of ordinary
> implementation of this Agreement shall be delivered by hand, sent by facsimile
> transmission (receipt verified), or by airmail to the employee or representative of
> the other Party who is designated by such other Party to receive such written
> communication.[27]

---

[26] Lambert Decl., Agreement § 14.4.2, Ex. A, Dkt. No. 17-2.
[27] Lambert Decl., Agreement § 14.4.1, Ex. A, Dkt. No. 17-2.

As noted, a key issue on these Motions is whether Sigmapharm complied with the Notice and Termination provisions in declaring the Agreement breached and terminated.

**B.   The Underlying Accounting Dispute and Sigmapharm's Request for an Audit**

(i)      The Genesis of the Dispute Regarding the Net Profits Owed to Sigmapharm

Richard A. Kremer ("Mr. Kremer") provided certifications and testimony that were the focus of significant aspects of these Motions.  Mr. Kremer joined Sigmapharm on February 2, 2015 as controller and was promoted to Director, to Vice President of Finance and then to Vice President of Administration and Finance.[28]   Mr. Kremer stated in his December 21, 2018 Certification in support of arbitration that, in May 2015, when he reviewed Rising's profit statement for the quarter ending December 31, 2014, he "noticed a large increase in chargebacks and rebates, along with other expenses" that "greatly reduced the Net Profits" under the Agreement.[29]   Plaintiffs initially provided a counter-explanation for changes in revenue (an increase in wholesale acquisition costs for two products with an ultimate increase in gross revenue).[30]   Initial explanations aside, by Plaintiffs' own admission, by the latter part of 2015, Sigmapharm began asking Rising for an audit of its profit share figures, as § 8.6 of the Agreement (the "Audit provision") allowed at the request of either party and on reasonable notice. [31]

(ii)      The Audit Provision

Section 8.6 of the Agreement (the "Audit provision") provides as follows:

8.6. Maintenance of Record; Audits. During the term of this Agreement and for a period of at least seven (7) years after the date of termination of this

---

[28] Lambert Decl., Nov. 11, 2020 Kremer Dep. 21:4-22:21; 67:17-21, Ex. B, Dkt. No. 17-2.

[29] Sigma Br., Dec. 21, 2018 Certification of Richard A. Kremer in support of Arbitration, Case No. 01-18-0002-4042, which was ordered in *Sigmapharm Labs., LLC v. Rising Pharmaceuticals, Inc. & Aceto Corp.*, Dkt. No. 2:18-cv-1238 (E.D. Pa.) ¶¶ 1-3, 17, Ex. 4, Dkt. No. 41 ("Kremer Certif."). This E.D. Pa. proceeding is discussed in more detail below.

[30] Pls.' Resp. to Sigma SUMF ¶ 10, Dkt. No. 49.

[31] Pls.' Resp. to Sigma SUMF ¶ 16, Dkt. No. 49.  Additionally, Mr. Kremer of Sigmapharm certified at ¶¶ 22-28 (i) that, on May 4, 2015, Rising, in response to his request, began to calculate shared profits on both a cash and an accrual basis; and (ii) that, at a November 20, 2015 meeting among Spireas, Kremer and others for Sigmapharm and Srinivasan, Licata and Ruben Valdez for Rising/Aceto, "Sigmapharm specifically requested an audit for the period

9

Agreement, each Party shall keep complete and accurate records of all expenses incurred by it under this Agreement, which expenses are to be reimbursed by one or both of the other Parties. **The cost of audits shall be borne by each Party (e.g., the Party requesting an audit pays for their own accountants, and the Party being audited pays for the personnel and overhead costs incurred in "hosting" that audit), provided, however, that in the event such audit by one Party of the other Party's records shows a discrepancy in excess of five percent (5%) of the amount reported by such Party, the Party responsible for the discrepancy will reimburse the auditing Party for the reasonable cost of such audit**. Any audit or inspection of books and records by a Party shall be conducted upon reasonable written notice to the other Party, be conducted during normal business hours and will not interfere materially with the business operations of the party being audited or whose books and records are being inspected. . . .[32]

(emphasis supplied).  As the highlighted language indicates, each Party bore its own cost of the audit, unless the audit disclosed a discrepancy greater than five percent (5%) in a Party's prior reporting, in which case that Party would reimburse the counterparty for its audit costs.[33]  With a narrow exception not relevant here, the Agreement did not provide for any other fee shifting.[34]  Relatedly, pursuant to § 1.37 of the Agreement, all "deductions" made in determining Net Sales and Net Profits under §§ 1.36 and 1.37 were required to be "transparent and readily available for independent audit," subject to § 8.6.

At a November 20, 2015 meeting, Sigmapharm requested an audit of Rising's reported profit-share figures from 2009 through 2015.[35]  Mr. Kremer sent Peter Licata ("Mr. Licata"), Vice President of Finance at Rising, a follow-up December 4, 2015 email, titled "Audit of Rising Net Sales" and requested listings of invoices that generated gross sales, credit memos, payments and adjustments, description of allocation methodology "where the adjustments are not specifically

---

from at least 2009 through 2015, and Rising-Aceto welcomed it."  Sigma Br., Kremer Certif. ¶¶ 23, 25, 27, Ex. 4, Dkt. No. 41**.**

[32] Lambert Decl., Agreement, § 8.6, Ex. A, Dkt. No. 17-2.  Each Party was also required to "keep complete and accurate records" of the expenses incurred under the Agreement.

[33] Lambert Decl., Agreement, § 8.6, Ex. A, Dkt. No. 17-2.

[34] If the parties defended third-party litigation, each was to bear the cost of that litigation in proportion to its percentage share of Net Profits, unless one party was solely responsible for a breach "of its representations, warranties or covenants."  Lambert Decl., Agreement, § 13.1 ("Litigation"), Ex. A, Dkt. No. 17-2.

[35] Sigma Br., Kremer Certif. ¶ 25, Ex. 4, Dkt. No. 41; Sigma SUMF ¶ 16, Dkt. No. 41-1.

associated with product manufactured by Sigmapharm" and inventory transactions to enable

Sigmapharm to start the audit.[36]  The parties corresponded throughout 2016.  Rising provided

various records to Sigmapharm, but the parties dispute whether Rising ever effectively met

Sigmapharm's demands for supporting and "source" documentation.[37]

On November 29, 2016, Rising's president, Satish Srinivasan ("Mr. Srinivasan"), advised

Sigmapharm's CEO, Dr. Spireas, that Walter Kaczmarek ("Mr. Kaczmarek"), then **Aceto's** COO,

would contact Dr. Spireas to arrange for a meeting and that Mr. Kaczmarek "would be the key

decision maker at Rising/Aceto" regarding the accounting/audit issues.[38]  The short November 29,

2016 email from Mr. Srinivasan to Dr. Spireas stated in full:

> Following up on your call just before the Thanksgiving Holiday last week, I am
> taking this opportunity to introduce you to **Walt Kaczmarek, COO of Aceto,** who
> will be reaching out to set up a meeting either during the week beginning December
> 5th or the week beginning December 12th.
>
> **He would be the key decision maker at Rising/Aceto to review and discuss any
> of the topics that you wish to discuss.**  He will be accompanied by Peter Licata
> (to address accounting matters) and Paul Krauthauser (to address market/customer
> matters) whom you've met previously.[39]

(emphasis supplied).  In its response to Plaintiffs' SUMF, Sigmapharm seems (at times) to take

issue with this statement -- even though the email above specifically refers to Mr. Kaczmarek as

the "key decision maker for Rising/Aceto" -- and instead asserts that Rising advised Sigmapharm

that Mr. Kaczmarek "would get involved" and Peter Licata "would be [the] point person for

---

[36] Sigma Br., Kremer Certif., Ex. 4, Dec. 4, 2015 email, Sub. Ex. 2, Dkt. No. 41.
[37] Pls.' Suppl. SUMF ¶¶ 33-49, Dkt. No. 50; Sigma Resp. to Suppl. SUMF ¶¶ 33-49, Dkt. No. 58-2.  See also Kremer
Certif. ¶¶ 25-45, for his narrative of the status of document production in 2016.  Sigma Br., Kremer Certif., Ex. 4, Dkt.
No. 41.
[38] Sigma Br., Kremer Certif., Ex. 4, Nov. 29, 2016 email, Sub. Ex. 14, at 3, Dkt. No. 41; Pls.' Suppl. SUMF ¶ 50, Dkt.
No. 50.
[39] Sigma Br., Kremer Certif., Ex. 4, Nov. 29, 2016 email, Sub. Ex. 14, at 3, Dkt. No. 41.

Rising."[40]  Sigma cites as the source of its interpretation the very same email just quoted, but that is not what the email says.

In any event, Mr. Kaczmarek's involvement in the dispute, whether as the "key decision maker" or otherwise, and his position as COO of Aceto by themselves create disputed issues of material fact as to the nature and extent of Aceto's involvement in and potential liability for any breach of the Agreement. Other material factual disputes exist in this regard as the result of individuals such as Mr. Kaczmarek, a high-ranking officer of Aceto, identifying as Aceto employees and using an aceto.com email address. Additionally, the definitions of "Affiliate" and related terms in the Agreement (as discussed above) require this Court to determine, as a mixed question of law and fact, whether Aceto is also a "Party" to and liable for any breach of the Agreement.

(iii)    The December 16, 2016 Letter

On December 16, 2016, Mr. Kremer addressed to Peter Licata, Vice President of Finance at Rising, a thirteen-page letter (including exhibits) titled "Review of Profit Share Payment Support" (the "December 16, 2016 Letter").[41]  The December 16, 2016 Letter was delivered under cover of an email that had as its subject heading "Profit Share Calculation Audit/Review." That email stated in full:

> As described in my voicemail message of this morning, I am providing the letter describing the results of our review.  The first page provides a summary of our review and delineates the areas supported by individual exhibits.
>
> Please let me know when you will be available to discuss each item after you have had the opportunity to review them.[42]

---

[40] Sigma Resp. to Pls.' Suppl. SUMF ¶ 50, Dkt. No. 58-2, citing to Sigma Br., Kremer Certif., Ex. 4, Nov. 29, 2016 email, Sub. Ex. 14, at 3, Dkt. No. 41.  See also Pls.' Resp. to Sigma's SUMF at ¶¶ 24-25, Dkt. No. 49.
[41] Lambert Decl., Dec. 16, 2016 Letter, Ex. E, Dkt. No. 17-2.  By the time of the December 16, 2016 Letter, Ron Gold had left Rising.  Lambert Decl., Kremer Dep. 29:19-22, 63:4-12, Ex. B, Dkt. No. 17-2.
[42] Lambert Decl., Dec. 16, 2016 email, Ex. G, Dkt. No. 17-2.

The December 16, 2016 Letter consisted of a cover page and twelve pages of exhibits, which included additional text.[43]  Mr. Kremer's December 16, 2016 Letter opened with the text:

> I have concluded my review of the documentation [Rising] provided to [Sigmapharm] in May, June and September 2016.  The submitted documentation covers the parties' business relationship, pursuant to their agreement dated June 22, 2006, and as amended subsequently ("Agreement"), from April 2009 through March 2016.[44]

During the period under review (April 2009 through March 2016), Rising calculated gross sales at $309,165,412.28 and Net Sales at $144,483,877.54.  Mr. Kremer calculated Net Sales at $147,947,714.59, a difference of $3,463,837.05, of which $1,905,110.38 should have accrued to Sigmapharm's benefit, as divided under the Agreement's formula.[45]

Mr. Kremer provided a list of the documents and information that he had reviewed in connection with the December 16, 2016 Letter (including certain original or "actual" documents) and included with it five exhibits, lettered A through E.  Exhibits A (Underpaid Profit Share) and C (amount owed based on reduction of Cost of Goods Sold ("COGS")) were demands, with calculations, for payment of specific amounts of alleged underpayments.  Exhibit E was a demand for a previously unpaid equipment invoice.  These three dollar-demands (A, C, E) were reduced to new invoices dated December 1, 2016 and included in the December 16, 2016 Letter.[46]  Exhibits B and D, regarding rebates from the Centers for Medicare & Medicaid Services ("CMS" or "Medicaid") and a $495,906 credit memo, sought additional information.[47]  In sum, Sigmapharm's dollar demands in the December 16, 2016 Letter were:

| | |
|---|---|
| $1,905,110.38 | Underpaid profit share (Q2-2009 through Q1-2016) (Exhibit A) |
| $1,109,491.91 | Underpaid profit share based on reduction in COGS (Q2-2009 through Q1-2016) (Exhibit C) |

---

[43] Lambert Decl., Dec. 16, 2016 Letter, Ex. E, Dkt. No. 17-2.
[44] Lambert Decl., Dec. 16, 2016 Letter, Ex. E, Dkt. No. 17-2.
[45] Lambert Decl., Dec. 16, 2016 Letter, at 2-3, Ex. E, Dkt. No. 17-2.
[46] Lambert Decl., Dec. 16, 2016 Letter, Ex. E, Dkt. No. 17-2.
[47] Lambert Decl., Dec. 16, 2016 Letter, Ex. E, Dkt. No. 17-2.

$  225,000.00          Share of equipment cost for abandoned product (Exhibit E)[48]

In closing, Mr. Kremer thanked Mr. Licata "for [his] assistance with this historical review."[49]  The December 16, 2016 Letter, the covering email and exhibits nowhere use the words "notice," "default," "breach" or "termination," nor do they provide for a cure period,[50] as Sigmapharm ultimately concedes (albeit reluctantly).[51]

Prior to the issuance of the December 16, 2016 Letter, the record reflects that Sigmapharm made repeated efforts to obtain information, including (at times) "source" or original documents from Rising/Aceto, in connection with the accounting/audit issues.[52]  Notwithstanding those claimed deficiencies (which do have at least some support in the record), Sigmapharm proceeded with its audit, prepared the December 16, 2016 Letter over a period of months, with the assistance of counsel, and also sought and obtained additional payments and information from Rising/Aceto pursuant to the Agreement, without declaring a breach in accordance with the Agreement's terms.[53]  Instead, the parties continued to attempt to resolve the accounting/audit issues over the next several months.

(iv)    The Post-December 16, 2016 Activities Relating to the Accounting Dispute

The parties dispute their progress thereafter toward resolving these accounting/audit issues. On December 22, 2016, less than a week after the December 16, 2016 Letter, Mr. Kaczmarek of Rising/Aceto wrote Dr. Spireas of Sigmapharm a cordial email apologizing for his delay in writing;

---

[48] Lambert Decl., Dec. 16, 2016 Letter, Ex. E, Dkt. No. 17-2.  According to Sigmapharm's Claim Nos. 155-2 and 162-1, only the asserted underpaid profit share based on the reduction of COGS remains unpaid.  Lambert Decl., Claim No. 155-2, Ex. H; Claim No. 162-1, Ex. K, Dkt. No. 17-2.  According to Mr. Hughes, all issues in the December 16, 2016 Letter were resolved, except for the COGS issue which the parties agreed to defer to a later date.  Hughes Decl., ¶¶ 19, 32, 50, Dkt. No. 52.  Sigmapharm asserts that this COGS amount is owed as part of its contractual damages. Sigma Claim No. 155-2, ¶ 6.  Thus, this is another disputed issue of fact and possibly law that also may be affected by the results of the ongoing audit.
[49] Lambert Decl., Dec. 16, 2016 Letter, Ex. E, Dkt. No. 17-2.
[50] Lambert Decl., Dec. 16, 2016 Letter, Ex. E, Dkt. No. 17-2.
[51] Pls.' SUMF ¶¶ 7-10, 12-14, Dkt. No. 17-1; Sigma's Resp. to Pls.' SUMF ¶¶ 7-10, 12-14, Dkt. No. 47.
[52] See, e.g., Sigma Br. ¶¶ 9-23, Dkt. No. 41; Sigma SUMF ¶¶ 9-23, Dkt. No. 41-1.
[53] Pls.' Suppl. SUMF ¶¶ 123-130, Dkt. No. 50; Hughes Decl., ¶¶ 26-27, 38, Dkt. No. 52.

inviting a meeting; announcing that he was "finally able to take a breath after the closing of the

Citron deal"; and introducing Vimal Kavuru (copied on the letter) "who will be running the

combined Rising/Citron generic business."[54]   One month later, on January 23, 2017, Mr.

Kaczmarek wrote Dr. Spireas a one-line follow up:  "Just following up on the email below.

Looking forward to meeting you in person."[55]

   Mr. Kremer certified that "[f]or the next several months into 2017, Sigmapharm continued

to make demands for information necessary to perform its audit."[56]  On April 19, 2017, Rising sent

Sigmapharm its first quarter 2017 profit share report (the exhibit appears to contain only the

transmission email and not the actual report).[57]  The email was from Mary Ann Basile at Rising to

Mr. Kremer at Sigmapharm.[58]  Mr. Kremer indicated that the report for Q1-2017 showed "negative

net profit" of $971,465 and that he wondered why "Rising-Aceto" (as he identified the Plaintiffs)

had not billed Sigmapharm for the loss.[59]  He then reviewed Rising's profit statements for Q2-

2016 through Q1-2017 and discovered negative accrued Sales Expenses for each of those quarters,

aggregating to negative $9,425,216 in Sales Expenses.[60]  Understandably, Mr. Kremer indicated

that this information signaled a "serious problem with Rising-Aceto's reporting of accrued Sales

Expenses."[61]

   On May 16, 2017, nearly five months after Mr. Kaczmarek first invited Sigmapharm to a

meeting to discuss the issues raised in the December 16, 2016 Letter, and almost four months after

Mr. Kaczmarek's reminder, Dr. Spireas wrote back to Mr. Kaczmarek, attaching a copy of Mr.

Kremer's December 16, 2016 Letter and stating in most relevant part:

---

[54] Sigma Br., Kremer Certif., Ex. 4, Dec. 22, 2016 email, Sub. Ex. 14, Dkt. No. 41.
[55] Sigma Br., Kremer Certif., Ex. 4, Jan. 23, 2017 email, Sub. Ex. 14, Dkt. No. 41.
[56] Sigma Br., Kremer Certif., ¶ 47, Ex. 4, Dkt. No. 41.
[57] Sigma Br., Kremer Certif., Ex. 4, Apr. 19, 2017 email, Sub. Ex. 13, Dkt. No. 41.
[58] Sigma Br., Kremer Certif., Ex. 4, Apr. 19, 2017 email, Sub. Ex. 13, Dkt. No. 41.
[59] Sigma Br., Kremer Certif., ¶ 48, Ex. 4, Dkt. No. 41.
[60] Sigma Br., Kremer Certif. ¶¶ 49-50, Ex. 4, Dkt. No. 41.
[61] Sigma Br., Kremer Certif. ¶ 51, Ex. 4, Dkt. No. 41.

I have been looking forward to meeting with both of you for a while now, since the beginning of the year.  **I truly apologize for not arranging a meeting earlier.  Unfortunately, my delay was purely due to my attempt to define the meeting agenda and logistics based on certain information and data that my people have been waiting to receive from Rising since last December**.

**We are coming however to a pivotal moment in our relationship, and we must act immediately in order to maintain it and ensure our services remain uninterrupted**.  The issues outlined in the attached letter dated December 16, 2016 are unresolved since the end of last year.  Moreover, the last accounting and profit share report we received from Rising for Q1-2017 is very alarming and rather unacceptable.  **These and other important issues must be addressed and, thus, we must meet as soon as possible.**[62]

Based on the record before the Court, this was the first substantive communication from top management at Sigmapharm to Plaintiffs about meeting to resolve these issues since the December 16, 2016 Letter.  As tracked above, the reason for this gap is not fully or satisfactorily explained by Sigmapharm as Dr. Spireas apologizes for his delay in responding, while seeking to place at least some of the blame on Rising/Aceto.  In any event, this email also does not give specific notice of any breach or any opportunity to cure, or that termination would result if not timely cured.  Further, this email was not delivered as an Extraordinary Notice.  While it may be implicit that a notice of breach and/or termination *may* result in the future if the issues described in this email were not satisfactorily addressed, Dr. Spireas' May 16, 2017 email simply does not give the express notice and opportunity to cure required under the Agreement before it could be properly terminated.

After receiving Dr. Spireas' email, Mr. Kaczmarek forwarded it internally within Rising with the question: "Were you aware of this audit and claim?  This is the first I have seen it."[63]  This question and statement are somewhat puzzling to the Court since Mr. Kaczmarek was to be the

---

[62] Sigma Br., Kremer Certif., Ex. 4, May 16, 2017 email, Sub. Ex. 14, Dkt. No. 41. (Emphasis supplied).
[63] Lambert Decl., May 17, 2017 email, Ex. 8, Dkt. No. 51.

"key decision maker at Rising/Aceto" on these issues.  Further, it was Mr. Kaczmarek who invited

Dr. Spireas to meet to discuss the December 16, 2016 Letter and reminded him about it a month

later.  In any event, on May 23, 2017 (a week after Dr. Spireas' May 16, 2017 email), Mr.

Kaczmarek and Rajiv Hazaray ("Mr. Hazaray"), who both held high level positions with Aceto (as

well as Aceto email addresses), traveled to the Pennsylvania offices of Sigmapharm to meet with

Dr. Spireas and Mr. Kremer.[64]  In relevant part, Mr. Hazaray told the parties that Rising planned

to engage EisnerAmper ("Eisner") as outside accountants to address Rising's accounting issues.

Here, the parties vigorously dispute the extent of the work for which Rising/Aceto planned to

engage Eisner and whether Rising/Aceto promised to provide a copy of any Eisner report to

Sigmapharm.[65]

---

[64] Pls. Suppl. SUMF ¶¶ 79-80, Dkt. No. 50; Sigma's Resp. ¶¶ 79-80, Dkt. No. 58-2.  Emails attached to the December 21, 2018 Kremer Certification show Hazaray with an Aceto email address.  Sigma Br., Kremer Certif. ¶ 48, Ex. 4, Emails at Sub. Exs. 15, 16, Dkt. No. 41.  Mr. Kaczmarek is copied on a September 15, 2017 email from Eugene Hughes (of Rising) as "Walt KaczmarekAceto."  Sigma Br., Kremer Certif. ¶ 48, Ex. 4, Sub. Ex. 17, Dkt. No. 41.  Mr. Kaczmarek addressed Dr. Spireas on May 17, 2017 from WKaczmarek@aceto.com.  Sigma Br., Kremer Certif. ¶ 48, Ex. 4, Sub. Ex. 14, Dkt. No. 41.

[65] Pls. Suppl. SUMF ¶ 81, Dkt. No. 50; Sigma Resp. ¶ 81, Dkt. No. 58-2.  Sigmapharm asserts emphatically and repeatedly that it was promised a copy of a report prepared by Eisner.  See, e.g., Sigma Resp. to Pls. Suppl. SUMF ¶¶ 81-83, Dkt. No. 58-2, in which Sigma cites to Sigma Br., Kremer Certif. ¶¶ 58-68, Ex. 4, Dkt. No. 41, and to June-July 2017 email exchanges. Sigma Br., Exs. 15, 18-22, Dkt. No. 41.  But nowhere in these sources cited by Sigma do Plaintiffs offer to give Sigmapharm a copy of an Eisner report.  In addition, Rajiv Hazaray, who identified himself as "Senior Vice President of Strategic Planning and Development for **Aceto Corporation**" from February 2017 to December 2018, denies that he ever told Sigmapharm representatives that he would share any report by Eisner about Rising's accounting practices generally.  Hazaray declared:

> 7. As for EisnerAmper, I never told Sigmapharm that EisnerAmper was going to conduct an Audit of Rising's accounting. I also never told Sigmapharm that Rising would provide a copy of any report or findings from EisnerAmper relating to Rising's accounting practices generally or any findings relating to other partners besides Sigmapharm.

> 8. As I mentioned, I did promise to provide Sigmapharm with the results of work that addressed Sigmapharm's profit sharing specifically. That was Rising's recast for fiscal year 2017, which effort was conducted by Rising's Senior Vice President of Finance, Mr. Eugene Hughes, and his department, with the assistance of EisnerAmper. The recast covered Rising's profit-sharing payments to all of its partners, not just Sigmapharm. Rising provided Sigmapharm with the results of the recast as they related to Sigmapharm, in September 2017.

> 9. Separately, **Aceto's** management engaged EisnerAmper to conduct an initial review of Rising's gross-to-net payable processes generally. EisnerAmper provided a draft report of its review on August 18, 2017 (the "EA Draft Report"). I was not involved in these activities, including the finalization and execution of this engagement related to the EA Draft Report. To my knowledge, no one at Rising or Aceto ever considered sharing the EA Draft Report with any of Rising's partners,

Eugene Hughes ("Mr. Hughes") joined Rising on June 12, 2017 as Senior Vice President of Finance and was asked, as one of his first assignments, to "review and understand" the December 16, 2016 Letter.[66]  He was also to "recast" the profit sharing for fiscal year 2017.[67]  In his December 18, 2020 deposition, Mr. Hughes initially testified that he did not know why the Eisner report was never made final.[68]  He later testified (after a recess) that Rising could not or did not release the report because it contained confidential information relating to its other development partners.[69]  Plaintiffs argue that Rising/Aceto never offered (and was not obliged) to share with Sigmapharm a draft report that Eisner ultimately produced because it contained a general review of Rising's accounting practices rather than exclusively addressing its accounting practices under the Agreement.[70]   In any event, it is undisputed that Plaintiffs never produced to Sigmapharm any Eisner report (in draft or final form) or any related correspondence or communications with Eisner.  Instead, Sigmapharm received 4,164 pages of material directly from Eisner in response to Sigmapharm's subpoena.[71]  No explanation is offered by Plaintiffs as to why they did not produce any of the documents relating to Eisner's engagement and work, even though those documents obviously existed and relate to the disputes that are the subject of this litigation.

In its brief, Sigmapharm made a timeline of Rising's alleged laggardness in responding to the December 16, 2016 Letter and in producing Eisner's findings.[72]  But that timeline is slanted and disputed in various ways.  For example, Sigmapharm asserts that from December 17, 2016 to

---

including Sigmapharm. I never told Sigmapharm that I was going to share a copy of the EA Draft Report with it, nor did I ever hear anyone say that.

Hazaray Decl. ¶¶ 7-9, Dkt. No. 53 (emphasis supplied).  Thus, these are more disputed facts.

[66] Hughes Decl. ¶¶ 1, 7, Dkt. No. 52.

[67] Hughes Decl. ¶¶ 9, 20-26, 38, Dkt. No. 52.

[68] Lambert Decl., Dec. 18, 2020 Hughes Dep. 141:1-18, Ex. 3, Dkt. No. 51.  Both parties filed excerpts of the Hughes deposition; a complete copy of the Hughes deposition was furnished to chambers but apparently not docketed.  For simplicity, citations to the Hughes deposition are to Lambert Decl., Ex. 3, Dkt. No. 51.

[69] Lambert Decl., Dec. 18, 2020 Hughes Dep. 167:10-168:6, Ex. 3, Dkt. No. 51.

[70] Pls.' Br., at 12, Dkt. No. 48.

[71] Sigma Resp. to SUMF ¶¶ 4, 15, Dkt. No. 47.

[72] Sigma Br., at 18-21, Dkt. No. 47.

May 15, 2017, Rising/Aceto allegedly sat and remained "silent," but even according to Sigmapharm's submissions, there were at least some communications and exchanges of information between the parties during this period, including efforts to set up the meeting with Dr. Spireas, requests for information by Sigmapharm and the delivery of Rising's first quarter 2017 profit share report, as noted above. And May 16, 2017 was when *Sigmapharm* finally wrote back to Rising/Aceto to set up a meeting to discuss the December 16, 2016 Letter.[73] That meeting was promptly set up and took place on May 23, 2017, one week after Dr. Spireas' email. Thus, the questions as to who was "silent" and the reasons for any delays in responding (on both sides) are also in dispute.

(v)    Rising Pays Admitted Underpayment of More Than $9 Million

On September 15, 2017, representatives from Rising/Aceto and Sigmapharm again met via teleconference.[74] Rising/Aceto provided Sigmapharm with Eisner's preliminary findings, which indicated that, for fiscal year 2017 (July 1, 2016 through June 30, 2017), Rising/Aceto should have paid Sigmapharm $12,351,723 (later corrected to $12,629,930) but had paid only $3,564,490.32 (the "Prior Payments"), meaning Rising/Aceto owed Sigmapharm approximately $9,065,440.[75] After this disclosure, Rising/Aceto fully paid Sigmapharm the difference in installments (the "Additional Recast Payments") over a period of just over two months, as set forth below:

Prior Payments

| | | |
|---|---|---|
| $ | 2,226,868.78 | October 28, 2016 |
| $ | 1,337,621.54 | January 31, 2017 |
| **$** | **3,564,490.32** | **Subtotal** |

---

[73] *Id.*

[74] As to Sept. 15, 2017 meeting, Sigma SUMF ¶ 39, Dkt. No. 41-1; Pls. Resp. ¶ 39, Dkt. No. 49. As to Nov. 14, 2017 meeting, Pls. Suppl. SUMF ¶¶ 134-135, Dkt. No. 50; Sigma Resp. ¶¶ 134-135, Dkt. No. 58-2. The parties' representatives also met in person on September 21, 2017. Sigma Br., Kremer Certif. ¶¶ 69-73, Dkt. No. 41; Pls. Suppl. SUMF ¶ 112, Dkt. No. 50; Sigma Resp. ¶ 112, Dkt. No. 58-2.

[75] Pls. Suppl. SUMF ¶¶ 110, 111, 113, Dkt. No. 50; Sigma Resp. ¶¶ 110, 111, 113, Dkt. No. 58-2; Hughes Decl. ¶ 38, Dkt. No. 52. Rising's fiscal year ended on June 30. Hughes Decl. ¶ 8, Dkt. No. 52.

<u>Additional Recast Payments</u>

| | |
|---|---|
| $ 2,500,000.00 | August 29, 2017 |
| $ 3,500,000.00 | September 25, 2017 |
| $ 1,500,000.00 | October 13, 2017 |
| $ 1,565,440.00 | November 1, 2017 |
| **$ 9,065,440.00** | **Subtotal** |
| | |
| **$12,629,930.30** | **Grand total**[76] |

Rising characterized the three payments made in August, September and October 2017 as "good faith payments" while the accounting continued and then made a final "true up" payment on November 1, 2017.[77] The parties' representatives met again on November 14, 2017.[78] The November 14, 2017 meeting was attended by Kaczmarek, Hazaray, Hughes and others on behalf of Plaintiffs and Spireas, Kremer and others for Sigmapharm.[79] Thus, the parties' business relationship and their efforts to address the accounting/audit issues were continuing through at least this time, as contemplated by the Agreement, and no notice of breach had been provided as required by the Agreement. Instead, the parties continued to proceed under the terms of the Agreement, even though Sigmapharm claims that Plaintiffs were in breach of the Agreement since at least December 16, 2016.

The Parties also dispute the extent to which they cooperated through the first quarter of 2018 to address outstanding items. For instance, Mr. Hughes at Rising said: (i) that he prepared or presented "statement data"; and (ii) that he does not recall receiving Mr. Kremer's January 12, 2018 email request for new information, blaming other competing and pressing demands at the time.[80] Mr. Hughes also states that he asked Mr. Kremer on February 17, 2018 for a list of "open items," a request to which Mr. Kremer did not respond.[81] On February 17, 2018, Mr. Hughes sent

---

[76] Hughes Decl. ¶ 38, Dkt. No. 52.
[77] Hughes Decl. ¶ 38, Dkt. No. 52.
[78] Pls. Suppl. SUMF ¶ 134, Dkt. No. 50; Sigma Resp. ¶ 134, Dkt. No. 58-2.
[79] Hughes Decl. ¶¶ 30-31, Dkt. No. 52.
[80] Hughes Decl. ¶¶ 39-48, Dkt. No. 52 and Ex. 8.
[81] Hughes Decl. ¶¶ 39-48, Dkt. No. 52 and Ex. 9.

Mr. Kremer a quarterly statement for December 2017.[82]  Also on February 17, 2018,  according to

this email, Mr. Hughes wired Sigmapharm a payment of $1.3 million (for Q3-2017 and Q4-2017);

this sum actually included an overpayment, which Mr. Hughes said he would take as credit against

other invoices.[83]  Sigmapharm stated that it did not receive usable information from Rising during

this period as to the outstanding items it had requested on various occasions.[84]   Nonetheless,

Sigmapharm received and accepted the February 2018 payment and also received the related audit

report.  Here again, and at least to this extent, the Parties appeared to be continuing to operate

pursuant to the terms of the Agreement, without any proper notice of breach.

In sum, the parties dispute on virtually every level whether Rising/Aceto complied with

the Agreement's Audit requirements and Sigmapharm's related requests for information during

the entire period from at least the December 16, 2016 Letter to Sigmapharm's unilateral

termination of the Agreement on March 23, 2018.  What is not in dispute is that during this period,

(i) the Parties continued to perform under the Agreement (notwithstanding any deficiencies in

information or documentation); and (ii) Sigmapharm did not provide the written notice of breach

required by the Agreement.

**C.**  **Sigmapharm Sends the Termination Notice on March 23, 2018**

On Friday, March 23, 2018, Sigmapharm Chairman and CEO, Dr. Spireas, sent Steven S.

Rogers ("Mr. Rogers"), identified as Chief Legal Officer of Aceto Corporation/Rising

---

[82] Hughes Decl. ¶ 46; Feb. 17, 2018 email, Ex. 9, Dkt. No. 52.  Hughes also stated that, in January 2019, he prepared an audit package for the period April 1, 2016 through December 31, 2018, later updated through April 30, 2020. Hughes Decl. ¶ 58, Dkt. No. 52.
[83] Hughes Decl., Feb. 17, 2018 email enclosing Dec. 2017 quarterly statement and announcing that he had wired $1.3 million to Sigmapharm's account that morning, Ex. 9, Dkt. No. 52.  On November 1, 2017, Plaintiffs also appear to have paid an additional $1,392,293 that is not specifically included in the "Grand Total" above, and it is unclear whether this payment is different from the $1.3 million wired on February 17, 2018.  Hughes Decl. Ex. 4, Nov. 1, 2017 email from Hughes to Kremer referencing a $1,392,293 payment for Q1-2018, Ex. 4, Dkt. No. 52; Pls.' Suppl. SUMF ¶ 130, Dkt. No. 50.  Sigma made a non-substantive objection to this statement and primarily asserted that any payments made by Rising were "feigned good faith efforts to resolve Rising/Aceto's material breaches."  Sigma Resp. to Pls.' Suppl. SUMF ¶¶ 109, 123, 128, 130, Dkt. No. 58-2.
[84] Sigma Resp. to Pls.' Suppl. SUMF ¶¶ 142-148, Dkt. No. 58-2.

Pharmaceuticals, Inc., a letter titled "Notice of Termination" (the "Termination Letter").[85]   The

text of that Letter stated in full:

> Please be advised that [Sigmapharm] hereby terminates for cause the
> entirety of the Master Product Development and Collaboration Agreement between
> Sigmapharm and [Rising], dated June 22, 2006 ("Agreement"), as it applies to each
> and every drug product covered by said Agreement.

> [Rising] has failed to cure the material breaches of its contractual
> obligations to Sigmapharm outlined in Sigmapharm's **notice of breach** dated
> December 16, 2016, despite Sigmapharm's **repeated reminders** from said date to
> the November 14, 2017 meeting of the parties at Sigmapharm's offices.[86]

On Monday, March 26, 2018, Mr. Rogers of Rising responded by:   (i) rejecting

Sigmapharm's position that Rising had breached the Agreement; and (ii) at least impliedly

rejecting Sigmapharm's March 23, 2018 Termination Letter as a proper termination of the

Agreement.[87]   Rogers' March 26, 2018 responsive letter stated in full:

> I am in receipt of your purported Notice of Termination dated March 23, 2018 and
> hereby reject same.

> Rising did not breach the Agreement.   To the extent that Sigmapharm alleged
> purported breaches, it failed to act in good faith to resolve open issues.

> If Sigmapharm wishes to discuss consensual termination of the Agreement, please
> contact **Walt Kaczmarek at WKaczmarek@aceto.com** or (201) 961-4310.[88]

As noted previously, the December 16, 2016 Letter did not use the words "notice,"

"breach," "termination," "default" or give Rising an opportunity to cure, nor was it sent as an

Extraordinary Notice.   Yet, the Termination Letter refers to the December 16, 2016 Letter as a

"notice of breach."   Besides being the very first time Sigmapharm referred to the December 16,

2016 Letter as a "notice of breach," the Termination Letter demonstrates that Sigmapharm knew

how to use those words when that was what it intended.   As to the asserted "repeated reminders,"

---

[85] Lambert Decl., Mar. 23, 2018 letter, Ex. F, Dkt. No. 17-2.
[86] Lambert Decl. Mar. 23, 2018 letter, Ex. F, Dkt. No. 17-2 (emphasis supplied).
[87] Sigma Br., Mar. 26, [2018] letter, Ex. 50, Dkt. No. 47.
[88] Sigma Br., Mar. 26, [2018] letter, Ex. 50, Dkt. No. 47 (emphasis supplied).

no document has been presented by Sigmapharm that constitutes the notice of breach required by the Agreement (or that even used the word breach) during the fifteen-month period from the December 16, 2016 Letter to the March 23, 2018 Termination Letter.

The Termination Letter was at least sent in the manner required for an Extraordinary Notice (by Federal Express), but without giving Rising/Aceto the prior notice and opportunity to cure required under the Agreement.  Instead, on that very same day, March 23, 2018, Sigmapharm commenced litigation against Plaintiffs in the Eastern District of Pennsylvania, as described in the next section.  Plainly, Sigmapharm was making preparations to send the Termination Letter at the same time it was preparing its Complaint against Rising/Aceto.

### D. Sigmapharm Commences the District Court Litigation, Which Is Referred to Arbitration

On March 23, 2018, the same day that the Termination Letter was sent, Sigmapharm filed a five-count Complaint against Rising and Aceto in U.S. District Court for the Eastern District of Pennsylvania, Dkt. No. 2:18-cv-1238 (the "District Court Action" or the "Pa. Complaint") for the following relief:

(i)     declaratory and injunctive relief (declaring the Agreement terminated and ordering turnover of product and other rights to Sigmapharm);

(ii)    breach of contract;

(iii)   promissory estoppel/detrimental reliance;

(iv)    unjust enrichment/quantum meruit; and

(v)     common-law fraud.[89]

Specifically, Count I of the Pa. Complaint sought the following declaratory and injunctive relief (identified by the paragraph of the Complaint in which the demand appears):

---

[89] Sigma Answer, Mar. 23, 2018 Pa. Compl., Ex. A, Dkt. No. 5.

132.    finding that Rising/Aceto are in material breach of the Agreement for their
reporting and performance and ordering up-to-date source information regarding
their reporting;

133.    ordering an audit;

134.    finding that Rising/Aceto are in material breach of their marketing and distribution
obligations and ordering all rights under the Agreement immediately returned to
Sigmapharm;

135.    finding that the Agreement has been terminated;

136.    finding that Sigmapharm is the sole owner of the Sigmapharm Products; related
ANDAs; all other marketing and distribution rights and ordering their turnover to
Sigmapharm for $1.[90]

In the District Court Action, Plaintiffs moved on May 25, 2018 to stay proceedings and to

compel arbitration.[91]    Shortly thereafter, Sigmapharm filed a separate motion on June 8, 2018 to

compel an audit.[92]    On October 26, 2018, Judge Eduardo C. Robreno, Jr., Eastern District of

Pennsylvania, entered an Order (with a statement of reasons) that granted Rising's motion to stay

the District Court Action and ordered the parties to arbitration, based on the "plain language" of

the Agreement at § 2.2.2 that required the parties to settle their disputes through arbitration.[93]    The

District Court rejected Sigmapharm's characterization of its demands for an audit and declaration

of property rights as "interim or provisional."    Instead, the District Court determined that those

demands "would necessarily touch on the merits of Sigmapharm's claims, which must be decided

by the arbitrator per the terms of the Agreement" and were not amenable to separate treatment.[94]

The District Court denied Sigmapharm's request for an audit, without prejudice to the arbitration,

but also directed Rising to preserve records that could be relevant to an audit, a requirement that

---

[90]Sigma Answer, Mar. 23, 2018 Pa. Compl., Ex. A, Dkt. No. 5.
[91] May 25, 2018 Mot., E.D. Pa. Case No. 18-1238, Dkt. No. 11.
[92] June 8, 2018 Mot., E.D. Pa. Case No. 18-1238, Dkt. No. 13.
[93] Sigma Answer, Oct. 26, 2018 District Court Order, at 3, Ex. C, Dkt. No. 5.  On Mar. 6, 2019, Plaintiffs docketed
on the E.D. Pa. docket a "Suggestion of Bankruptcy" to stay the District Court proceedings.  E.D. Pa. Case No. 18-
1238, Dkt. No. 28.
[94] Sigma Answer, Oct. 26, 2018 District Court Order, Ex. C, Dkt. No. 5.

Sigmapharm has placed in issue in this case by alleging that the Debtors transferred at least some of their books and records relating to Sigmapharm to Shore Suven in violation of the District Court's Order and the Agreement.[95]

In the arbitration, Sigmapharm again moved for an audit, which the Plaintiffs appeared to contest, at least initially.[96]  While that motion was pending, Plaintiffs and their related Debtors filed for bankruptcy protection, staying the arbitration and audit motion.[97]

### E.  **The Debtors' Bankruptcy Filing**

(i)    The Sale of the Pharma Business to Shore Suven

The nine Debtors filed their voluntary Chapter 11 petitions on February 19, 2019.  The Bankruptcy Court entered an Order for Joint Administration on February 21, 2019.[98]  The Debtors promptly sold the smaller component of their business operated through Rising ("Pharma Business") to Shore Suven Pharma, Inc. ("Shore Suven") by Sale Order entered on April 10, 2019. The Pharma Business included Rising's relationship with Sigmapharm prior to this transaction, but (as is described below) the Agreement was not part of that sale.  The larger component of the Debtors' business -- described as Chem Plus Business -- was sold to NMC Atlas, L.P. by Sale Order entered on April 16, 2019.[99]

The sale of the Pharma Business to Shore Suven has indirectly impacted the ongoing discovery and document production dispute between the Plaintiffs and Sigmapharm.  The March

---

[95] Judge Robreno stated at the end of his statement of reasons: "As the Court previously discussed, the Court does, however, direct Defendants to preserve all records, 'which might arguably be relevant to the audit provision.'" *Total Car Franchising*, 2002 WL 34727053, at *16 (D.N.J. Mar. 28, 2002).  Sigma Answer, Oct. 26, 2018 District Court Order, Ex. C, Dkt. No. 5.

[96] Pls. Suppl. SUMF ¶ 154, Dkt. No. 50; Sigma Resp. to Pls. Suppl. SUMF ¶ 154, Dkt. No. 58-2.

[97] On Mar. 6, 2019, Plaintiffs docketed on the E.D. Pa. docket a "Suggestion of Bankruptcy" to stay the District Court proceedings.  E.D. Pa. Case No. 18-1238, Dkt. No. 28.

[98] Feb. 21, 2019 Order for Joint Administration, Main Dkt. No. 29.

[99] Apr. 10, 2019 Sale Order to Shore Suven Pharma, Inc. (purchase price was $12,306,304.36 minus certain credits), Main Dkt. No. 372; Apr. 16, 2019 Sale Order to NMC Atlas, L.P. (purchase price was $332,440,000 plus or minus certain adjustments), Main Dkt. No. 429.  To the extent that this summary conflicts with the Sale Orders, the Sale Orders control.

31, 2019 *Amended and Restated Asset Purchase Agreement* (the "Shore Suven APA") (attached

to the April 10, 2019 Shore Suven Sale Order) provided at § 1.1(i) that "all Books and Records"

of the Debtor-sellers were generally included in the Purchased Assets, except to the extent that

they related to an Excluded Asset or Excluded Liability (with other exceptions not relevant

here).[100]  Because the Agreement was not designated as one to be assumed and assigned to Shore

Suven, it was considered an Excluded Asset or Excluded Liability under the Shore Suven APA

and related Sale Order.[101]  Additionally, the Debtor-sellers' *Notices of Potential Assumption and*

*Assignment of Executory Contracts*, dated March 25, 2019 and April 4, 2019 with respect to sale

of the Pharma Business to Shore Suven do not include the Agreement.[102]

Sigmapharm asserts that the Shore Suven APA nowhere states that the Agreement and the

Books and Records relating to it are included in the sale.  Plaintiffs counter in response that the

sale of their Pharma Business to Shore Suven necessarily included the Books and Records relating

to the Agreement (without directly addressing the Pa. District Court's Order).  The following is

from Sigmapharm's SUMF with Plaintiffs' response below:

> 75.  Subsequently, with Court approval, Rising-Aceto sold its pharma business
> assets. (Rising-Aceto Bankruptcy Dkt. 372).

---

[100] Apr. 10, 2019 Shore Suven Sale Order, Mar. 31, 2019 Shore Suven APA § 1.1(i), Ex. A, Main Dkt. No. 372.  The Preamble to the Shore Suven APA identified the Sellers as:

> Rising Pharmaceuticals, Inc., a Delaware corporation ("Rising"), and the wholly-owned subsidiaries of Rising, PACK Pharmaceuticals, LLC, an Arizona limited liability company, Rising Health, LLC, a Delaware limited liability company, and Acetris Health, LLC, a Delaware limited liability company (collectively with Rising, "Sellers" and each, a "Seller").

The Preamble also identified "Aceto Corporation, a New York corporation" as the "Parent," "solely with respect to ARTICLE IV, Section 6.2(d), Section 6.13(a), Section 6.13(b), Section 6.13(c), Section 6.14, Section 6.18(a) and ARTICLE IX."
[101] Apr. 10, 2019 Sale Order ¶ 6; Shore Suven APA §§ 1.2(b) and § 1.4, Main Dkt. No. 372.
[102] Mar. 31, 2019 *Notice of Potential Assumption*, Main Dkt. No. 199; Apr. 4, 2019 *First Supplemental Notice of Potential Assumption*, Main Dkt. No. 338.  The Sept. 27, 2019 *Notice of Filing of Third Plan Supplement* includes an additional assigned contract, but not this Agreement.  Main Dkt. No. 1038.  The March 31, 2019 Shore Suven APA attached to the Apr. 10, 2019 Sale Order does not appear to include or contain a final list of assumed and assigned contracts.  Apr. 10, 2019 Sale Order, Mar. 31, 2019 Shore Suven APA, Ex. A, Main Dkt. No. 372.

RESPONSE: Plaintiffs admit that on April 10, 2019, the Court entered its [Shore Suven Sale Order], which speaks for itself.

76. Nowhere did that agreement reference the Sigmapharm business as included. It also expressly excluded the records relating to Sigmapharm.

RESPONSE: Plaintiffs dispute SUMF 76. It finds no support in the [Shore Suven APA], which is why Sigmapharm does not attempt to cite a provision in the APA or anything else for that matter.

Rising's obligation to pay pricing concessions and adjustments *to customers* —which are the charges that Sigmapharm can audit—arises from Rising's contracts *with its customers*, not Rising's Agreement with Sigmapharm. As Sigmapharm concedes, Shore Suven bought Rising's generic pharmaceutical business. (SUMF 75.) Obviously, then, Shore Suven assumed Rising's contracts with customers and the obligations thereunder, including Rising's obligation to pay its customers any pricing concessions and adjustments resulting from Rising's sale of products manufactured by Sigmapharm. (See, e.g., Bankruptcy Case, ECF No. 199) (emphases in original).[103]

As a consequence of the Orders entered on discovery motions while these summary judgment motions were pending (which are discussed in more detail below), Plaintiffs indicated that they would work with Shore Suven to identify and provide to Sigmapharm the documents and information necessary to perform the audit, including original or source documents to the extent available.[104]

(ii)    The Filing of Sigmapharm's Proofs of Claim and This Adversary Proceeding

Two significant events occurred on July 18, 2019 in the bankruptcy cases:

As the first event, Sigmapharm timely filed identical proofs of claim for **$37,840,800.97** in the bankruptcy cases of Aceto (Claim No. 155-2) and of Rising (Claim No. 162-1).[105]  Each Claim

---

[103] Pls.' Resp. to Sigma SUMF ¶¶ 75, 76, Dkt. Nos. 41-1 and 49.

[104] June 7, 2021 *Order on Sigmapharm Laboratories, LLC's Motion to Enforce the Audit Requirements of the Agreement*, Dkt. No. 64 (which requires Plaintiffs to produce to Sigmapharm the documents and information identified by Sigmapharm's expert as necessary to conduct the audit, to the extent they exist and are in Plaintiffs' control, and to advise Sigmapharm of documents not in Plaintiffs' control); *see also* May 18, 2021 *Order on Defendant's Motion to Compel* (which requires Rising to explain damages it incurred with respect to liabilities that were assumed by Shore Suven). Dkt. No. 55.

[105] These Claims are not in the Claims Register maintained by the Bankruptcy Court.  The Claims were properly filed with the Debtor's retained Claims Noticing Agent, Prime Clerk, LLC, now known as Kroll Business Services, and are

was supported by (i) the Agreement; (ii) the October 26, 2018 District Court Order; and (iii) a

four-page narrative that described the damages sought.  The damages appear to include:

(1) actual underpaid profits of $1,109,491 through March 31, 2016 (an invoice already referenced above as part of the December 16, 2016 Letter), plus $154,728 interest;

(2) damages for CMS credits taken before they were paid, including $14,734 interest;

(3) $804,398 cost of the audit;

(4) $116,506 interest for the calculated but unaudited underpaid 2017 profits (Debtor having already paid the $9,065,440 principal balance due on the 2017 profits, *supra*);

(5) an estimated $524,394 in interest on an estimated $9.5 million in underpayment that Sigmapharm presumes will be disclosed for the April 1, 2016 through March 23, 2018 period based on a 16% error rate;

(6) total refund of $11.6 million in administrative fees paid under the Agreement (plus $1,480,402 interest) through the petition date;

(7) $745,588 in legal fees and costs;

(8) $37,602 in expert fees and costs;

(9) $856,158 for product destroyed rather than returned to Sigmapharm;

(10)  $251,989 in lost inventory;

(11)  $10 million in estimated lost revenue from other products that Sigmapharm would have developed and sold had Rising paid it on time.[106]

As the second event, Plaintiffs filed the instant nine-count Adversary Complaint for the

following relief:

(1)    objecting to Claim No. 155-2, which Sigmapharm filed against Aceto only;

(2)    seeking an estimate of Claim No. 155-2;

(3)    objecting to Claim No. 162-1, which Sigmapharm filed against Rising only;

(4)    seeking an estimate of Claim No. 162-1;

---

available on the public website for Prime/Kroll.  They appear in this Adversary Proceeding as Exhibits to the initial Declaration of Reynold Lambert, Esq., Claim No. 155-2, Ex. H; Claim No. 162-1, Ex. K, Dkt. No. 17-2.
[106] Claim No. 155-2, Ex. H; Claim No. 162-1, Ex. K, Dkt. No. 17-2.

(5)    seeking declaratory judgment that Sigmapharm unlawfully terminated the
Agreement (on behalf of Rising only);

(6)    seeking damages for Sigmapharm's unlawful termination and breach of the
Agreement (on behalf of Rising only);

(7)    seeking damages for failure to return net profits of $9 million (on behalf of Rising
only);

(8)    seeking an Order allowing Rising to inspect and to audit Sigmapharm's books and
records under Agreement §§ 5.3.4 and 8.6 (on behalf of Rising only); and

(9)    seeking setoff of Plaintiffs' claims against Sigmapharm's claims (on behalf of both
Rising and Aceto).[107]

Sigmapharm filed an Answer and three-count Counterclaim on August 19, 2019:

(1)    the First Counterclaim is against Aceto only; incorporates by reference the following
three documents; and contains no other substantive text: [108]

(A) Sigmapharm Claim No. 155 against Aceto (not attached to Answer);

(B) the March 23, 2018 Pa. Complaint (Exhibit A to Answer); and

(C) September 20, 2018 document entitled *Respondent Sigmapharm Laboratories,
LLC's Counterclaims Against Rising Pharmaceuticals, Inc. and Claims Against
Aceto Corporation* under Case No. 01-18-2-4042, American Arbitration
Association (the "Arbitration Statement") (Exhibit B to Answer);

(2)    the Second Counterclaim is against Rising only; incorporates by reference Sigmapharm
Claim No. 162 (against Rising), the Pa. Complaint and the Arbitration Statement
referenced above; and contains no other substantive text; and

(3)    the Third Counterclaim is against Aceto and Rising; incorporates by reference the
above four documents (Claim Nos. 155, 162, the Pa. Complaint; and the Arbitration
Statement); and contains additional language requesting a record inspection and
audit.[109]

Debtor answered the Counterclaim on September 9, 2019.[110]

---

[107] Compl., Dkt. No. 1.
[108] Aug. 19, 2019 Answer and Counterclaim, Dkt. No. 5.  The Answer also included as Ex. C the October 26, 2018
Order of the District Court in E.D. Pa. Case No. 18-1238.
[109] Aug. 19, 2019 Answer and Counterclaim ¶¶ 121-30, Dkt. No. 5.
[110] Sept. 9, 2019 Answer to Counterclaim, Dkt. No. 6.

On August 13, 2019, Debtor filed a motion to estimate Sigmapharm's Claims at $0 for all purposes, including allowance and distribution.[111]   Sigmapharm cross-moved to have the claims temporarily allowed in full for distribution and voting purposes.[112]   After a hearing, the parties resolved the motion and cross-motion with a September 25, 2019 Stipulation and Consent Order that established a cash reserve of $1.9 million for the Sigmapharm Claim in Class 3A (General Unsecured Claims against Aceto) and estimated the Claim at $8.1 million for purpose of voting in Class 3B (General Unsecured Claims against Rising), without prejudice to future determination of the claims and without any present right to a distribution.[113]   That Stipulation and Consent Order left this Adversary Proceeding as the vehicle for the Plaintiffs and Sigmapharm to resolve their dispute and damage demands in the bankruptcy case.

(iii)   Discovery and Related Matters in the Adversary Proceeding

The parties entered an October 21, 2019 Joint Scheduling Order that established various discovery deadlines and an initial trial date.[114]   The Court held various case management conferences and entered three more Joint Scheduling Orders thereafter.[115]   The Court entered an April 8, 2020 Order that approved the parties' *Confidentiality Stipulation and Protective Order*.[116]

On August 18, 2020, Counsel for Sigmapharm sent Counsel for Plaintiffs a letter memorializing a July 30, 2020 conference on discovery issues.[117]   On the basis of (among other things) the last paragraph of that August 18, 2020 letter (and as elaborated below), Plaintiffs argue

---

[111] Aug. 13, 2019 Mot., Main Dkt. No. 842.
[112] Aug. 16, 2019 Cross Mot., Main Dkt. No. 859.
[113] Sept. 25, 2019 Stip. and Consent Order, Main Dkt. No. 1028.  The Bankruptcy Court confirmed the Debtor's Liquidating Plan by September 18, 2019 Order (after a September 17, 2019 hearing), Main Dkt. No. 996.
[114] Oct. 21, 2019 JSO, Dkt. No. 7.
[115] May 11, 2020 JSO, Dkt. No. 11; Oct. 8, 2020 JSO, Dkt. No. 14; Mar. 12, 2021 JSO, Dkt. No. 26.
[116] Apr. 8, 2020 Order on Stip., Dkt. No. 9.
[117] Lambert Decl., Aug. 18, 2020 letter, Ex. L, Dkt. No. 17-2.

that Sigmapharm has abandoned any fraud claim, which Plaintiffs assert is not available in any event in this contract action.[118]  On August 18, 2020, Counsel for Sigmapharm wrote:

> Although you refer to Topic 23 at the end of your letter, it was my understanding that Rising/Aceto will advise us if they still need a witness to testify as [to] the factual basis for price fixing and fraud allegations **because Sigmapharm did not assert a fraud claim in the bankruptcy action.** (Emphasis supplied).[119]

(iv)    The Kremer Deposition

Mr. Kremer gave a deposition on November 11, 2020 and testified at length about various issues germane to these motions.[120]   As noted above, Mr. Kremer testified that he joined Sigmapharm on February 2, 2015 as controller and was promoted to Director, Vice President of Finance and finally Vice President of Administration and Finance.[121]  Mr. Kremer acknowledged that Rising paid in full (but tardily) the $9,065,430 underpayment for 2017 described above.[122]  As to the demand for interest on these payments, Mr. Kremer acknowledged both (i) that he was not sure whether the Agreement allowed for such interest but that he used an interest rate that Counsel gave him; and (ii) that Sigmapharm did not demand this interest until after Sigmapharm terminated the Agreement.[123]

When asked to justify Sigmapharm's demand for $745,000 in legal fees and costs and $37,000 in expert fees and costs, Mr. Kremer referred (impliedly) to that section of the Agreement that allows fee shifting for "costs of audits" if the "results of an audit are greater than a five percent variance," while also acknowledging that results of an "audit" that Mr. Kremer provided in December 2016 showed less than five percent (5%) variance (but disputing that any complete audit

---

[118] Pls.' Br., at 16, Dkt. No. 17.
[119] Lambert Decl., Aug. 18, 2020 letter, at 2, Ex. L, Dkt. No. 17-2.  It is not clear to what Lambert letter Mr. Myers refers.
[120] Lambert Decl., Nov. 11, 2020 Kremer Dep., Ex. B, Dkt. No. 17-2.
[121] Lambert Decl., Nov. 11, 2020 Kremer Dep. 21:4-21; 67:17-21, Ex. B, Dkt. No. 17-2.
[122] Lambert Decl., Nov. 11, 2020 Kremer Dep. 206:25-207:11, Ex. B, Dkt. No. 17-2.
[123] Lambert Decl., Nov. 11, 2020 Kremer Dep. 207:12-208:2, Ex. B, Dkt. No. 17-2.

existed).[124]  Mr. Kremer admitted that he was "not sure" whether audit fees and legal fees are synonymous and that he would have to look at the Agreement to determine whether it provided for legal fees.[125]

As to the damage demand for $251,989 in lost inventory, Mr. Kremer testified that Sigmapharm asked Rising to return inventory that had not been returned.[126]  However, the Agreement at §§ 12.5 and 12.5.3 provided that, upon a nonmutual termination of the Agreement, the remaining party could buy all the withdrawing party's rights in the Products, intangible and tangible (including inventory) for $1.[127]

When asked what products Sigmapharm was delayed or prevented from bringing to market because of the breach that it alleged against Rising (conduct that Sigmapharm alleged in Claim Nos. 155-2 and 162-1 cost Sigmapharm $10 million), Kremer could identify none:

> Q. Paragraph 16 [of the Itemization in support of each Claim] talks about lost revenues for products that Sigmapharm would have developed had Rising and Aceto made timely payment under the agreement. It goes on to say those damages are estimated in excess of $10 million.  What products are you talking about?

---

[124] Lambert Decl., Nov. 11, 2020 Kremer Dep. 212:6-213:14, Ex. B, Dkt. No. 17-2.
[125] Lambert Decl., Nov. 11, 2020 Kremer Dep. 213:5-14, Ex. B, Dkt. No. 17-2.
[126] Lambert Decl., Nov. 11, 2020 Kremer Dep. 213:18-214:18, Ex. B, Dkt. No. 17-2.
[127] Agreement § 12 was called "Term and Termination" generally.  Agreement § 12.5.3 provided generally:

> 12.5.3.  Generally.  If either Party terminates the Agreement other than by reason of Section 12.4 (mutual termination), the Party not in breach of the Agreement (the "Continuing Party") or the Remaining Party, as the case may be, may continue to develop, market and sell the Products and shall have the right to purchase the rights of the terminating Party (the "Non-Continuing Party") or the Withdrawing Party, as the case may be, in and to the Products.  The Non-Continuing Party or the Withdrawing Party, as the case may be, shall contemporaneously assign or license, as applicable, to the Continuing Party or the Remaining Party, as the case may be, the Non-Continuing Party's or Withdrawing Party's, as the case may be, proprietary rights needed by the Continuing Party or the Remaining Party, as the case may be, to continue to develop (or have made), import, market, distribute and sell the Products, including any SigmaPharm Technology and Rising Technology, as the case may be.  The assigned or licensed rights, as applicable, shall include, without limitation and as appropriate, Regulatory Approvals (including the ANDA), the trade names and the manufacturing rights, the good will related to the Products (approved and in various stages of development), accounts receivable, inventory and cash on hand from the sale of the Products.  **The purchase price of such rights shall be one dollar ($1.00) or as stipulated by the Parties in the Specimen Schedule for the Product.**  The purchased rights shall be held as agreed by the Continuing Party or Remaining Party, as the case may be, or failing agreement, shall be held on a joint basis.  The Non-Continuing Party or Withdrawing Party, as the case may be, shall provide the following paid up, perpetual licenses and shall make the following payments to the Continuing Party or Remaining Party, as the case may be [subsections (a) through (c) follow].  (emphasis supplied).

A. Sigmapharm is constantly working on developing new products. The costs associated with developing new products is substantial, even in a generic environment, especially for the products that we typically try and develop. I don't know the specific products but I know that there are a number of them where the development processes were delayed, in some cases were delayed to a point where we no longer would have the advantage of being the first generic to market, and therefore, we decided to stop developing those products.

Q. What products -- you couldn't bring to market, or were delayed in bringing to market because of payment issues with Rising. What are the names of those products?

A. I'd have to look at the specific products that we've discontinued in that, during that period. I don't have that on the tip of my tongue.

Q. Who would know that information?

A. That would be known by Dr. Spireas and also Dr. Basil Theopanopoulos, who is the vice-president of R&D.

Q. This goes on to say, those damages are estimated in excess of ten million dollars. Do you know what that's based upon?

A. Having seen historically what some of these products can produce, especially during the first six months of exclusivity, which is really the primary objective of generic pharmaceutical companies, and estimating that it could have been at least ten million dollars.

Q. Can you point me to any document, any documentary proof that suggests that you were not able to bring a new product to market because of payment issues with Rising? I've read through your production of documents and it ain't there as far as I can see.

MR. SIEDZIKOWSKI: Objection to your comment.

A. Well, I'd have to look at what are the relevant processes during this time period and determine those products that we opted to discontinue research and then I could provide that information.[128]

In Sigmapharm's voluminous submissions in connection with these Motions, no further

information, documents, or specifics are provided with respect to this $10 million claim. In fact,

---

[128] Lambert Decl., Nov. 11, 2020 Kremer Dep. 217:11-219:10, Dkt. No. 17-2.

Sigmapharm cites to this same conclusory and speculative testimony as the only support for its $10 million claim.[129]

(v)   The Audit Motion and the Summary Judgment Motions

In the adversary proceeding, on December 23, 2020, Sigmapharm filed a motion to compel an audit (the "Audit Motion"), and on January 11, 2021, the Plaintiffs filed this Motion for Partial Summary Judgment.[130]   Before Sigmapharm filed any objection to the Plaintiffs' Summary Judgment Motion, the parties entered a January 22, 2021 Joint Mediation Order that appointed a former New Jersey District Court judge as Mediator.[131]   The Audit Motion and Partial Summary Judgment Motion were held in abeyance pending the results of the mediation.   The Mediator reported on February 23, 2021 that the parties had not reached a settlement.[132]   As a result, on March 8, 2021, Sigmapharm docketed a Notice of Intent to pursue the Audit Motion (effectively a request for the Court to reschedule the Audit Motion after settlement negotiations failed).[133]   The Notice of Intent included the partial December 18, 2020 deposition transcript of Rising's Eugene Hughes.[134]

Sigmapharm stated in its Notice of Intent that it had learned from the Hughes deposition that Shore Suven, the asset-purchaser under the April 10, 2019 Sale Order, may have acquired certain books and records relating to the Agreement, which Sigmapharm believed were excluded

---

[129] Sigma's Resp. to Pls.' SUMF ¶¶ 24-25, Dkt. No. 47 (in response to Plaintiffs' statements that Sigmapharm had produced no discovery to support its claim for $10 million in lost profits, Sigmapharm cites to those sections of the Kremer Deposition quoted above).

[130] Dec. 23, 2020 Audit Mot., Dkt. No. 16; Jan. 11, 2021 Mot. for Partial Summary Judgment, Dkt. No. 17. The partial summary judgment is complex but is also specifically targeted. The Motion (and form Order) seek to disallow Claim No. 155-2; to liberate the $1.9 million cash reserve; to modify Claim No 162-1 (generally eliminating the claims for other than underpaid profits); to find that Sigmapharm did unlawfully terminate the Agreement; and to disallow and dismiss with prejudice all claims pleaded by Sigmapharm sounding in fraud, unjust enrichment, and promissory estoppel, including without limitation Counts III, IV, and V asserted in the Pa. Complaint to the extent such claims have been incorporated by reference in the Counterclaims.

[131] Jan. 22, 2021 JMO, Dkt. No. 20.

[132] Feb. 23, 2021 Mediation Report, Dkt. No. 24.

[133] Mar. 8, 2021 Sigmapharm Notice of Intent, Dkt. No. 25.

[134] Mar. 8, 2021 Sigmapharm Notice of Intent, Dec. 18, 2020 Hughes Dep., Ex. 1, Dkt. No. 25.

from the sale.[135]   Based on that information, Sigmapharm served a March 2, 2021 Subpoena on

Shore Suven for production of the allegedly transferred books and records, a Subpoena which

Plaintiffs promptly moved to quash, as joined in by Shore Suven.[136]   Sigmapharm then filed its

own Summary Judgment Motion on April 2, 2021.[137]

On April 22, 2021, the Court heard and resolved a sequence of four discovery motions and

one discovery cross-motion (denying only the cross-motion by Sigmapharm to compel purchaser

Shore Suven to answer Sigmapharm's Rule 45 subpoena).[138]   Three Orders on the April 22, 2021

motions and cross-motion were entered on May 18, 2021.[139]   The Court entered a fourth Order on

June 7, 2021 granting Sigmapharm's motion to enforce the audit requirements under the

Agreement.[140]   A fifth Order was entered on June 10, 2021 resolving prior, outstanding discovery

---

[135] Mar. 8, 2021 Sigmapharm Notice of Intent, at 1-2, Dkt. No. 25; Apr. 10, 2019 Sale Order, Main Dkt. No. 372.  The Shore Suven APA § 1.2 ("Excluded Assets") defined assets excluded from the sale and said in most relevant part (for these purposes) at (f):

> (f) all Organizational Documents, minute books, stock ledgers, member transfer books, corporate seals and stock certificates of each Seller and other similar Books and Records that a Seller is required by Law to retain or that a Seller determines are necessary or advisable to retain, including Tax Returns, financial statements and corporate or other entity filings . . . .

Apr. 10, 2019 Sale Order, Shore Suven APA, Ex. A, Main Dkt. No. 372.
[136] Lambert Decl. in support of Quash Motion, Mar. 2, 2021 Subpoena, Ex. A, Dkt. No. 28-2.  The Subpoena contains only six line items which are nonetheless directed to Sigmapharm transactions.
[137] Sigma Mot., Dkt. No. 41.
[138] The four discovery motions and one discovery cross-motion (with filing dates) were:

| Dkt. No. 16 | Sigmapharm Laboratories, LLC's motion to enforce the audit requirements of the Agreement (12/23/20) |
| Dkt. No. 28 | Plaintiffs' motion to quash subpoena or, alternatively, for protective Order barring Sigmapharm from enforcing subpoena (3/16/21) |
| Dkt. No. 30 | Sigmapharm's cross-motion to compel compliance with subpoena directed to Shore Suven Pharma, Inc. (3/19/21) |
| Dkt. No. 29 | Sigmapharm's motion to compel deposition of representative of Kavod/Rising (3/19/21) |
| Dkt. No. 31 | Plaintiffs' motion to compel production of documents (3/19/21) |

[139] May 18, 2021 Order granting Plaintiffs' motion to quash Sigma's subpoena on Shore Suven and denying Sigma's cross-motion to compel (both without prejudice), Dkt. No. 54; May 18, 2021 Order granting in part and denying in part Sigma's motion to compel deposition (specifically compelling answers to limited interrogatories and denying the balance of the motion), Dkt. No. 55; May 18, 2021 Interim Order on Plaintiffs' motion to compel document production, Dkt. No. 56.
[140] June 7, 2021 Order on Sigma's motion to enforce the audit requirements of the Agreement, Dkt. No. 64.

issues.[141]    As a result, further proceedings in this case, including trial, are necessarily being

continued while the audit and related document productions are taking place.[142]

## IV.    THE REQUESTS FOR RELIEF ON THESE MOTIONS

In its motion for partial summary judgment, Plaintiffs made the following five requests for

relief.   The corresponding five decretal paragraphs of Plaintiffs' form Order for Summary

Judgment are, in some places, more precise and match the Plaintiffs' argument to the appropriate

Count of the Adversary Complaint or Counterclaim:

(1) The Court should enter summary judgment declaring that Sigmapharm's March 23, 2018 Notice of Termination of the Agreement was unlawful because Sigmapharm (*inter alia*) failed to give proper notice of the breach and termination or opportunity to cure, with the resulting damages to be determined at trial.   This argument corresponds to decretal ¶ 2 of the form Order, which would grant summary judgment on **Count 5** of the Complaint, declaring that Sigmapharm unlawfully terminated the Agreement;

(2) The Court should enter summary judgment declaring that Sigmapharm breached the Agreement for essentially the same reasons.   This argument corresponds to decretal ¶ 3 of the form Order, which would grant summary judgment on **Count 6** of the Complaint as to Sigmapharm's liability only for breach of the Agreement with damages to abide further proceedings;

(3) The Court should enter summary judgment dismissing (with prejudice) Sigmapharm's Counterclaims I and III against parent company Aceto Corporation because Aceto was not a party to the Agreement.   These Counterclaims incorporate Claim No. 155-2, the Pa. Complaint, the Arbitration Statement and demand an audit.   Upon the dismissal of all claims against Aceto, Sigmapharm asks the Court to release the $1.9 million cash reserve established under the September 27, 2019 Stipulation and Consent Order.[143] This Argument corresponds to decretal ¶¶ 4 and 5 of the form Order.

(4) The Court should enter summary judgment dismissing with prejudice certain specific elements of Sigmapharm's Counterclaims I, II and III, which are contrary to law or contradicted by the record.   These include the following damages asserted (by paragraph) in Claim No. 162-1 and are memorialized in decretal paragraph ¶ 6 of the form Order:

---

[141] June 10, 2021 Order resolving Plaintiffs' motion to compel the production of documents, Dkt. No. 67.

[142] The prior Joint Scheduling Order, entered on Mar. 12, 2021, scheduled trial for Sept. 29, 2021, a date which will necessarily be continued while the audit and related proceedings take place and the Parties conduct the related expert discovery.  June 7, 2021 Order ¶ 7, Dkt. No. 64.

[143] Sept. 27, 2019 Stip. and Consent Order ¶ 2, Main Dkt. No. 1028; Counterclaim II is against Rising only, and a portion of Counterclaim III is against Rising.  Aug. 19, 2019 Answer and Counterclaim, Dkt. No. 5.

- interest on allegedly late payments, asserted in Claim No. 162, ¶¶ 6, 7, 9, 10, 11;
- audit costs, Claim No. 162, ¶ 8;
- disgorgement of $11.6 million administrative fees paid to Rising under the Agreement, Claim No. 162, ¶ 11;
- legal fees and costs, Claim No. 162, ¶ 12;
- expert fees and costs, Claim No. 162, ¶ 13;
- claims contingent on the validity of the termination of the Agreement, Claim No. 162, ¶¶ 14-15;
- $10 million lost revenue, Claim No. 162, ¶ 16;

(5) The Court should enter summary judgment dismissing Sigmapharm's claims for fraud, unjust enrichment and promissory estoppel, which Sigmapharm did not properly plead in its Counterclaims pursuant to Fed. R. Bankr. P. 7008 / Fed. R. Civ. P. 8 but apparently attempted to include in its Counterclaims by incorporating other pleadings by reference, including without limitation Pa. Complaint Counts III, IV and V. This argument corresponds to decretal ¶ 7 of the form Order.[144]

On its motion for summary judgment, Sigmapharm seeks dismissal of Plaintiffs' Adversary

Complaint in its entirety, arguing that:

(1) Rising/Aceto materially breached the Agreement by failing to comply with its audit provisions, and that Sigmapharm properly terminated the Agreement based on that breach;

(2) Rising/Aceto and Aceto's material breaches of the Agreement preclude their attempt to seek remedies under it;

(3) Rising/Aceto failed to produce admissible source documents supporting their claim for damages and the audit packages prepared by Rising are inadmissible summaries and, as a result, Plaintiffs have no evidence to support their affirmative claims against Sigmapharm;

(4) Rising/Aceto failed to invoice Sigmapharm for any claimed damages as the Agreement requires.

## V.    LEGAL ANALYSIS

### A.  Summary Judgment Standard under Fed. R. Bankr. P. 7056 / Fed. R. Civ. P. 56

Summary judgment under Fed. R. Civ. P. 56 (which is fully incorporated into Fed. R.

Bankr. P. 7056) may be granted when the Court, viewing the facts in the light most favorable to

---

[144] Pls.' form Order on Motion for Partial Summary Judgment, Dkt. No. 17-22.

the nonmoving party, finds that there is no genuine issue of material fact, so that the moving party is entitled to judgment on particular claims as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); Fed. R. Bankr. P. 7056, Fed. R. Civ. P. 56(a). "A fact is material when its resolution 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Justofin v. Metropolitan Life Ins. Co.*, 372 F.3d 517, 521 (3d Cir. 2004) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden of demonstrating that there are no genuine issues of material fact. *Celotex Corp.*, 477 U.S. at 323-24; *Knauss v. Dwek*, 289 F. Supp. 2d 546, 549 (D.N.J. 2003). The burden then shifts to the nonmoving party to "present evidence establishing that a genuine issue of material fact exists, making it necessary to resolve the difference at trial." *Id.* The nonmoving party must "make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Cardenas v. Massey*, 269 F.3d 251, 254-55 (3d Cir. 2001), citing *Celotex Corp.*, 477 U.S. at 322.

Inferences and facts should be construed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Sempier v. Johnson & Higgins*, 45 F.3d 724, 727 (3d Cir.), *cert. denied*, 515 U.S. 1159 (1995). However, parties opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita, supra,* 475 U.S. at 586. The nonmovant may not rely on mere allegations but must present actual evidence raising a genuine issue of material fact. *Anderson,* 477 U.S. at 248, 249.

At summary judgment "the judge's function is not to weigh the evidence and determine the truth of the matter, but rather to determine if there is a genuine issue for trial." *Josey v. John R. Hollingsworth Corp.,* 996 F.2d 632, 637 (3d Cir. 1993). Use of summary judgment in bankruptcy

adversary proceedings is looked upon favorably as an efficient means to preserve limited estate assets. It "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.,* 477 U.S. at 327 (quoting Fed. R. Civ. P. 1). Nevertheless, "[i]ssues such as intent and credibility are rarely suitable for summary judgment." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).

At this point, the Court will address the SUMF submitted by the parties and note that while Sigmapharm objects to many of Plaintiffs' SUMF, it also does not directly address or properly dispute or deny many of them. Instead, it adds lengthy explanations or objections and, at times, fails to cite to specific portions of the record that dispute the precise facts asserted by Plaintiffs. These are not proper responses or sufficient to preclude summary judgment. D.N.J. LBR 7056-1. *See Barker v. Our Lady of Mt. Carmel Sch.*, 2016 WL 4571388 at *1 n.1 (Bankr. D.N.J. Sept. 1, 2016), *appeal dismissed*, 2017 WL 4117344 (D.N.J. July 26, 2017) ("Several times in Plaintiffs' responsive statement of material facts, they dispute Defendants' allegations but do not cite to any evidentiary support, add additional facts but do not contest the asserted proposition, or assert arguments and legal analysis, not facts [citations omitted]. Those are not valid disputes of fact, so Defendants' allegations are deemed undisputed where that occurs"); *see also Webster v. Dollar Gen. Inc.*, 197 F. Supp. 3d 692, 696 n.5 (D.N.J. 2016) (citing same principles and holding that improperly supported or irrelevant information must be disregarded). Also, in certain instances, Plaintiffs seem to rely on the specific language of a Sigmapharm SUMF (e.g., source data or auditable information) to avoid directly addressing the substance of Sigmapharm's SUMF. These standards are being applied in determining whether disputed issues of material fact preclude summary judgment on all or any portion of these Motions.

**B. The December 16, 2016 and March 23, 2018 Letters Do Not Constitute Proper Notice of Breach or Termination under §§ 12.2 and 14.4.2 of the Agreement**

(i)   The December 16, 2016 Letter Was Not a Proper Notice of Breach, Nor Did Any Subsequent Communications by Sigmapharm Constitute Proper Notice of Breach

The "Termination for Cause" provision of the Agreement at § 12.2 required the aggrieved party to give the other "written notice of such [material] breach," followed by written notice of termination, if the party in breach did not cure within ninety days of the first notice, with the possibility of a second ninety day grace period if the party in breach showed due diligence during the first ninety day period.[145]  For the breach to give rise to possible "Termination for Cause" (as is alleged here by Sigmapharm), the breach had to be "material."[146]   Although the Agreement at § 12.2 does not require any "magic" language for the notice of breach (as is argued by Sigmapharm), it does require at a minimum that notice of the alleged material breach be provided. The December 16, 2016 Letter did not do so.

This issue is ripe for summary judgment because it is undisputed -- and indisputable -- that the December 16, 2016 Letter contains **no** language of "notice," any material "breach" or "termination," nor does it refer to any cure period.[147]  The December 16, 2016 Letter also fails to specifically identify the provision or provisions of the Agreement that were breached and therefore were required to be cured.[148]  The reference line of the letter was "Review of Profit Share Payment Support"; the reference line on the cover email was "Profit Share Calculation Audit/Review."  The cover email invites Mr. Licata to discuss the items described in the letter, rather than indicating

---

[145] Lambert Decl., Agreement § 12.2, Ex. A, Dkt. No. 17-2.
[146] *Id.*
[147] See Pls.' SUMF ¶¶ 12-14, Dkt. No. 17-1. Sigmapharm itself asserts that it properly terminated the Agreement and is entitled to summary judgment dismissing Plaintiffs' claims against it based on the same record now before the Court. Sigma Br. at 2, 5, Dkt. No. 41. Thus, both parties have argued that the termination issue should be decided on summary judgment.
[148] However, in its Pa. Complaint, filed on March 23, 2018, Sigmapharm specified that the Audit provision was breached.  Answer, Mar. 23, 2018 Pa. Compl. ¶¶ 38-41, 48-49, 67-68, 97, Ex. A, Dkt. No. 5.

there was any breach.[149]  Further, the profit share audit/review was expressly contemplated by the Agreement.[150]  Thus, the audit/review was not a breach, but a process undertaken pursuant to the Agreement.  Consistent with this continuing review and process, Mr. Kremer closed the December 16, 2016 Letter by thanking addressee Peter Licata for his "assistance with this historical review."[151]  That is also not notice of a breach; instead, it is an indication that the audit was undertaken and completed, as contemplated by the Agreement.

In fact, rather than identifying any breach, Mr. Kremer opens his December 16, 2016 Letter by stating he has "concluded" his review of the documents and information provided by Rising and lists the documents and information he received, including "source documents" such as an invoice and seven credit memos.[152]  Mr. Kremer does not, however, indicate in the December 16, 2016 Letter that Rising failed to provide any requested documents or information or much less give notice that any such failure gave rise to a breach of the Agreement.

In sum, Sigmapharm's claim that the December 16, 2016 Letter gave notice of Plaintiffs' breach of the Audit provision is simply not stated or reflected in that letter.[153]  Although Mr. Kremer said in his exhibits in support of the December 16, 2016 Letter that he had some difficulty reconciling Rising's calculations, he did not specifically (or generally) state that his concerns arose from Rising's failure to provide a proper audit, nor did he assert that any such difficulties or failures gave rise to any breach of the Agreement or even that he was unable to "conclude" his review because he did not have the necessary documents or information.[154]  Instead, the December 16, 2016 Letter reflects a communication in a longer series of communications (written and oral) that were undertaken pursuant to and as contemplated by the Audit provision.  These types of

---

[149] Lambert Decl., Dec. 16, 2016 Letter, and cover email, Exs. E, G, Dkt. No. 17-2.
[150] Lambert Decl., Agreement § 8.6, Ex. A, Dkt. No. 17-2.
[151] Lambert Decl., Dec. 16, 2016 Letter and cover email, Exs. E, G, Dkt. No. 17-2.
[152] Lambert Decl., Dec. 16, 2016 Letter, Ex. E, Dkt. No. 17-2.
[153] Lambert Decl., Dec. 16, 2016 Letter, Ex. E; Mar. 23, 2018 Letter, Ex. F, Dkt. No. 17-2.
[154] Lambert Decl., Dec. 16, 2016 Letter, Ex. E, Dkt. No. 17-2.

communications were an ordinary and necessary part of the parties' business relationship and the performance of the Agreement, none of which was conveyed as an Extraordinary Notice.  If there was an alleged breach of the Agreement, Sigmapharm was required to expressly state there was a breach in a writing and send it as an Extraordinary Notice.  It did none of that.

Similarly, the March 23, 2018 Termination Notice stated that Rising had failed to cure the "material breaches…outlined" in the December 16, 2016 Letter, despite "repeated reminders" by Sigmapharm.  But (as noted above) the December 16, 2016 Letter did not state that Plaintiffs failed to comply with the Audit provision of the Agreement or that, as a result, any breach of the Agreement -- material or otherwise -- had occurred.[155]  Nor does Sigmapharm cite to any of the "repeated reminders" that allegedly provided notice of the asserted breach.

Additionally, the method of delivery (via email) of the December 16, 2016 Letter was not one permitted under § 14.4.2 if it was intended as an Extraordinary Notice, as it was required to be if a notice of material breach.  That section permitted Extraordinary Notices to be made by recognized overnight delivery service or verified facsimile (among other methods), but not by email.  Finally, Mr. Licata, as Vice President of Finance, was not the correct notice party for a notice of breach, which the Agreement at § 14.4.2 required Sigmapharm to send "Attn.:  Mr. Ronald Gold, President."[156]

Sigmapharm does not dispute that a notice of material breach requires Extraordinary Notice or that it failed to comply with the Extraordinary Notice provision in providing its alleged notice of breach.[157]  Sigmapharm understandably argues that Mr. Gold was no longer at Rising in 2016, so it would not make sense to address the letter to him.  But the letter could easily have addressed Mr. Gold as President (or President generally) and/or been copied to other known parties and

---

[155] Lambert Decl., Mar. 23, 2018 Letter, Ex. F, Dkt. No. 17-2**.**
[156] Lambert Decl., Agreement § 14.4.2, Ex. A, Dkt. No. 17-2.
[157] Pls.' SUMF ¶ 5, Dkt. No. 17-1; Sigma Resp. ¶ 5, Dkt. No. 47.

delivered in the appropriate manner.  That said, if the addressee and method of delivery were the

only deficiencies in the December 16, 2016 Letter as a Notice of Breach, and the December 16,

2016 Letter expressly stated that Rising and/or Aceto were in material breach of the Agreement

and that the failure to timely cure the identified breach could result in termination of the

Agreement, the Court's analysis may have been different.  But the December 16, 2016 Letter did

not do so, and that failure is fatal to Sigmapharm's argument that it complied with the Agreement's

Notice provision.

In so ruling, the Court finds it relevant -- and telling -- that despite the omission of the

words "breach," "notice," "termination" and "cure" from its text and exhibits, Sigmapharm defines

the December 16, 2016 Letter as a "Notice of Breach" and uses that defined term numerous times

in its motion papers (Plaintiffs count "more than 130").  Further, in the Termination Notice,

Sigmapharm stated that the December 16, 2016 Letter was a "notice of breach."  But defining or

describing that letter as a Notice of Breach in the Termination Notice and in pleadings filed more

than a year later (starting in March 2018) does not somehow transform the December 16, 2016

Letter into a proper "Notice of Breach." Instead, Sigmapharm's repeated use of that defined term

demonstrates that Sigmapharm could easily have provided Rising/Aceto with a proper "Notice of

Breach" when the alleged breach occurred and that Sigmapharm knows how to use those words

when that is what it meant -- as it did in the Termination Letter.  Sigmapharm did not, however,

use any of those words in the December 16, 2016 Letter.

These words -- notice and breach -- are not "magic" but are necessary, as expressly and

specifically required by the Agreement, to put the other party on notice of the alleged breach, what

the breach is, how long the party has to cure the breach, and the dire consequences that will result

if it fails to do so, i.e., termination.[158]   In fact, Sigmapharm's "explanation" that it did not use the word "breach" in the December 16, 2016 Letter "in order not to be overly provocative" shows that it understood the import of using the "breach" language and intentionally did not do so.[159] Accordingly, this Court finds that the December 16, 2016 Letter did not satisfy or comply with the Notice provisions of the Agreement.

The same holding applies to any subsequent communications (and actions) that were alleged to be Notices of Breach or any of the alleged "repeated reminders" of that asserted Notice. Sigmapharm points to no writing -- sent as an Extraordinary Notice or otherwise -- that constitutes the Notice of Breach required under the Agreement during the fifteen-month period from the December 16, 2016 Letter to the Termination Notice.   In fact, no writings from Sigmapharm, starting with the December 16, 2016 Letter and continuing until the March 23, 2018 Termination Notice use the words breach or termination -- until the Termination Notice.   Additionally, the actions of the parties after the December 16, 2016 Letter in attempting to address the accounting/audit issues were expressly contemplated by the Agreement's Audit provision.   If Sigmapharm believed that Plaintiffs were in breach of that or any other provision of the Agreement such that the breach was material and could give rise to termination of the Agreement, it had to tell them so in writing as an Extraordinary Notice.   It did not.   As a result, Sigmapharm breached the Notice and Termination provisions of the Agreement when it terminated the Agreement on March 23, 2018 without the proper, required prior notice of breach.

---

[158] Interestingly, Sigmapharm asserted in its response to Plaintiffs' SUMF that drafts of the December 16, 2016 Letter were prepared months earlier (starting in July 2016) and reviewed by senior management and legal counsel, after previously claiming that lawyers were not yet involved.   Whether or not Sigmapharm's counsel was involved, the December 16, 2016 Letter could have simply said it was a Notice of Breach if that was what was intended.   Compare Sigma Resp. to SUMF ¶ 16, Dkt. No. 47 with Sigma Br., Sept. 4, 2019 Hr'g Tr. 41:18-42:5, Ex. 47, Dkt. No. 47.
[159] Sigma SUMF ¶ 26, Dkt. No. 41-1.

(ii)     <u>The Notice of Termination Was Improper for Similar Reasons</u>

On March 23, 2018, Dr. Spireas of Sigmapharm sent Steven S. Rogers, identified as Chief Legal Officer of "Aceto Corporation/Rising Pharmaceuticals, Inc.," a letter titled "Notice of Termination" that characterized the December 16, 2016 Letter as "notice of breach" and complained that Rising had not cured that breach from the December 16, 2016 Letter to the November 14, 2017 meeting, despite "repeated reminders."[160]  But (as noted above) none of the alleged "reminders" used the words "breach," "notice," "termination" or "cure," nor has Sigmapharm pointed to any writings that contained the required language (because there were none).[161]  Yet, despite these prior omissions, the Termination Notice refers to both "notice of breach" and "Notice of Termination," making the omission of these words from the prior correspondence more glaring.

In sum, Sigmapharm failed to provide Plaintiffs with the required prior notice of the alleged material breach of the Agreement that could give rise to its termination if not timely cured.  That failure, combined with Sigmapharm's subsequent defective termination of the Agreement, constitute breaches of the Agreement's Notice and Termination Provisions.

(iii)    <u>The Applicable Law</u>

The Agreement at § 14.9 provides that New Jersey law controls the interpretation of the contract in every event. [162]  New Jersey courts "enforce contracts based on the intent of the parties, the express terms of the contract, surrounding circumstances and the underlying purpose of the contract." *Cypress Point Condo Ass'n v. Adria Towers, LLC*, 226 N.J. 403, 415 (2016).  "[W]here the terms of a contract are clear and unambiguous there is no room for interpretation or construction and the courts must enforce those terms as written." *Karl's Sales & Serv., Inc. v.*

---

[160] Lambert Decl., Mar. 23, 2018 letter, Ex. F, Dkt. No. 17-2.
[161] Lambert Decl., Agreement § 14.4.2, Ex. A, Dkt. No. 17-2.
[162] Lambert Decl., Agreement § 14.9, Ex. A, Dkt. No. 17-2.

*Gimbel Bros. Inc.*, 249 N.J. Super. 487, 493 (App. Div.), *cert. denied*, 127 N.J. 548 (1991).  The Court finds that the applicable Notice and Termination provisions of the Agreement are clear and unambiguous and will enforce those terms as written.

Sigmapharm argues, mostly by repeatedly calling the December 16, 2016 Letter a Notice of Breach, that this letter was a sufficient Notice of Breach under the Agreement. But saying it is a Notice of Breach after the fact in motion papers does not transform the December 16, 2016 Letter into a proper Notice of Breach under the Agreement.  Sigmapharm also complains that, during the extended period in which it was seeking backup documentation for the Net Profits calculations, Rising delayed and ultimately refused to provide all the supporting documents that Sigmapharm requested pursuant to the Audit provision of the Agreement.  Sigmapharm also asserts that Rising reneged on its promise to provide Sigmapharm with a copy of the Eisner Report.

The Court acknowledges and understands Sigmapharm's argument that these asserted delays, diversions, and failure to produce supporting documentation may ultimately be determined to be breaches of the Agreement by Rising and/or Aceto, if proven.  However, the question of whether Rising/Aceto were in breach of the Agreement's Audit provision is separate and distinct from the question of whether Sigmapharm breached the Agreement's Notice provisions.  Just as significantly, the underlying facts as to the asserted breach of the Audit provision are disputed by Rising/Aceto in almost every respect as noted above and as further described in section C (i) below. Additionally, the Court has now ordered the audit Sigmapharm has long requested, but the results of that audit and Plaintiffs' response are all subject to further proceedings which are presumably being undertaken by the parties at this time and have not yet been presented to the Court.[163]  Thus, these inherently factual and disputed issues must be developed before any judgment -- summary

---

[163] June 7, 2021 *Order on Sigmapharm Laboratories, LLC's Motion to Enforce the Audit Requirements of the Agreement*, Dkt. No. 64.

or otherwise -- can be made as to whether Rising/Aceto was in breach of the Audit provisions of

the Agreement. As discussed above, that is an issue separate and apart from whether Sigmapharm

failed to properly terminate the Agreement.

In reaching its decision, the Court finds *In re 4Kids Entm't, Inc.*, 463 B.R. 610, 682, 685-

86 (Bankr. S.D.N.Y. 2011), cited by Plaintiffs, informative and persuasive. In that case, the Court

found inadequate as notice of breach a sequence of letters that did not "'objectively' put the

allegedly breaching party on 'notice that a cure period [is] being triggered' and that 'drastic legal

repercussions' will result from a failure to cure." *In re 4Kids*, 463 B.R. at 682, quoting *Gil Enters.,

Inc. v. Delvy*, 79 F.3d 241, 246 (2d Cir. 1996). "[T]he purpose [of a notice of breach or demand

for performance] is to alert the recipient that a cure period is running and that the failure to cure

could result in termination of the contract." *In re 4Kids*, 463 B.R. at 682-83. Those principles

apply with full force here as Plaintiffs were not "objectively" on notice of any alleged breach or

that the ninety day (or more) cure period was running and that, as a result, failure to timely cure

could result in termination.

Sigmapharm attempts to distinguish the *In re 4Kids* case by noting that it was decided after

trial. But in this Court's view, that distinction in the procedural posture of the cases makes no

substantive difference in determining whether the Notice and Termination provisions of the

Agreement have been breached in this case. Sigmapharm acknowledges that it did not use the

words "notice," "breach," "cure," "termination" in the December 16, 2016 Letter or thereafter, at

least until it sent the similarly improper Termination Notice on March 23, 2018. As a result, Rising

and/or Aceto were simply not on proper "notice" of the breach or the dire consequence that may

result -- termination -- if it did not timely cure any specific breach or breaches identified by

Sigmapharm (as none were). Nor was Rising on proper notice of the beginning of the ninety day

(or longer) period it had to cure the alleged breaches. As noted by the *In re 4Kids* court, that is

the very purpose of such notice provisions. *In re 4Kids,* 463 B.R. at 682-83. Accordingly, this Court finds that the Notice and Termination provisions were breached by Sigmapharm, but goes no further than that. What damages were caused by that breach, and what impact, if any, a finding that Plaintiffs were also in breach of the Agreement would have on any damages or liability determinations are all reserved for further proceedings before this Court.

The Court also rejects Sigmapharm's arguments that New Jersey law, which applies here, is different from New York law with regard to the effect of failure to give proper notice. Here, Sigmapharm relies principally on *Conley v. Guerrero,* 443 N.J. Super. 62, 68 (App. Div. 2015), *aff'd as modified,* 228 N.J. 339, 356-57 (2017). However, that case, which involved the standard form of residential real estate purchase and sale contract and New Jersey's required three-day attorney review period, is readily distinguishable from this one. Of course, the Agreement at issue here is not a standard form residential real estate contract; it is a detailed and comprehensive Agreement between sophisticated commercial parties. But, more importantly, *Guerrero* dealt only with the appropriate *methods* of delivery of a notice of termination and whether the fact that the notice was not properly delivered to the broker—who was neither the buyer nor the seller—rendered the termination ineffective. Not surprisingly, the New Jersey Courts in *Guerrero* found that the very technical noncompliance with the notice provision as to the broker—in essence, a third party—did not invalidate the otherwise proper Notice of Termination, as it was not a material part of the "agreed exchange" between the parties in that case. *Conley,* 443 N.J. Super. at 69-70. This Court need look no further than the Agreement's very specific two-tiered Notice provision and the equally detailed Termination provision to determine that they were a material part of the "agreed exchange" between the Parties in this case. Further, the defects in notice here go far beyond the method of delivery and instead go to the essence of and reasons for the Agreement's Notice and Termination provisions.

Similarly, two of the other notice cases cited by Sigmapharm addressed method of delivery, not adequacy of content (which was adequate in each case).  *See Giacone v. Virtual Officeware, LLC*, 642 Fed. App'x 137, 142-43 (3d Cir. 2016) (applying Pennsylvania law) (finding that the notice provision was a "technical" requirement of the employment agreement that was satisfied by utilizing email and regular mail rather than methods specified by the contract and that the content of the notice of termination satisfied the agreement's requirements); *126 South Street Owner, LLC v. Suzi's Skin & Nail Care Studio, Inc.*, 2019 WL 254539, at *11-*12 (N.J. App. Div. Jan. 18, 2019) (addressing notice provision of lease agreement and concluding that the purpose of the notice provision under the lease and relevant statute was fulfilled by allowing personal delivery (an arguably better form) rather than the contractually specified certified or registered mail and also finding the content of the notice of termination was sufficient).

As urged by both Sigmapharm and Plaintiffs, this Court is required to interpret a contract in accordance with its plain language when its terms are unambiguous, as a matter of law, without resort to parol or other extrinsic evidence.  *Karl's Sales*, 249 N.J. Super. at 493; *East Brunswick Sewerage Auth. v. East Mill Assocs., Inc.*, 365 N.J. Super. 120, 125 (App. Div. 2004).  The Court finds the Agreement's Notice and Termination provisions to be clear and unambiguous as to the type of notice that must be provided when a material breach is declared and what opportunity to cure must be given before the Agreement can be terminated.  On the undisputed facts, Sigmapharm did not comply with those terms with respect to the required notice as to an alleged breach, the commencement of the cure period and the fact that the failure to timely cure could result in the termination of the Agreement.  Sigmapharm's argument that Rising/Aceto was in breach of the Agreement does not obviate the need to give proper notice of its breach or termination.  In fact, it highlights the need for that proper notice.

In sum, in the instant case, Sigmapharm simply did not comply with the Agreement's requirements under §§ 12.2 and 14.4.2 for notifying Rising (or Aceto) that it was in breach of the Agreement, as to both the content of the purported December 16, 2016 "Notice of Breach" and the manner in which and to whom it was delivered.  Nothing that occurred after the December 16, 2016 Letter until the March 23, 2018 Termination Notice -- in writing or otherwise -- constituted a sufficient Notice of Breach under the Agreement. As a result, the March 23, 2018 purported Notice of Termination, following a faulty alleged Notice of Breach, was also defective, as having been sent without the required prior notice of the breach or the commencement of the ninety day (or more) opportunity to cure.

For the foregoing reasons, the Court grants the Plaintiffs summary judgment on their claim that Sigmapharm did not properly or lawfully give Plaintiffs notice of breach of the Agreement or its termination, resulting in breaches of the Agreement by Sigmapharm.

**C.  Sigmapharm is Not Entitled to Summary Judgment Dismissing Plaintiffs' Complaint as Disputed Issues of Material Fact Exist as to Whether Rising/Aceto Breached the Audit Provisions of the Agreement**

(i)      Disputed Issues of Material Fact Exist With Respect to Sigmapharm's Claim That Rising/Aceto Was in Breach of the Audit Provision of the Agreement

Sigmapharm argues that Plaintiffs were in material breach of the Agreement by: (1) not allowing and performing the audit authorized under § 8.6; (2) not providing the "source" and other documents that supported Rising/Aceto's own accounting, including the Eisner Report; (3) not maintaining "transparent books and records"; and (4) not providing a "consistent and accurate accounting of the partnership gross-to-net profit share split."[164] On these grounds, Sigmapharm argues that it is entitled to summary judgment dismissing Plaintiffs' claims against it in their entirety.

---

[164] Sigma Br., at 6, Dkt. No. 41.

As noted above, the Court recognizes that Sigmapharm has provided substantive evidence that Plaintiffs were in breach of the Agreement for failing to comply with its Audit provision and its related requirements.  However, as was also noted above and as is summarized below, those facts are disputed by Plaintiffs in almost every material respect.

    (ii)    <u>Summary and Sampling of the Material Disputed Facts</u>

The material disputed facts on Sigmapharm's summary judgment motion can be grouped into three general categories:  (1) whether Plaintiffs failed to provide Sigmapharm with "source documents" and other information necessary to conduct the audit required under the Agreement; (2) whether Plaintiffs were obligated to provide Sigmapharm with any report from the Eisner accounting firm; and (3) procedural noncompliance in the parties' Statements of Undisputed Material Facts and the effect of that noncompliance on their responses.[165]   The following discussion is based primarily on Sigmapharm's Statement of Undisputed Material Facts in support of its motion for summary judgment and Plaintiffs' response thereto.[166]

For examples of alleged noncompliance with the audit, including failure to provide and maintain "source documents," and other related information, the Court notes that Sigmapharm appears to have used the term "source documents" for the first time in these Motions (or at least in the Pa. District Court litigation and arbitration that preceded these Motions).  The expression does not appear in the parties' letters and emails exchanged when the dispute first developed.  At the same time, Plaintiffs sometimes seem to attempt to avoid responding substantively to a Sigmapharm SUMF on the grounds that "source document" does not appear in an underlying email.

---

[165] There are other instances of material disputed facts, including those referenced in the Statement of Facts above.
[166] Sigma SUMF, Dkt. No. 41-1; Pls. Resp., Dkt. No. 49.

Additionally, Sigmapharm makes allegations that appear to go to its underlying complaint that Plaintiffs were chronically late in payments to Sigmapharm and that it was underpaid by Plaintiffs. But that complaint, though embedded in Sigmapharm's Claim Nos. 155-2 and 162-1, is less a feature of these motions than are Sigmapharm's claims based on Plaintiffs' asserted breach of the Audit provision by their failure to provide adequate responses to Sigmapharm's requests for "source documents" and other related information. However, the substance of virtually all these claims is disputed by Plaintiffs with appropriate citations to the record and/or not properly supported by Sigmapharm, as the following summary demonstrates.

(1) <u>Source Documents and Other Alleged Noncompliance With the Audit</u>

¶¶ 17-20     Sigmapharm asserts that, in February 2016, Kremer asked Rising for "detailed listings of all Sigmapharm transactions" from which "he would choose hard copy samples of the source data" and alleges repeated follow ups were unanswered by Plaintiffs. Plaintiffs, with properly supported citations, respond that Sigmapharm did not accurately describe the emails on which it relies, starting with Kremer's December 4, 2015 email, which was the first in the chain, and that these emails never use the term "source data." (The Court notes that, even if Sigmapharm did not use "source data" or "source documents," its demands for information (as opposed to specific source documents) were steady.)   However, Kremer's December 4, 2015 email requests only a "[*l*]*isting* of all invoices sent from Rising to its customers, reported as Gross Sales," rather than source documents. The February 9, 2016 email was a follow-up request.[167] These are part of a string of emails from Kremer to Rising from July 2015 to March 2016  seeking updates and information.[168]   Rising responded on April 25, 2016 with a 1st Quarter 2016 recalculation.[169]   As pointed out by Plaintiffs, there were no requests for "source" documents in this email trail, except for the request for certain "actual credit memos" in Kremer's June 6, 2016 email (Exhibit 10) and related follow up emails. According to the documents supplied by Plaintiffs, the requested credit memos and related follow up were provided to Sigmapharm on June 16, 2016.[170]

¶¶ 21-22, 24   Sigmapharm asserts that the June through November 2016 emails from Kremer to Rising in Exhibits 10-14 to Sigmapharm's Motion show a continuing demand for source documents.  But Plaintiffs respond, with supported record citations, that those emails do not use the term "source documents,"  nor do those

---

[167] Sigma Br., Dec. 4, 2015 and Feb. 9, 2016 emails, Ex. 7, Dkt. No. 41 (emphasis supplied). Like many others, this email requests a listing of invoices or transactions, as opposed to source documents.
[168] Sigma Br., Exs. 5, 7 and 8, Dkt. No. 41.
[169] Sigma Br., Apr. 25, 2016 emails, Ex. 9, Dkt. No. 41.
[170] Lambert Decl., Ex. 14 at Sub. Ex. I, Dkt. No. 51.

emails ask for original documents, except for a limited number of actual credit memos, which appear to have been provided, as noted above. The June-November 2016 emails at Sigmapharm's Exhibits 10-14 show Kremer performing calculations, comparing the parties' accounting practices, requesting specific credit memos and demanding more global information for 1st Quarter 2016 and "pre 2013 information."[171] Further, as noted previously, Kremer's December 16, 2016 Letter states that he has concluded his review, does not identify any source (or other) documents he did not receive, identifies actual credit memos he did review and does not request additional information. As to allegedly unpaid amounts identified in the December 16, 2016 Letter, Plaintiffs assert that all appropriate amounts were paid, except for a dispute as to the invoice relating to COGS that Plaintiffs indicate the parties agreed to defer.[172]

¶ 23    Sigmapharm characterizes the 2009-16 audit review process as an "initial review" that was "unaudited" and that Sigmapharm picked up numerous errors in Rising's quarterly reports after the original audit period (FY 2017 forward). Plaintiffs respond that the December 16, 2016 Letter states that Sigmapharm's review was "concluded," refers to that review as an audit and does not request additional source documents or information. As for FY 2017, Plaintiffs respond, with record support, that they identified the errors in their accounting for that year, retained Eisner to address the issues and paid Sigmapharm what was owed (over $12 million). Additionally, Plaintiffs assert that they conducted an investigation and confirmed that the issues that led to the 2017 recast were confined to that year.[173]

¶ 65    Sigmapharm asserts that Rising's CFO acknowledged that Rising/Aceto never let Sigmapharm conduct the audit based on the claim that a formal request was required, contrary to the terms of the Agreement. Besides properly objecting to this SUMF on the ground that it is actually (at least in part) a statement of law, Plaintiffs point out, with appropriate citation to the record, that Rising's CFO stated that he did not acknowledge that Sigmapharm was never allowed to conduct an audit and that the cited line of questioning related to a hypothetical audit with outside auditors that had not been requested by Sigmapharm. Further, prior to the termination of the Agreement, Sigmapharm did not seek to use outside auditors; instead, it conducted the audit "in-house" under Kremer's supervision. Finally, Plaintiffs assert that, under the Agreement, a request for an outside or "independent" audit would had to have been requested as an Extraordinary Notice, rather than in an email that was part of a continuing string of communications between the parties. In this regard, Sigmapharm acknowledges that the first time it requested an audit (which was conducted in-

---

[171] Sigma Br., Exs. 10-14, Dkt. No. 41.

[172] Lambert Decl., Dec. 16, 2016 Letter, Ex. E, Dkt. No. 17-2. According to Sigmapharm's Claim Nos. 155-2 and 162-1, only the asserted underpaid profit share based on the reduction of COGS remains unpaid. Lambert Decl., Claim No. 155-2, Ex. H; Claim No. 162-1, Ex. K, Dkt. No. 17-2. According to Mr. Hughes, all issues in December 16, 2016 Letter were resolved, except for the COGS issue, which the parties agreed to defer to a later date. Hughes Decl., ¶¶ 19, 32, 50, Dkt. No. 52. Sigmapharm asserts that this COGS amount is owed as part of its contractual damages. Sigma Claim No. 155-2 at ¶ 6. Thus, this is another disputed issue of fact and possibly law that may be affected by the results of the ongoing audit. See also ¶¶ 25, 27 to similar effect.

[173] Pls. Suppl. SUMF ¶¶ 106-107, Dkt. No. 50; Sigma Resp. ¶¶ 106-107, Dkt. No. 58-2.

house) was in December 2015, which is nine years after the inception of the parties' relationship.[174] Thus, there are also material disputes of fact and law as to whether Sigmapharm requested an independent audit with outside auditors and whether such a request required an Extraordinary Notice.

In sum, as noted, virtually all material facts relating to the alleged breach of the Audit provision (and related claims) are disputed and therefore inappropriate for summary judgment.

(2) Eisner Report

Sigmapharm's allegation that Plaintiffs failed to produce any report generated by Plaintiffs' accountant, Eisner, retained by Plaintiffs in 2017 as they began to address Sigmapharm's December 16, 2016 Letter, caused Sigmapharm to generate multiple SUMF, which all fall into three categories:  (i) whether the Agreement required Plaintiffs to produce the accountants' report; (ii) whether Plaintiffs bound themselves by their representations to produce the accountants' report; and (iii) whether the production of the accountants' report is material to Sigmapharm's claims and/or whether Sigmapharm suffered any damages if it was.

These disputes as to Eisner are mostly contained in ¶¶ 23, 27, 29, 30, 31, 35, 37, 39, 43-46, 48, 81-91 regarding Sigmapharm's insistence that Rising retained Eisner to correct the Sigmapharm account generally; promised to provide the Eisner report to Sigmapharm; and changed its story about the existence of an Eisner report.  Plaintiffs dispute these assertions in every material way, as is principally set forth in the Hazaray Declaration, where Mr. Hazaray denies that he ever told any Sigmapharm representatives that Eisner was going to conduct an audit of Rising's accounting or that Rising would share with Sigmapharm any Eisner report about Rising accounting practices generally, any draft reports, or any report that contained information about Rising's other practices.  Instead, Hazaray states that Rising indicated it would provide the results of Eisner's work that related to Sigmapharm (i.e., the results of the fiscal year 2017 profit share

---

[174] Lambert Decl., Nov. 11, 2020 Kremer Dep., 70:14-71:3; 75:8-21, Ex. B, Dkt. No. 17-2.

recast), and that it provided those results to Sigmapharm in the form of the 2017 recast payment

and the $12 million profit-share payment.  Plaintiffs further assert that nothing in the Agreement

required them to provide any outside accountant report to Sigmapharm; that any failure to do so is

not material to Sigmapharm's claims; and that in any event, Sigmapharm did not suffer any

damages as a result.  Additionally, Plaintiffs respond that Eisner was retained to "help . . . fix the

issue," that Rising "fixed the issue," and that Rising fully paid its underpayment of more than $12

million for 2017 (¶ 23).  Finally, in Mr. Hazaray's Declaration and elsewhere, Plaintiffs assert that

Eisner was retained to review Rising's customer accounts that included Sigmapharm as well as

other Rising customers and therefore would not show a report or data that related to customers

other than Sigmapharm.  Thus, all the material facts relating to Eisner and the Eisner report(s), and

whether Plaintiffs were required to provide any such report to Sigmapharm, are directly disputed.

(3) <u>Procedural Noncompliance</u>

For examples of procedural noncompliance (in addition to those noted above), see:

¶  9    Sigmapharm asserts that Plaintiffs obfuscated and obstructed Sigmapharm's audit
request from the first demand in 2015 through this litigation.  Plaintiffs object that
this charge is improper and unsupported, particularly because it relies exclusively
on ¶¶ 17-24 of the December 21, 2018 Kremer Certification, which relate mostly
to a different time period, do not address or support many of the broad and
compound opinions and conclusions in this paragraph and are therefore not proper
SUMF.  The Court agrees that this is not proper SUMF for those reasons.

¶ 10    Sigmapharm asserts that rebates and chargebacks increased substantially from
2014-2018 without explanation by Plaintiffs, resulting in greatly reduced net
profits.  Plaintiffs reply that this SUMF is improperly supported, as Sigmapharm's
sampling was limited to one quarter (Q4-2014), as is acknowledged by Kremer,[175]
and that there was a significant increase in acquisition costs of two products that
resulted in increased chargebacks and rebates, but also led to significant increased
revenue.  The assertions in SUMF ¶¶ 11 and 14 and Plaintiffs' response are of
similar effect.

¶ 13    Sigmapharm makes multiple assertions regarding Plaintiffs' alleged failure to
provide complete information and intentionally instituting a misleading process to
confuse and delay the production of source documents or of information over a

---

[175] Sigma Br., Kremer Certif., ¶¶ 17-24, Dkt. No. 41.

period of fourteen months, without citing to any support in the record. Plaintiffs properly objected on this ground. Further, the Court finds this paragraph is also not a proper SUMF as it contains multiple assertions, argument and conclusions.[176]

¶ 16    Sigmapharm asserts that Kremer sought all relevant product information, backup support and cash-basis accounting in a December 4, 2015 email entitled "Audit of Rising Net Sales" for the 2009-2015 period. Plaintiffs properly respond that Sigmapharm has mischaracterized that email because (among other things) it does not make those specific requests (although Plaintiffs acknowledge the request for cash-basis accounting elsewhere). Instead, the email requests a "listing" of certain invoices, credit memos and inventory transactions in electronic form.

¶ 40    Sigmapharm asserts that Rising/Aceto failed to provide the detailed backup for the 2017 revised accounting. Plaintiffs contest this assertion by referring to multiple paragraphs of Hughes' Declaration that directly dispute these claims and detail the voluminous information that was provided to Sigmapharm (¶¶ 11-13, 24-25, 30, 36).

¶ 54    Sigmapharm asserts that Plaintiffs did not provide Sigmapharm with "relevant auditable information" in connection with the 2017 recast. Plaintiffs respond that relevant auditable information is not defined and Sigmapharm does not identify what was not provided. Further, these claims are directly disputed in the cited sections of the Hughes Declaration (¶¶ 20-37).

¶ 61    Sigmapharm asserts that Kremer demanded responses to the list of specific backup data he previously requested, referring to Mr. Kremer's November 14, 2017 email and related testimony. However, a review of Kremer's November 14, 2017 email shows that he requested a detailed calculation of the cash-based accounting that supported the figure in his email and requested similar such detail for other quarters. Plaintiffs responded that nothing in this email or Kremer's testimony refers to "specific backup data"; that Kremer acknowledged that the level of detail he requested in the email was "not required for quarterly profit share statements by the agreement"; and that the additional requested detail was in any event provided by Rising.[177]

The exchanges in these SUMF illustrate the procedural deficiencies and disputes that plague many of these SUMF statements and responses; the lack of symmetry between an affirmative statement and the counterparty's response; and the parties' persistent dispute of material facts about the parties' fulfillment of their obligations under the Agreement.

---

[176] Sigma SUMF ¶ 13, Dkt. No. 41-1; Pls. Resp. ¶ 13, Dkt. No. 49.
[177] Lambert Decl., Nov. 11, 2020 Kremer Dep. 166:2-167:17, Ex. B, Dkt. No. 17-2 (discussing Nov. 14, 2017 email at Lambert Decl., Ex. 2, Dkt. No. 51; Hughes Dep. 163:7-166:1; 171:2-10, Ex. 3, Dkt. No. 51; Hughes Decl. ¶¶ 28-29, 46, Dkt. No. 52.

Notwithstanding these issues, the bottom line is that Plaintiffs disputed virtually every one of Sigmapharm's assertions regarding the audit.  Plaintiffs argue with support in the record that they provided Sigmapharm with what is required for an audit; that they provided the required information to Sigmapharm that allowed it to pursue an audit; that their books and records are available as required by the Agreement; and that they never promised a copy of the Eisner report. Additionally, at the April 22, 2021 hearing on Sigmapharm's audit motion and the parties' discovery motions, this Court ordered Plaintiffs to allow Sigmapharm to conduct the audit contemplated by the Agreement's Audit provision such that granting summary judgment on the basis of failure to perform or to provide a proper audit is premature.[178]  The results of the audit and related expert testimony from both sides will be needed to determine whether Rising/Aceto did in fact breach the Audit provision by failing to produce and maintain the documents and information necessary to conduct the audit, whether any such breach was material and whether any additional amounts are owed to either party under the Agreement.[179]

For similar reasons, Sigmapharm's argument that Rising's audit packages are inadmissible as evidence is premature, both as a procedural matter and because the audit ordered by this Court is ongoing.  First, as argued by Plaintiffs, the determination of whether audit packages are admissible is more appropriately left for a motion *in limine* or trial.  *See, e.g., Sperling v. Hoffman-LaRoche, Inc*., 924 F. Supp. 1396, 1413 (D.N.J. 1996) (finding it "difficult" to rule on admissibility of evidence prior to trial); *Williams v. City of Birmingham*, 2019 WL 11679764, at *1, *33  (N.D. Ala. Apr. 23, 2019) (denying without prejudice as premature cross-motions to exclude evidence on summary judgment motions), *aff'd sub nom Williams v. Aguirre*, 965 F.3d 1147 (11th Cir.

---

[178] See June 7, 2021 Order, Dkt. No. 64.
[179] Plaintiffs deem Sigmapharm's motion (that seeks, in part, a finding that Sigmapharm "properly terminated the Agreement") an assent to the Court's deciding this issue on summary judgment.  Pls.' Br., at 1, Dkt. No. 48; Sigma Br., at 2, 5, Dkt. No. 41.

2020). In this regard, Plaintiffs should be afforded the opportunity to demonstrate that the audit packages are admissible business records as hearsay exceptions (under Fed. R. Evid. 803(6)), rather than summaries. *See, e.g., United States v. Leo,* 941 F.2d 181, 187, 191, 194 (3d Cir. 1991) (data prepared by company's finance director admissible as business record); *United States v. Blackwell*, 954 F. Supp. 944, 974 (D.N.J. 1997) (finding company's audit admissible as business record). Further, the audit packages included the data requested from Rising by Sigmapharm and were produced from Rising's accounting systems, and are not summaries, according to Rising. Rising also asserts that the packages were part of its course of dealing with Sigmapharm and other business partners.[180] Finally, as noted, the audit needs to be completed so that these issues can be further developed. Thus, the Court will not exclude evidence of Rising's audit packages at this stage, without prejudice to a determination of this issue on the merits at trial.

For all these reasons, the Court cannot find on this record that Sigmapharm is entitled to summary judgment determining that Rising/Aceto materially breached the Agreement by failing to comply with the Audit provision of § 8.6, as virtually every material fact relating to this claim is disputed by Plaintiffs. Further, as found above, Sigmapharm did not in any event give Rising/Aceto proper notice of any asserted breach or properly terminate the Agreement. Thus, Sigmapharm itself was in breach and ceased performing under the Agreement on the basis of the faulty termination. The effects of that breach, including any damages that may result, are disputed questions of fact and law as applied to those facts. Because disputed issues of material facts and mixed questions of fact and law exist as to these critical matters, the Court will deny Sigmapharm's

---

[180] Pls.' Br. at 18-19, Dkt. 48. In this regard, the Court also notes that the audit protocol proposed by Sigmapharm with respect to the audit period from April 1, 2016 to the present included a sampling of approximately 400 transactions, rather than the hundreds of thousands of transactions that occurred during that period. See generally, Plaintiffs' Suppl. SUMF ¶¶ 169-172, Dkt. No. 50. Sigmapharm objected to Plaintiffs' SUMF as to this assertion presumably on the ground that Plaintiffs did not provide auditable source documents. Sigma Resp. to Pls.' Suppl. SUMF at ¶¶ 169-172, Dkt. No. 58.

motion for summary judgment based on Plaintiffs' alleged breach of the Audit provision of the

Agreement.[181]

> (iii)    Material Questions of Fact Exist as to Whether and to What Extent Sigmapharm
> Waived Its Breach Claim by Continuing to Accept the Benefits of the Agreement

In seeking dismissal of Plaintiffs' affirmative claims, Sigmapharm also argues that, under

applicable law, it was entitled to cease performing under the Agreement, *citing Roach v. BM*

*Motoring, LLC*, 228 N.J. 163, 174 (2017) ("[i]n the event of a 'breach of a material term of an

agreement, the non-breaching party is relieved of its obligations under the agreement'") (internal

citation omitted).  However, Sigmapharm's argument omits the second option available to the non-

breaching party -- continuing to perform -- and the consequences of electing to do so.  In *General*

*Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 315 n.5 (3d Cir. 2001), the Third Circuit

summarized this law in a footnote:

> It is hornbook law that when one party to a contract commits a material breach, the
> non-breacher has the option of either continuing the contract and suing for partial
> breach, or terminating the agreement in its entirety. *See* 2 E. Allan Farnsworth,
> Farnsworth on Contracts § 8.16, at 495 (2d ed. 1998).

Similarly, our District Court has held that: "A material breach by either party to a bilateral contract

excuses the other party from rendering any further performance"; however, "'even a material

breach will not excuse performance if the party continues to take advantage of the contract's

benefits.'"  *RNC Sys., Inc. v. Modern Tech. Group, Inc.*, 861 F. Supp. 2d 436, 447-48 (D.N.J. 2012)

---

[181] The Court also notes that Sigmapharm claims that Plaintiffs breached the Agreement by failing to provide invoices
to Sigmapharm for the amounts Plaintiffs claim they are owed (as Plaintiffs have argued in defending certain of
Sigmapharm's claims) or to provide Plaintiffs with notice of breach.  However, these arguments are without merit, as
Sigmapharm had terminated and ceased performing under the Agreement since at least the March 23, 2018
Termination Notice and simultaneously commenced the Pa. District Court litigation.  Plaintiffs cannot be faulted for
failing to send a notice of breach after the Agreement had been terminated and they were sued.  Similarly, there was
no basis or reason to send invoices for charges that had not yet accrued when the Agreement had already been
terminated by Sigmapharm.  In any event, any such notice or invoice could be sent now, but would be effectively
superseded by Plaintiffs' affirmative claims in this Adversary Proceeding.

(internal citation omitted).  The District Court in *RNC Sys.* set forth the counterparty's options as follows:

> [w]hen one party to a contract feels that the other contracting party has breached its agreement, the non-breaching party must either stop performance and assume the contract [is] avoided, or continue its performance and sue for damage; **under no circumstances may the non-breaching party stop performance <u>and</u> continue to take advantage of the contract's benefits.**

*RNC Sys.*, 861 F. Supp. 2d at 447, quoting *Travelodge Hotels, Inc. v. Honeysuckle Enters., Inc.*, 357 F. Supp. 2d 788, 798 (D.N.J. 2005) (further internal citations omitted) (underlined emphasis in original; other emphasis supplied).  To the same effect is *Frank Stamato & Co. v. Borough of Lodi*, 4 N.J. 14, 21 (1950), which quotes 5 Williston on Contracts (Rev. Ed.) 3749 as follows:

> [Under] "a material breach of contract which does not, however, indicate any intention to renounce or repudiate the remainder of the contract * * * the injured party has a genuine election offered him of continuing performance or of ceasing to perform, and **any action indicating an intention to perform will operate as a conclusive choice, not indeed depriving him of a right of action for the breach which has already taken place, but depriving him of any excuse for ceasing performance on his own part**."

*Stamato*, 4 N.J. at 21 (emphasis supplied).

Here, Plaintiffs argue that Sigmapharm waived its right to declare a breach by continuing to take advantage of the Agreement's benefits after the alleged December 16, 2016 "Notice of Breach."[182]  For example, Sigmapharm itself asserts that Rising was in material breach of the Agreement since at least December 16, 2016.  Yet, during the fifteen-month period from December 2016 to March 2018, Sigmapharm continued to supply products to Rising and to accept Net Profits paid by Rising.  In fact, Sigmapharm did not attempt to terminate the Agreement until about a month after a profit share report was delivered and paid by Rising in February 2018.[183]

---

[182] Pls.' Br., at 16-17, Dkt. No. 48.
[183] Lambert Decl., Nov. 11, 2020 Kremer Dep. 178:10-181:25, Ex. B, Dkt. No. 17-2.

Sigmapharm, of course, denies any such waiver and repeatedly refers to Rising's breach of the Audit provision.

The Court finds that there are disputed issues of material facts (or at least mixed questions of fact and law) as to whether and to what extent Sigmapharm waived its right to declare the Agreement in breach and whether and to what extent that asserted waiver may limit or modify Sigmapharm's rights to recovery against Plaintiffs.[184]   In this regard, it appears to be undisputed that immediately after giving Notice of Termination (and possibly before), Sigmapharm began selling its products for its own account without sharing any profits (or information) with Plaintiffs. Thus, all these issues remain to be developed and determined at trial, including whether Sigmapharm is liable to Plaintiffs for Sigmapharm's breach of the Agreement.

### D. Aceto is Not Entitled to Summary Judgment on Its Claim That It Is Not Liable For the Acts of Its Wholly Owned Subsidiary, Rising

In support of their summary judgment motion, Plaintiffs argue that Aceto is not liable to Sigmapharm because it did not sign the December 20, 2010 letter assigning the Agreement to Rising.  In this regard, Plaintiffs rely primarily on *SmartTran, Inc. v. Alpine Confections, Inc.*, 352 Fed. App'x 650, 656 (3d Cir. 2009) for the proposition that plaintiff's claims for breach of contract and of duties of good faith and fair dealing against defendant's wholly owned subsidiaries failed because the latter did not sign the contract.[185]   The court in *SmartTran* based its decision (at least in part) on a finding that the contract did not oblige the subsidiaries to pay the defendant or the plaintiff for the use of plaintiff's product.  *SmartTran*, 352 Fed. App'x at 656.[186]   In this case, and

---

[184] The Court notes that Plaintiffs raised this waiver argument in response to Sigmapharm's motion for partial summary judgment but did not affirmatively move for summary judgment on this issue.

[185] Pls.' Br., at 24, Dkt. No. 17.

[186] The Third Circuit declared:

> Nowhere in the Agreement are Alpine's subsidiaries obligated to pay SmartTran for their use of SmartTran's recommendations. Alpine was responsible for payment of all fees accrued by its subsidiaries. As such, neither Maxfield nor Kencraft [two Alpine subsidiaries] can be held liable for breaches arising from the Agreement.

in sharp contrast to *SmartTran,* the Preamble to the Agreement declares that the contracting Parties included "subsidiaries and Affiliates" (the mixed capitalization appears to be correct, as "Affiliate" is a defined term), of which Aceto was one.  Under the definitions for "Affiliate" and "Control," at Agreement §§ 1.4 and 1.11, "Affiliates" include entities controlling (as well as controlled by) Rising through ownership of more than fifty percent (50%) of stock (as quoted above).[187]  Thus, relying on the plain language of the Agreement and giving that language meaning, the mere fact that Aceto did not sign the Agreement does not necessarily absolve Aceto of liability under the express terms of that Agreement.

Moreover, as is noted by Sigmapharm, when Satish Srinivasan, president of Rising, introduced himself to Sigmapharm in a November 29, 2016 email, he identified Walt Kaczmarek, COO of Aceto, as "the key decision maker at Rising/Aceto."[188]  Although Sigmapharm itself appears to take issue with that statement by asserting that Rising advised Sigmapharm that Kaczmarek "would get involved" and that Peter Licata "would be [the] point person for Rising," the basis for Sigma's alternate interpretation is not clear and therefore is one several material facts in dispute on this issue.[189]

Additionally, the Court notes that at the September 4, 2019 hearing in the main case on the Plaintiffs' claims estimation motion (the precursor to this Complaint), and in response to the Court's question as to whether Rising or Aceto attended the [May 23], 2017 meeting between the parties, Mr. Rogers, the Plaintiffs' then General Counsel, voluntarily advised the Court that:

> Mr. Cassimiro [sic, Kaczmarek] was the CEO of Aceto who was appointed officially by the board of directors of Rising as the president of Rising when the prior president left.[190]

---

*SmartTran*, 352 Fed. App'x at 656.
[187] Lambert Decl., Agreement §§ 1.4, 1.11, Ex. A, Dkt. No. 17-2.
[188] Sigma Br., Kremer Certif., Ex. 4, Nov. 29, 2016 email, Sub Ex. 14, at 3, Dkt. No. 41.
[189] Sigma Resp. to Pls.' Suppl. SUMF ¶ 50, Dkt. No. 58-2.
[190] Sigma Br., Sept. 4, 2019 Hr'g Tr. 42:6-7; 67:10-12, Ex. 47, Dkt. No. 47.

However, no support for this asserted appointment was ever provided. Even if it had been, that would not change the fact that Rising advised Sigmapharm that Mr. Kaczmarek (who had an email address "@aceto" as did various others involved in the accounting dispute) would be the "key decision maker" on these issues.

Further, in another adversary proceeding in this bankruptcy case, *Tri Harbor Holdings Corp. v. Reddy*, Adv. Pro. No. 19-1981 (VFP), these Plaintiffs and one Debtor-affiliate made essentially the opposite argument—that even though they did not sign the underlying agreements, Rising's affiliates were the intended beneficiaries of those agreements and therefore were entitled to enforce them.[191] In defending against Reddy's motion to dismiss, Plaintiffs (and affiliate Debtors) argued that third-party beneficiary status under that contract was a question of fact that should not be decided at the pleading stage.[192] Case law confirms that, absent express language indicating third parties are entitled to a contract's benefits, third-party beneficiary status is often a question of intent and of fact determined from the surrounding circumstances. *Broadway Maint. Corp. v. Rutgers, State Univ.*, 90 N.J. 253, 259 (1982); *Werrmann v. Aratusa, Ltd.*, 266 N.J. Super. 471, 476-77 (App. Div. 1993); *Corrugated Paper Prods. v. Longview Fibre Co.*, 868 F.2d 908, 912-14 (7th Cir. 1989) (interpreting New Jersey law). In the *Reddy* adversary proceeding, this Court concurred with Plaintiffs' argument that third-party beneficiary status and intent were fact issues that should not be decided at the pleading stage in that case.[193] Nor should they normally be decided on summary judgment, as is the procedural posture here. The Court will consistently apply these principles and determine that Aceto's potential liability under the Agreement is a disputed question of fact, including intent, that should be determined at trial. *Wishkin v. Potter*,

---

[191] Sept. 19, 2019 Pls.' Br., at 30-32, Adv. Pro. No. 19-1981-VFP, Dkt. No. 27,

[192] Sept. 19, 2019 Pls.' Br., at 30-32, Adv. Pro. No. 19-1981-VFP, Dkt. No. 27.

[193] Apr. 15, 2020 Hr'g Tr. 80:8-81:4, Adv. Pro. No. 19-1981-VFP, Dkt. No. 48; Apr. 17, 2020 Order, Adv. Pro. No. 19-1981-VFP, Dkt. No. 46.

476 F.3d 180, 184 (3d Cir. 2007). Part of the Court's analysis in these regards will also involve

the proper interpretation of the "Affiliate," "Control" and "Party" language of the Agreement,

which at this stage appears to be a mixed question of fact and law.

Plaintiffs also argue that reading the Agreement to include Affiliates as parties would

render meaningless the Assignment provision of the Agreement (§ 14.1) that allows for assignment

of the Agreement to related parties.[194]   However, an assignment may occur on differing terms

and/or be made to related parties who may or may not meet the definition of Affiliate but could be

assignees. Additionally, in the case of an assignment to an Affiliate, the assigning Affiliate has to

agree to remain liable. In these circumstances (and there may be many others), the Assignment

provision would be applicable and have meaning as to related parties, including Affiliates.[195]

In contrast, if the Affiliate, Control and Party language does not apply to make an Affiliate

a Party, then those definitions in the Agreement are arguably without meaning.   It is hornbook

law that a court should not interpret a contractual provision in a manner that renders it meaningless

or superfluous;[196] yet, that is what Plaintiffs would have the Court do here. Instead, this Court will

---

[194] Agreement § 14.1 ("Assignment, Sale, etc.") provides as follows:

> 14.1 Assignment/Sale, etc. Neither Party may sell, assign, pledge, hypothecate or otherwise dispose of its interests under this Agreement without the consent of the other Party. Neither this Agreement nor any interest hereunder shall be assignable by any Party without the prior written consent of the other Party. Notwithstanding the foregoing, each Party shall be permitted to assign this Agreement to (i) any successor by merger or upon sale of all or substantially all of the assets to which this Agreement relates and/or (ii) an Affiliate; provided, however, that in the case of clause (ii), the assigning Party agrees to remain liable for the obligations hereunder. This Agreement shall be binding upon the successors and permitted assigns of the Parties and the name of a Party appearing herein shall be deemed to include the names of such Party's successors and permitted assigns to the extent necessary to carry out the intent of this Agreement. Any assignment not in accordance with this Section 14.1 shall be void.

Lambert Decl., Agreement § 14.1, Ex A, Dkt. No. 17-2.

[195] Similarly, and contrary to Plaintiffs' argument, the limited and isolated use of the word "Affiliates" in the Indemnification provisions of the Agreement (§§ 13.2 and 13.3) does not necessarily expand or define the extent of any Affiliate's indemnification obligation. Instead, they make clear that actions by an Affiliate could give rise to an indemnification obligation. This reading gives effect to both the definition of Affiliates and the Indemnification obligation rather than making the Affiliates definition meaningless in virtually all other respects under the Agreement.

[196] *See, e.g.*, *Fitts v. Chase Manhattan Mortg. Corp.*, 2006 WL 3432296, at *4 (N.J. App. Div. Nov. 30, 2006) ("[w]hen interpreting the terms of the writing, the court is required to give meaning to every word in the contract rather than leave a portion of the writing useless or inexplicable").

read those terms in a way that gives meaning to all of them, especially since we are at the summary judgment stage and all reasonable inferences should be made in Sigmapharm's favor on this point. Plaintiffs have also failed to satisfactorily explain why the words "Party" and "Parties" in the Agreement, as defined in the Preamble, and Affiliate and Control, as defined in §§ 1.4 and 1.11, should not apply to entities that came into such relationship with Rising and Aceto after the Agreement was entered into and assigned, as well as those that existed when it was originally entered into. At best (from Plaintiffs' point of view), that is another ambiguity that also makes summary judgment inappropriate.

Because the facts and the application of the facts to the law are in dispute on this issue, summary judgment is not warranted as to Aceto's potential liability under the Agreement. Accordingly, Plaintiffs' motion for summary judgment on this issue is denied.

### E.  Aceto and Rising Are Entitled to Summary Judgment Dismissing Certain Claims That Are Not Supported by the Agreement and/or That Sigmapharm Has Waived

(i)      Lost Profits of $10 Million

Plaintiffs are entitled to summary judgment dismissing with prejudice Sigmapharm's damage claim for $10 million in lost profits. Mr. Kremer, at his November 11, 2020 deposition, was unable to identify any products that Sigmapharm failed to launch or any damages resulting from any delay in launching other products as a consequence of its contract dispute with Rising over the Agreement. His testimony in this regard is quoted in full above at section III.E.(iv).

Mr. Kremer's conclusory, unsupported statements are simply not enough to sustain a lost profits claim—an insufficiency which is magnified by Sigmapharm's failure to provide an expert report as to lost profits. See, for example, Fed. R. Evid. 701(c) (which does not allow lay witness testimony if the opinion is based on "scientific, technical, or other specialized knowledge within the scope of Rule 702" that governs testimony by expert witnesses); *Eichorn v. AT&T Corp.*, 484

F.3d 644, 649-50 n.3, 651 (3d Cir.), *reh'g en banc denied*, (3d Cir.), *cert. denied*, 552 U.S. 1071 (2007) (ruling inadmissible an employee's lay testimony on behalf of multiple employee-plaintiffs for damages arising from lost pension rights, as the necessary calculations were "sufficiently complex" and the employee "had no personal knowledge of the underlying facts and no relevant experience or training"); *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 82-83 (3d Cir. 2009) (barring the lay witness's testimony as to future lost pension to the extent that her opinion "crossed the line into subject areas that demand expert testimony"); *All Seasons Home Improvement Co. v. Arch Concept Construction, Inc.*, 2018 WL 3928787, at *9 (D.N.J. Aug. 16, 2018).  In *All Seasons*, the court dismissed at summary judgment plaintiff's claim for lost profits after plaintiff produced no data, methodology, evidence of projected income, or cost calculation; made only generic allegations about its losses; and its representative at deposition could shed no further light on plaintiff's claim.  The same is true in this case, as Sigmapharm has failed to provide any competent evidence to support its large demand, and the deadline for submission of expert reports (for instance, with respect to lost profits) has expired.[197]

Sigmapharm itself has correctly argued that, in order to obtain damages on a contract-based claim, Rising must present evidence that "afford[s] . . . a basis for estimating damages with some reasonable degree of certainty."  *Jersey City Redevelopment Agency v. Clean-O-Mat Corp.*, 289 N.J. Super 381, 402 (App. Div.), *cert. denied*, 147 N.J. 262 (1996) (internal citations omitted); *Zelnick v. Morristown-Beard Sch.*, 445 N.J. Super. 250, 262 (Law. Div. 2015) ("[s]ince plaintiffs have failed to introduce sufficient evidence that would permit a rational factfinder to find in their favor on the issue of breach of contract or the appropriateness of damages arising from that alleged

---

[197] Pls.' Reply Br., at 19 n.5, Dkt. No. 57.  Each of the four Joint Scheduling Orders fixed and then extended the deadlines for expert discovery.  The last of these, the *Third Supplemental Joint Order Scheduling Pretrial Proceedings and Trial* entered on March 12, 2021 required the parties to serve affirmative expert reports on or before April 2, 2021; to serve rebuttal expert reports on or before May 18, 2021; and to complete expert discovery on or before June 30, 2021.  Mar. 12, 2021 Order, Dkt. No. 26.  The deadline for completion of expert discovery has necessarily been extended while the audit is being conducted, as noted above.  See June 7, 2021 Order ¶ 7, Dkt. No. 64.

breach, summary judgment in favor of defendants is appropriate on their breach of contract claim").[198]    Damages "cannot be based on mere speculation."    *Sanders ex rel. Sanders v. Rosenberg*, 2008 WL 2945983, at *4 (D.N.J. July 30, 2008).    The party seeking damages must "demonstrate the appropriate method for quantifying that loss."    *Totaro, Duffy, Cannova & Co., L.L.C. v. Lane, Middleton, & Co., L.L.C.*, 191 N.J. 1, 15, 17 (2007) (reversing decision of Law Division and Appellate Division as to their overestimation (trebling) of damages against departing accountant who violated his firm's antisolicitation agreement).

In this case, Mr. Kremer, in his November 11, 2020 deposition, was unable to identify a single product that Sigmapharm was unable to develop (or was delayed in bringing to market) because of Rising's alleged "breach" of the Agreement as of December 16, 2016, or even as of March 23, 2018.[199]    Nor has Sigmapharm provided any further detail or support as to how it arrived at the $10 million number.    Instead, Sigmapharm insists that the very same testimony from Mr. Kremer as quoted above -- and only that testimony -- somehow constitutes "'concrete evidence in the record'" of future lost profits.[200]    To the contrary, the Court finds that Kremer's testimony as to lost profits is amorphous, far from concrete, highly speculative and unsupported by the record.    Accordingly, Sigmapharm's demand for $10 million in lost profits, which is based on unsupported conclusions and pure speculation is denied, and Plaintiffs' motion for summary judgment dismissing this claim is granted.

---

[198] Sigma Br., at 7-8, Dkt. No. 41.
[199] Lambert Decl., Nov. 11, 2020, Kremer Dep.  217:11-219:10, Ex. B, Dkt. No. 17-2.
[200] Sigma Br., at 29, Dkt. No. 47, *quoting Laverick v. Addiego*, 2020 WL 3546807, at *2 (D.N.J. June 30, 2020) (which merely cites the summary judgment standard generally and states that it requires "concrete evidence in the record" but does not address lost profits).

(ii)    Disgorgement of $11.6 Million Administrative Fee From 2009 Through December 16, 2016/March 23, 2018 Is Not An Available Remedy in This Contract Action, Although Damages May Be

Sigmapharm demands that Debtor disgorge the $11.6 million in administrative fees that it collected over the life of the Agreement.  As argued by Plaintiffs, disgorgement is an equitable remedy that is applied when there is a breach of fiduciary duty or duty of loyalty.  *Kay v. Rosefielde*, 223 N.J. 218, 231-32, 236 (2015) (reaffirming disgorgement as an equitable remedy and one suitable for an employee's breach of duty of loyalty, even absent economic loss); *Vibra-Tech Engineers, Inc. v. Kavalek*, 849 F. Supp. 2d 462, 489-90 (D.N.J. 2012) (companies privately owned by employees who breached duty of loyalty to their employer by engaging in self-dealing were required to disgorge to their employer all the net profits of the privately owned companies, minus a reasonable wage for the work that they actually performed for their employer); *City Council of City of Orange Tp. v. Edwards*, 455 N.J. Super. 261, 271, 274, 278 (App. Div. 2018), *cert. denied*, 237 N.J. 205 (2019) (deputy business administrator, who knew that his appointment by the mayor was *ultra vires* with respect to the mayor's authority but who accepted salary and served anyway, did not act in good faith; was not a *de facto* officer under N.J.S.A. § 40A:9-6; was compelled to disgorge his salary; and was not entitled to relief under quantum meruit or equitable estoppel).  Further, other jurisdictions have found that disgorgement is not an appropriate remedy for a breach of contract claim, which measures the aggrieved party's losses, rather than (as disgorgement does) "'the defendant's ill-gotten gains.'"  *Franconero v. Universal Music Corp.*, 2011 WL 566794, at *4 (S.D.N.Y. Feb. 11, 2011), *aff'd*, 542 Fed. App'x 14 (2d Cir. 2013) (internal citations omitted).

There is no fiduciary relationship in this case.  In fact, the opposite is true, as the only relationship between the parties is contractual.  Further, these parties specified that they are independent contractors (rather than fiduciaries) in the Agreement.  See § 14.11 (entitled

"Independent Contractors"), which provides that "[e]ach Party is an independent contractor under this Agreement," and that the Agreement does not "create an employment, agency, joint venture or partnership relationship between any of the Parties hereto."[201]

Sigmapharm argues that *Vibra-Tech Engineers, Inc. v. Kavalek*, 849 F. Supp. 2d 462, 497-98 (D.N.J. 2012) supports its argument that "New Jersey law permits a claim of disgorgement and allows parties to recover under a disgorgement theory should such a theory exceed compensatory damages for breach of contract."[202]  But Sigmapharm confuses the remedy (disgorgement, ordered because the defendant-employees breached their fiduciary duty to their employer) with the measure of damages (net profits of the employees' privately owned companies minus a reasonable wage).  *Vibra-Tech*, 849 F. Supp. 2d at 489-90.  Absent the breach of fiduciary duty, there would have been no remedy of disgorgement and no need to calculate damages according to the net profits gained by the disloyal employees.

For these reasons, Plaintiffs are entitled to summary judgment dismissing Sigmapharm's disgorgement claim.  However, this dismissal does not limit Sigmapharm's right to seek recovery for any damages caused by any breach of the Agreement by Plaintiffs, including (without limitation) any claim for damages resulting from Plaintiffs' alleged failure to:  (1) allow the audit; (2) provide appropriate backup documentation; (3) maintain necessary and transparent books and records; or  (4) properly perform administrative duties under the Agreement.  To the extent the Court finds that Plaintiffs breached the Agreement in any of these regards, any damages caused by that breach may be recovered by Sigmapharm, not as disgorgement but as contractually allowed damages.

[201] Lambert Decl., Agreement § 14.11, Ex. A, Dkt. No 17-2; Pls.' Reply Br., at 18, Dkt. No. 57.
[202] Sigma Br., at 27, Dkt. No. 47.

(iii)    Audit Fees; Legal Fees; Expert Fees

In its Claim Nos. 155-2, 162-1 (and therefore in its Counterclaim to the Adversary Complaint), Sigmapharm demands $804,398 in audit fees; $745,558 in legal fees and costs; and $37,602 in expert fees and costs. All these fees appear to relate to the audit (although that is not completely clear). The Agreement § 8.6 provided that neither party was entitled to reimbursement for the expense that it incurred in undertaking an audit unless the variance was greater than 5%.[203] Said another way, audit expenses are recoverable only in the limited circumstance that the allowed 5% variance was exceeded. Absent this very narrow circumstance, the Agreement did not have a fee-shifting provision as between Rising and Sigmapharm.

During his November 11, 2020 deposition, Mr. Kremer testified that the variance that he identified in his December 16, 2016 Letter to Mr. Licata was only 2.3%.[204] Thus, the fee-shifting provision would not apply. However, Sigmapharm has argued that it was prevented from conducting a complete audit for the reasons described above and that the variance could be determined to be greater than 5% once the audit is completed. The Court agrees that this issue is not ripe for determination on summary judgment as to the audit fees because the court-ordered audit has not been completed.

The ability of any party to collect legal fees under the Agreement is also very limited. For example, section § 13.1 of the Agreement ("Litigation") provides that Rising and Sigmapharm would share the expenses or losses of third-party litigation according to their percentage share of Net Profits (unless only Rising or Sigmapharm was responsible for any breach or loss to a third party, in which case only Rising or Sigmapharm would pay expenses and losses).[205] Rising and

---

[203] Lambert Decl., Agreement § 8.6, Ex. A, Dkt. No. 17-2.
[204] Lambert Decl., Nov. 11, 2020 Kremer Dep. 109:8-17; 112:22-113:22, Dkt. No. 17-2.
[205] Lambert Decl., Agreement §§ 1.41, 13.1, Ex. A, Dkt. No. 17-2.

Sigmapharm were to indemnify and hold each other harmless in third-party litigation.[206]   See also

Agreement at § 2.2.2 ("Decisions of the Parties; Arbitration"), which concludes with the statement:

"The costs of arbitration, excluding the Parties' legal fees, shall be borne as directed by the

arbitrators."[207] None of these narrow circumstances apply here.

Plaintiffs cite to the above provisions in support of their argument that there is no shifting

of legal fees allowed under the Agreement.[208]   In contrast, Sigmapharm does not cite to any

provision of the Agreement that would allow shifting of legal fees in these circumstances.   In

determining these issues, New Jersey courts follow the American Rule generally and do not permit

fee shifting absent (1) agreement in a contract; or (2) N.J.R. 4:42-9 exceptions (which include the

award of fees as provided by statute).   *In re Hatala*, 295 B.R. 62, 66 (Bankr. D.N.J. 2003).   Under

the American Rule as applied in federal law, the court may award attorney's fees "only under one

of the following exceptions" which "developed in a sequence of United States Supreme Court

cases":

> (1)    a contract provides for payment of attorney's fees;
> (2)    a statute provides an allowance of attorney's fees;
> (3)    a recovered fund or property confers a "common benefit," as in a class
>        action suit;
> (4)    a party willfully disobeys a court order; or
> (5)    a court finds that the losing party has acted "'in bad faith, vexatiously,
>        wantonly or for oppressive reasons.'"

*In re S.S.*, 271 B.R. 240, 245 (Bankr. D.N.J. 2002) (internal citations omitted; paragraphing added).

In this case, *audit* fees may be recovered in a limited circumstance, but there is no provision

for shifting of legal fees in connection with an audit or enforcement of the Agreement generally,

and Sigmapharm has not cited any provision of the Agreement or applicable law to the contrary.

---

[206] Lambert Decl., Agreement §§ 13.2, 13.3, Ex. A, Dkt. No. 17-2.
[207] Lambert Decl., Agreement § 2.2.2, Ex. A, Dkt. No. 17-2.
[208] Pls.' Br., at 31-32, Dkt. No. 17.

New Jersey law also circumscribes the awarding of expert fees. *Josantos Constr. v. Bohrer*, 326 N.J. Super. 42, 47-48 (App. Div. 1999) ("[t]he general rule is that litigants bear their own expenses for fees and costs, except where specifically authorized by statute, rule, or agreement"). In *Josantos*, the court determined that expert fees were litigation costs, not taxable costs under N.J.S.A. § 22A:2-8, and did not award them as damages to the prevailing party. *See also Maintainco, Inc. v. Mitsubishi Caterpillar Forklift Am., Inc.*, 408 N.J. Super 461, 482-83 (App. Div.), *cert. denied*, 200 N.J. 502 (2009) (recognizing strong adherence in New Jersey jurisprudence "to the general prohibition of expert fee awards in the absence of manifest statutory authority" and declining to award expert fees under the Franchise Practices Act, N.J.S.A. § 56:10-1 *et seq.*).

As noted above, Sigmapharm argues in its opposition to summary judgment that it is premature to dismiss its claims for audit, expert and legal fees, because the audit is not complete.[209] And, if the Court finds that dismissal is not premature, Sigmapharm asserts that "the current error rate is 100%."[210]  But that would entitle Sigmapharm only to audit fees, not legal fees, under the Agreement.  Therefore, the claims for those legal, audit and expert fees will be dismissed, except to the limited extent provided for in the Agreement (i.e., audit fees may be awarded if the variance determined through the ongoing audit is in excess of 5%; expert fees may be awarded if related to the actual audit).

Based on the foregoing, the Court grants Plaintiffs' motion for summary judgment denying Sigmapharm those fees as follows:

(1) the demand for $804,398 in audit fees is denied without prejudice, pending the result of the audit and a determination as to whether the 5% threshold has been met;

(2) the demand for $745,588 in legal fees and costs is denied; and

---

[209] Sigma Br., at 29-30, Dkt. No. 47.
[210] Sigma Br., at 30, Dkt. No. 47.

(3) the demand for $37,602 in expert fees and costs is denied without prejudice, pending the results of the audit and a determination as to the nature of the expert fees (e.g., whether directly related to the audit or to legal services).

The parties may revisit the allocation of audit fees at the conclusion of the audit, as the Agreement at § 8.6 requires and, if they are unable to agree, at trial.[211]

(iv)    <u>Interest</u>

Sigmapharm seeks awards for interest on monies already paid or allegedly due:

(1) $154,728 on the additional amount allegedly owed based on overstatement of COGS;

(2) $14,734 interest on rebates from CMS ("CMS Rebates");

(3) $116,506 on the $9,065,440 in profits that Plaintiffs tardily paid by November 1, 2017, as described above;

(4) $524,394 on alleged additional Net Profits due Sigmapharm; and

(5) $1,480,402 on administrative fees allegedly improperly paid by Sigmapharm.

These demands for awards for interest appear in paragraphs ¶¶ 6, 7, 9, 10 and 11 in Sigmapharm's Proofs of Claim.[212]

As to interest on the tardily paid amounts, as already noted above, Mr. Kremer acknowledged both that:  (1) he was not sure whether the Agreement allowed for such interest but that he used an interest rate that Counsel gave him; and (2) Sigmapharm did not demand this interest until after Sigmapharm terminated the Agreement.[213]  Examination of the Agreement, particularly of § 8 ("Expenses and Profit Sharing") and § 8.3 ("Distribution of Net Profits") and even § 8.6 ("Maintenance of Record; Audits"), discloses no provision for any payment of interest. Indeed, the Agreement does not appear even to contemplate interest or any other penalty for late payment of the profit share.  Instead, as a maximum (and limited) penalty, as described above, the

---

[211] Lambert Decl., Agreement § 8.6, Ex. A, Dkt. No. 17-2.
[212] Lambert Decl. Claim Nos. 155-2 and 162-1, Exs. H, K, Dkt. No. 17-2.
[213] Lambert Decl., Nov. 11, 2020 Kremer Dep. 207:8-208:2, Ex. B, Dkt. No. 17-2.

Agreement allows shifting of the cost of an audit which shows a variance greater than 5%.[214]

Sigmapharm has not cited any provision of the Agreement that provides for interest.

In sum, the Agreement does not provide for interest on such payments. Similar to legal

fees, contractual interest is an integral part of contractual debt and cannot be awarded outside the

contract or absent any provision for it in the contract. *Conklin Farm v. Leibowitz*, 140 N.J. 417,

425 (1995). As a consequence, the Court grants partial summary judgment in favor of Plaintiffs

denying Sigmapharm's demand for interest on the five separate items noted above. Of course, the

Court would rule in the same manner to the extent that Plaintiffs seek legal fees, interest or the like

absent the presentation of new or additional evidence that would allow recovery of these items.

        (v)     <u>Inventory and Destroyed Product</u>

Plaintiffs, by seeking dismissal of certain of Sigmapharm's Counterclaims, also seek

dismissal of those elements included in Claim No. 162-1 (against Rising) which Plaintiffs assert

are contingent on the validity of the termination of the Agreement. These elements include

Sigmapharm's demand for $856,158 in product destroyed rather than returned (a line item through

June 30, 2018).[215] Hughes testified in his December 18, 2020 deposition that some of the product

represented by this figure, "short-dated" and sitting on shelves, may not actually have been

destroyed but was sold and therefore generated more revenue.[216] Under the definition of "Net

Profits" in Agreement § 1.36 at (vi), "the cost of all Product(s) that are unsaleable or no longer

marketable" was an item to be deducted from "Net Sales" to produce "Net Profits."[217] Thus, after

it is determined whether this inventory was sold or destroyed, this is also an item that can and

should be addressed as part of the audit, as provided by the Agreement. Additionally, this issue

---

[214] Lambert Decl., Agreement § 8.6, Ex. A, Dkt. No. 17-2.
[215] Claim No. 162-1 ¶ 14 ($856,158 in destroyed product); Lambert Decl., Dec. 18, 2020 Hughes Dep. 241:18-23, Ex. 3, Dkt. No. 51.
[216] Lambert Decl., Dec. 18, 2020 Hughes Dep. 241:18-249:4, Ex. 3, Dkt. No. 51.
[217] Lambert Decl., Agreement § 1.36, Ex A, Dkt. No. 17-2.

may be affected by this Court's determination as to whether either or both Plaintiffs were also in breach of the Agreement.   Accordingly, this aspect of Plaintiffs' motion is denied without prejudice subject to the results of the audit and trial.

### F.   Aceto and Rising are Entitled to Summary Judgment Dismissing Certain Common-law Claims (Fraud, Unjust Enrichment, Promissory Estoppel) As They Are Not Available in This Breach of Contract Action and as They Were Improperly Pleaded in the Counterclaim by Incorporation of Other Documents

Plaintiffs argue that Sigmapharm is not entitled to pursue certain common-law claims for promissory estoppel/detrimental reliance, unjust enrichment/quantum meruit, and common-law fraud.  These constitute Counts Three, Four and Five of Sigmapharm's five-count Pa. Complaint, which Sigmapharm incorporated by reference into all three Counterclaims in this Adversary Proceeding.[218]

(i)      Waiver of Affirmative Fraud Claims

Plaintiffs first argue that Sigmapharm, through counsel, separately waived or abandoned its common-law fraud claim in counsel's August 18, 2020 letter to Plaintiffs' counsel memorializing the results of a July 30, 2020 conference.  There, counsel for Sigmapharm stated:

> Although you refer to Topic 23 at the end of your letter, it was my understanding that Rising/Aceto will advise us if they still need a witness to testify as [to] the factual basis for price fixing and fraud allegations **because Sigmapharm did not assert a fraud claim in the bankruptcy action.**

---

[218] Counterclaim One is against Aceto only; Counterclaim Two is against Rising only; and Counterclaim Three is against Aceto and Rising. Aug. 19, 2019 Answer and Counterclaim, Dkt. No. 5.  To recap, Counts One and Two of the Pa. Complaint are for:

(i)      declaratory and injunctive relief (declaring the Agreement terminated and ordering turnover of product to Sigmapharm); and
(ii)     breach of contract.

Answer and Counterclaim, Mar. 23, 2018 Pa. Compl., Ex. A, Dkt. No. 5.

(emphasis supplied).[219] While this statement may be technically true, it fails to acknowledge that Sigmapharm incorporated its Pa. Complaint (which includes the fraud claim) into all three of its Counterclaims in the Adversary Proceeding (a fair illustration for why Fed. R. Bankr. P. 7008 / Fed. R. Civ. P. 8(a) require a "short and plain statement" of the grounds for relief). Sigmapharm does not substantively dispute its waiver of any affirmative fraud claim. However, it seeks to preserve its right to argue defensively that Plaintiffs made false statements to Sigmapharm representatives in connection with the audit and related matters.[220] The Court agrees that the affirmative fraud claim has been waived, but also finds that this waiver does not prevent Sigmapharm from asserting that the Plaintiffs' alleged breaches were based at least in part on false or misleading statements made in connection with the accounting/audit process.

Relatedly, Plaintiffs presume that Sigmapharm wants to preserve common-law claims as a "defense" against Aceto, if the Court finds that Aceto is not bound by the Agreement.[221] Plaintiffs argue (without support) that Sigmapharm cannot have a "defense" against Aceto on the grounds that "Aceto does not assert affirmative claims against Sigmapharm."[222] But (as noted) a defense is different from an affirmative claim, and Sigmapharm certainly has the right to argue and attempt to prove at trial that Plaintiffs (whether as representatives of Aceto, Rising or both) made false and misleading claims in connection with the accounting and audit process. Those alleged misstatements are not only part of the alleged breach of the Agreement, as alleged by Sigmapharm, but also a component of Sigmapharm's defense to Plaintiffs' affirmative claims.[223]

---

[219] Lambert Decl., Aug. 18, 2020 letter, at 2, Ex. L, Dkt. No. 17-2. See also Sigmapharm's objection to Plaintiffs' SUMF at ¶ 27, Dkt. No. 47, quoted at length, *supra.*
[220] See Sigmapharm's objection to Pls. SUMF, ¶ 27, Dkt. No. 47 (acknowledging that Sigmapharm is not pursuing a fraud claim, but not waiving any defenses); Sigma Br., Sept. 15, 2020 Letter, Ex. 46, Dkt. 47 (same).
[221] Pls.' Reply Br., at 22, Dkt. No. 57.
[222] Pls.' Reply Br., at 22, Dkt. No. 57.
[223] Compl., Dkt. No. 1. Sigmapharm sued Aceto and Rising in the March. 23, 2018 Pa. Complaint. Sigma Answer, Mar. 23, 2018 Pa. Compl., Ex. A, Dkt. No. 5.

Plaintiffs also argue that the economic loss doctrine prevents Sigmapharm from pursuing any fraud (and related common law tort) claims while it pursues contract claims under a valid contract. "The economic loss doctrine 'prohibits plaintiffs from recovering in tort economic losses to which their entitlement only flows from a contract.'" *Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co.*, 226 F. Supp. 2d 557, 562 (D.N.J. 2002) (internal citation omitted); *TBI Unlimited LLC v. Clear Cut Lawn Decisions, LLC*, 2013 WL 6048720, at *5 (D.N.J. Nov. 14, 2013).[224]  The Court agrees with this analysis, as Sigmapharm's alleged damages flow directly from the Agreement. Thus, the only damages to which Sigmapharm may be entitled rise or fall on the basis of its claims of breach of the Agreement.

(ii)    <u>Quasi-Contractual Claims</u>

Sigmapharm also argues that, because Plaintiff *Aceto* "disputes being obligated under the [Agreement]," Sigmapharm may pursue its alleged quasi-contractual claims against Aceto, based on alleged misrepresentations by its Chief Operating Officer (Kaczmarek), Licata and other officers, on the theory that an aggrieved party may simultaneously pursue contract and quasi-contract claims when it contests the *validity* of the contract (even if it does not seek rescission). *CHNJ Investors, LLC v. Koger*, 2013 WL 1192400, at *6, *9 (D.N.J. Mar. 21, 2013).[225]  In *Koger*, the parties disputed the validity and existence of the subject contracts based on fraudulent inducement and other related claims. *Koger*, 2013 WL 1192400, at *10. In this case, Plaintiffs do not contest the validity or existence of the Agreement, but merely argue that Aceto was not bound by the Agreement because it did not sign it. Thus, *Koger* is not applicable here.

---

[224] Courts recognize an exception to the economic loss doctrine and allow claims for contract and tort damages to proceed simultaneously when the plaintiff claims (i) fraud by the counterparty in inducing the plaintiff to enter the contract; rather than (ii) fraud by the counterparty in performing the contract. *RNC Sys., Inc. v. Modern Tech. Grp., Inc.*, 861 F. Supp. 2d 436, 451 (D.N.J. 2012); *Ribble Co., Inc v. Burkert Fluid Control Sys.*, 2016 WL 6886869, at *3 (D.N.J. Nov. 22, 2016).  Neither party asserted a claim for fraudulent inducement in the Complaint, Counterclaim or Pa. Complaint.
[225] Sigma Br., at 30-31, Dkt. No. 47.

Plaintiffs argue further that, even if Aceto is not bound by the Agreement, Sigmapharm may still not proceed affirmatively against it on common law grounds.[226]  In this regard, Plaintiffs rely on *D.R. Horton, Inc.- N.J. v. Dynastar Dev., L.L.C.*, 2005 WL 1939778, at *18-*19 (Law Div. Aug. 10, 2005), in which Plaintiff-contractor, which successfully sued its counterparty on a construction-development contract, also sought to sue non-contracting parties on a theory of unjust enrichment (the plaintiff did not assert that it had an implied or quasi-contract with these defendants).  Citing numerous published decisions, the trial court in *D.R. Horton* declared that "the equitable remedy of restitution for unjust enrichment is available only when there is no adequate remedy at law"; that when "'there is in fact a legally subsisting express contract, the law will not imply an agreement concerning the same subject matter'"; and that the targeted defendants had not been unjustly enriched in any event. *D.R. Horton*, 2005 WL 1939778, at *18-*19 (internal citations omitted).[227]  *And see In re Vizstara, LLC*, 2011 WL 4433593, at *5 (Bankr. D.N.J. Sept. 21, 2011) ("'a [person] is not entitled to employ the legal fiction of quasi-contract to substitute one promisor or debtor for another'") (internal citation omitted).

The Court agrees with Plaintiffs that Sigmapharm's extra-contractual claims fail as a matter of law because the existence and validity of the Agreement is not in dispute.  Instead, Sigmapharm's claims against Aceto and Rising must rise and fall on the basis of the Agreement, which both sides agree is valid.  Accordingly, Sigmapharm's claims based on fraud, quasi-contract, unjust enrichment and promissory estoppel are dismissed on summary judgment.

## VI.    CONCLUSION

For the reasons stated above, the Court rules on the Motions as follows:

---

[226] Pls.' Reply Br., at 23-24, Dkt. No. 57.
[227] Pls.' Reply Br., at 23-24, Dkt. No. 57.  For the reasons previously stated, the Court disagrees with Plaintiffs' argument that there has been no showing of any benefit to Aceto from the Agreement, especially if it is found to be a Party to the Agreement.

1.    The Court **GRANTS** summary judgment in favor of Plaintiffs and against Sigmapharm on **Count 5** of the Complaint and declares that Sigmapharm's letters of December 16, 2016 and March 23, 2018 do not constitute proper notice of breach and termination of the June 22, 2006 *Master Product Development and Collaboration Agreement* (the "Agreement").  As a result, the Agreement was unlawfully terminated and breached by Sigmapharm.

2.    The Court **GRANTS** partial summary judgment in favor of Plaintiffs and against Sigmapharm on **Count 6** of the Complaint as to liability only and declares that Sigmapharm breached the Agreement by failing to give the Plaintiffs proper notice of breach and termination of the Agreement.  The determination as to the amount of any damages caused by these breaches is reserved for trial.

3.    The Court **DENIES WITHOUT PREJUDICE** Plaintiffs' motion for summary judgment dismissing Sigmapharm's Counterclaims 1 and 3 as they relate to Aceto.  The determination of the liability, if any, of Aceto to Sigmapharm for any claimed breach of the Agreement by Aceto is reserved for trial.

4.    The Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's motion for summary judgment to disallow certain elements of Sigmapharm's Claim Nos. 155-2 (which pertains to Aceto) and 162-1 (which pertains to Rising) as follows:

(A) The Court **DISALLOWS** and **DISMISSES WITH PREJUDICE Sigmapharm's** claims for:

(i)    $10 million in lost profits;

(ii)    $745,588 in legal fees and costs; and

(iii)    Interest on alleged late payments, as asserted in Paragraphs 6, 7, 9, 10, and 11 of Sigmapharm's Proofs of Claim against Rising (162-1) and Aceto 55(155-2).

(B) The Court **GRANTS IN PART** Plaintiffs' motion for partial summary judgment that disgorgement is not an available remedy for breach of the Agreement; provided, however, that this relief is granted **WITHOUT PREJUDICE** to Plaintiffs' claims for damages resulting from any breach of the Agreement, including (without limitation) Plaintiffs' alleged failure to: (i) allow the audit; (ii) provide appropriate backup documentation; (iii) maintain necessary and transparent books and records; or (iv) properly perform the administrative duties under the Agreement, including those that gave rise to the administrative fee paid to Rising pursuant to the Agreement.

(C) The Court **DENIES WITHOUT PREJUDICE** the Plaintiffs' motion for summary judgment to disallow the following elements of Sigmapharm's Claim Nos. 155-2 and 162-1, pending further proceedings and/or trial:

    (i)    $804,398 in audit fees, subject to the results of the Court-ordered audit and, if not resolved by the audit, a determination at trial;

    (ii)    $37,602 in expert fees and costs, subject to a determination at trial as to whether such fees relate to the audit and are recoverable under the Agreement;

    (iii)    $856,158 in product destroyed rather than returned, subject to the results of the Court-ordered audit, and, if not resolved by the audit, a determination at trial as to whether Plaintiffs were also in breach of the Agreement and the effect of any such breach by Plaintiffs on the respective damage claims of the parties.

    (iv)    Any claim of Sigmapharm that is based on Sigmapharm's termination of the Agreement being valid, including those asserted in paragraphs 14 and 15 of Claim Nos. 155-2 and 162-1, subject to a determination at trial as to whether Plaintiffs were also in breach of the Agreement and the effect of any such breach by Plaintiffs on the respective damages claims of the parties.

5.    The Court **DISMISSES WITH PREJUDICE** Sigmapharm's common-law claims against the Plaintiffs for fraud, unjust enrichment and promissory estoppel, which are incorporated

by reference into each of Sigmapharm's three Counterclaims through Sigmapharm's further incorporation of the Complaint that it filed in the U.S. District Court for the Eastern District of Pennsylvania, Dkt. No. 2:18-cv-1238, including without limitation Counts III, IV and V therein.

6.     The Court **DENIES** Sigmapharm's motion for summary judgment dismissing Plaintiffs' Complaint.  The determinations as to whether either or both Plaintiffs breached the Agreement and the amount of damages caused by any such breach involve multiple disputed questions of fact and mixed questions of fact and law and are reserved for determination at trial.

An Order consistent with this Opinion is being entered by the Court.

*Vincent f. Papalia*
VINCENT F. PAPALIA
United States Bankruptcy Judge

Dated:  October 5, 2021