UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

In Re:

TRI HARBOR HOLDINGS CORPORATION, *et al.*,

Debtor.

-----------------------------------------------------------------

KAVOD PHARMACEUTICALS LLC (*f/k/a* RISING PHARMACEUTICALS, LLC, *f/k/a* RISING PHARMACEUTICALS, INC.) and TRI HARBOR HOLDINGS CORPORATION (*f/k/a* ACETO CORPORATION),

                    Plaintiffs,

v.

SIGMAPHARM LABORATORIES, LLC,

                    Defendant/Counterclaimant.

**FILED**

June 18, 2025
Jeanne A. Naughton, CLERK
United States Bankruptcy Court
Newark, NJ
By: *Juan Filgueiras*, Courtroom Deputy

Case No.: 19-13448 (VFP)

Chapter: 11

Adv. Pro. No.: 19-2053 (VFP)

Judge: Vincent F. Papalia

**OPINION AFTER TRIAL**

<u>APPEARANCES</u>

LOWENSTEIN SANDLER LLP
Reynold Lambert, Esq.
Gavin Rooney, Esq.
One Lowenstein Drive
Roseland, NJ 07068
*Counsel for Plaintiffs*

ELLIOTT GREENLEAF, PC
Henry F. Siedzikowski, Esq. (*pro hac*)
Timothy Myers, Esq.
Andrew Estepani, Esq.
925 Harvest Drive, Ste. 300
Blue Bell, PA 19422
*Counsel for Defendant/Counterclaimant*

**HONORABLE VINCENT F. PAPALIA**
**United States Bankruptcy Judge**

## I.  INTRODUCTION

This dispute is, at its core, about the parties blaming each other for the failure of their longstanding business relationship.[1] From 2006 to early 2018, Kavod Pharmaceuticals LLC[2] ("Rising") and Tri Harbor Holdings Corporation[3] ("Aceto") (collectively "Plaintiffs" or "Rising/Aceto") and Sigmapharm Laboratories, LLC ("Sigmapharm" or "Defendant") were parties to a Master Product Development and Collaboration Agreement (the "Agreement") to develop, manufacture, and sell generic pharmaceutical products. For many years, the parties' relationship was mutually beneficial and generally proceeded without incident.

The parties' conflict began when Sigmapharm asked Rising/Aceto in May 2015 to account for an increase in reported chargebacks, rebates and expenses against sales that reduced the parties' shared net profits (which, under the Agreement, were generally paid 45% to Rising/Aceto and 55% to Sigmapharm). Later that year, Sigmapharm requested an audit as provided for under § 8.6 of the Agreement. After the exchange of data (which took too long and was incomplete, according to Sigmapharm), Sigmapharm sent Rising/Aceto a letter on December 16, 2016 (the "December 16 Letter") that largely liquidated Sigmapharm's claims for underpaid profits from April 2009 (the beginning of the productive life of the Agreement) through March 31, 2016 ("Audit Period I") and reduced certain of those claims to invoices.[4]

---

[1] See generally, Dkt. No. 72 (this Court's October 5, 2021 Opinion that granted in part and denied in part the parties' separate motions for summary judgment); also found at *Kavod Pharmaceuticals LLC v. Sigmapharm Labs., LLC (In re Tri Harbor Holdings Corp.)*, 2021 WL 4877265 (Bankr. D.N.J. Oct. 5, 2021) (the "SJ Opinion").
[2] Formerly known as Rising Pharmaceuticals, LLC, *f/k/a* Rising Pharmaceuticals, Inc.
[3] Formerly known as Aceto Corporation.
[4] Dkt. No. 72 at 12-14 (SJ Opinion).

From 2016 until early 2018, the parties continued to communicate and exchange at least some information.[5] Ultimately, on March 23, 2018, Sigmapharm sent Rising/Aceto a letter terminating the Agreement based on alleged material breaches it asserts were described in the December 16 Letter.[6]

This Court previously found, as part of its ruling on competing motions for summary judgment, that Sigmapharm "unlawfully terminated and breached" the Agreement when it issued the March 23, 2018 termination letter without providing the notice and opportunity to cure required by the Agreement.[7] The Court reserved for trial the issue of any damages resulting from Sigmapharm's breach of the Agreement and the determination of the liability, if any, of Rising/Aceto to Sigmapharm for any claimed breach of the Agreement by Plaintiffs.[8] The Court conducted a 33-day trial to determine the issues that remained after it granted partial summary judgment. This Opinion sets forth the Court's resolution of those issues after trial.

## II. JURISDICTIONAL STATEMENT

The Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and the Standing Orders of Reference entered by the United States District Court on July 23, 1984, and amended on September 18, 2012 (Standing Order 12-1), and as further amended on June 6, 2025 (Standing Order 2025-02). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (C) and (O). In its Answer, Sigmapharm admitted this Court's core jurisdiction.[9] Venue is proper

---

[5] *Id*. at *12.

[6] CC-52.

[7] Dkt. No. 72 at 79 (SJ Opinion).

[8] Dkt. No. 69 (Order Granting in Part and Denying in Part the Plaintiffs' Motion for Summary Judgment and Denying the Defendant's Motion for Summary Judgment).

[9] Dkt. No. 1 (Compl. ¶¶ 15-17 (Plaintiffs' statement of jurisdiction and venue)); Dkt. No. 5 (Answer ¶¶ 15-17). Sigmapharm admits this Court's "core" jurisdiction and venue, as pleaded by Plaintiffs.

in this Court under 28 U.S.C. § 1408. The Court issues the following findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052. To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

## III.  PROCEDURAL HISTORY

### A. Pre-Bankruptcy Litigation and Subsequent Arbitration

On March 23, 2018,  the same day that Sigmapharm sent its Notice of Termination, Sigmapharm commenced litigation against Rising/Aceto in the District Court for the Eastern District of Pennsylvania (the "District Court Action") [10] seeking various forms of relief, including damages for breach of contract, a declaration that the Agreement had been validly terminated, and to compel an audit.[11] In the District Court Action, Sigmapharm filed a Motion to Enforce an Audit, which Rising/Aceto opposed. Rising/Aceto then filed a Motion to Stay Proceedings and Compel Arbitration based on the arbitration clause in the Agreement.[12] By Order and Opinion entered on October 26, 2018, the District Court granted Rising/Aceto's Motion to Compel Arbitration; denied Sigmapharm's Motion to Compel an Audit (on the ground that it was more properly considered in the context of the arbitration); and also ordered Rising/Aceto to preserve records that could be relevant to the Plaintiff's audit.[13] Sigmapharm then moved to compel an audit in the Arbitration, which Rising/Aceto contested, at least initially.[14] That motion and the Arbitration itself were stayed by Rising/Aceto's bankruptcy filing on February 19, 2019.

---

[10] 2:18-CV-01238, *Sigmapharm, LLC v. Rising Pharmaceuticals, Inc. et al.*.
[11] Dkt. No. 5 (Sigmapharm Answer, Ex. A., District Court Action).
[12] Dkt. No. 5 (Sigmapharm Answer at ¶ 53).
[13] Dkt. No. 5 (Sigmapharm Answer, Ex. C).
[14] Dkt. No. 50 at ¶ 155-6; Dkt. No. 58-2 at ¶ 154.

**B. The Debtors' Bankruptcy Filing and the Shore Suven Sale**

Nine affiliated Debtors, including Plaintiffs, filed their voluntary Chapter 11 petitions for reorganization on February 19, 2019.[15] The Court granted the Debtors' motion to jointly administer the cases.[16] The Debtors promptly sold the components of their business operated through Rising (the "Pharma Business") to Shore Suven Pharma, Inc. ("Shore Suven") pursuant to a Sale Order entered on April 10, 2019 and the related Asset Purchase Agreements ("APA") approved by that Order.[17] That sale closed on April 19, 2019.[18] Prior to the sale to Shore Suven, the Pharma Business included Rising's relationship with Sigmapharm; however, the Agreement between Rising/Aceto and Sigmapharm was not part of that sale.

**C. This Adversary Proceeding**

The Plaintiff commenced this adversary proceeding on July 18, 2019 by filing a nine-count complaint against Sigmapharm. [19] Sigmapharm filed its Answer and Counterclaims on August 19, 2019.[20]

**1. Pre-Trial Motion Practice**

**(a) Sigmapharm's Motion to Compel an Audit**

On December 23, 2020, Sigmapharm filed a Motion to Enforce the Audit Requirements of the Agreement (the "Audit Motion"),[21] which Rising/Aceto opposed.[22] On June 7, 2021, after extensive briefing and oral argument, this Court granted Sigmapharm's Audit Motion and

---

[15] Main Case Dkt. No. 1 (Bankruptcy petition for Tri Harbor Holdings Corporation, *et al*., Case No. 19-13448 (VFP) (jointly administered).
[16] Main Case Dkt. No. 29 (Order Granting Motion For Joint Administration).
[17] Main Case Dkt. No. 372
[18] Main Case Dkt. No. 640 (Joint Disclosure Statement at 42).
[19] Dkt. No. 1.
[20] Dkt. No. 5.
[21] Dkt. Nos. 16, 25 (Notice of Intent to Pursue the Audit Motion).
[22] Dkt. No. 34.

entered an order mandating the audit (the "Audit Order").[23] Among other things, the Audit Order

required Rising/Aceto to produce the documents that Sigmapharm's expert, Gregory Cowhey,

identified in his April 2, 2021 Report that were not previously produced.[24] Following the

completion of any supplemental production(s), the Audit Order gave Sigmapharm the right to

make supplemental document/information requests and/or "sampling requests."[25]

### (b) Discovery Disputes and Summary Judgment

Prior to trial, there were numerous discovery disputes that required Court intervention.[26]

Following discovery, the parties brought cross motions for summary judgment. On October 5,

2021, this Court issued an Opinion[27] and accompanying Order[28] denying in part and granting in

part the Plaintiffs' motion for summary judgment and denying the Defendant's motion for

summary judgment.

### (c) Motions *in limine*

The parties also filed multiple motions *in limine*.[29] Rising/Aceto filed a motion *in limine*

to limit or bar the testimony of Sigmapharm's expert, Gregory Cowhey, as to alleged lost profits

by Sigmapharm, *i.e.,* an alleged $9 million profit share underpayment for Audit Period I. [30] The

Court granted in part and denied in part that motion, holding that Mr. Cowhey's opinion "with

respect to Audit Period I is improperly based and highly speculative," and "not a proper

---

[23] Dkt. No. 64.
[24] *Id.*.
[25] *Id.* ¶ 3.
[26] Dkt. Nos. 16, 18, 29, 30, and 31.
[27] Dkt. No. 72 (SJ Opinion)
[28] Dkt. No. 69 (Order Granting in Part and Denying in Part the Plaintiffs' Motion for Summary Judgment and Denying the Defendant's Motion for Summary Judgment).
[29] Dkt. Nos. 98, 99, 114, 115, 117, 119, 133.
[30] Dkt. No. 99.

application of principles and methods to the facts of this case [.]"[31] The other motions *in limine* were all denied without prejudice pending trial.[32]

### 2. Trial

The trial on the issues remaining after this Court's summary judgment ruling commenced on February 23, 2023, and concluded on April 30, 2024, during which the Court heard 33 days of testimony.[33]

#### (a) Damages Claimed

##### (i) Rising/Aceto

Rising/Aceto asserts that as a remedy for Sigmapharm's unlawful termination of the Agreement, it is owed expectation damages in the form of the lump-sum, net present value of the future profits Rising/Aceto expected under the Agreement, measured by future Product sales expected as of the March 23, 2018 date of breach. Rising/Aceto's expert witness, Laureen Ryan, calculated those damages at between $10,041,270 to $12,683,777, as of August 19, 2024, utilizing several different scenarios based on varying levels of price and unit erosion. Rising/Aceto argues that Sigmapharm's actual sales of Products or Co-Owned Products following its unlawful termination corroborate Rising/Aceto's expectation damages and, in fact, prove that Ms. Ryan's estimates are conservative. As such, Rising/Aceto asserts that the Court

---

[31] Dkt. No. 136 at 15-16 (Opinion); Dkt. No. 135 (related Order).

[32] Dkt. No. 149 (Opinion Denying Without Prejudice Sigmapharm's Motion to Preclude Evidence of Lost Profits); Dkt. No. 145 (Opinion Denying Without Prejudice Sigmapharm's *In Limine* Motion to Exclude Documents Created by Plaintiffs Post-Litigation); Dkt. No. 147 (Opinion Denying Without Prejudice Plaintiffs' *In Limine* Motion to Exclude Video Recording of Laureen M. Ryan's Deposition); Dkt. No. 153 (Opinion Denying Without Prejudice Sigmapharm's Motion for Sanctions for Spoliation of Evidence).

[33] Citations to trial transcripts refer to the trial day, the last name of the testifying witness, and pages and lines of cited testimony.

should award lost profits damages to Rising/Aceto at the top of the range, *i.e.*, $12,683,777 (the "Lost Profits").

As a separate and independent item of damage, Rising/Aceto claims that it is also owed recovery of Sigmapharm's share of credits provided to customers for actual sales of Products under the cost-and-profit-sharing formula of the Agreement. Rising/Aceto alleges that Sigmapharm failed to pay or refund Rising/Aceto for its contractual share of over $9 million in financial obligations owed to customers in the form of rebates, chargebacks, and various other credits arising from pre-termination Product sales (the "Credit" or "Credit Refund" damages). Finally, Rising/Aceto also claims an additional $668,802 in damages based on improper calculation of the Costs of Goods Sold ("COGS") component of the profit share.

### (ii) Sigmapharm

At trial, Mr. Kremer identified the following categories of damages: (i) $1.9 million claim set forth in Exhibit A to the "Audit Results" Letter for Audit Period I; (ii) $1.1 million COGS set forth in Exhibit C to that letter; (iii) $235,000 related to auditor fees; and (iv) "duplicate credit memos" totaling approximately $300,000 arising from Mr. Hughes' analysis of Mr. Kremer's claimed underpayments from Audit Period I.[34] Sigmapharm also asserts that Rising/Aceto should be denied any recovery based on its breaches of the Agreement.

### (b) Trial Witnesses

Plaintiffs called the following fact witnesses: (i) Steven Rogers, Aceto's former Chief Legal Officer and Secretary to Aceto's Board of Directors;[35] (ii) Eugene Hughes, Rising's former Senior Vice President of Finance;[36] (iii) Rebecca Roof, Aceto's former Interim Chief Financial

---

[34] Day 19, Kremer, 153:1-154:10.
[35] Day 1, Rogers, 34:23-36:5.
[36] Day 3, Hughes, 10:17-20.

Officer;[37] and (iv) Rajiv Hazaray, Aceto's former Senior Vice President of Strategic Planning.[38]

Defendant called the following fact witnesses: (i) Bernard Katz,[39] the Plan Administrator; and (ii)

Richard Kremer, Sigmapharm's former Vice President of Finance.[40]

Each side called a single financial expert. Plaintiffs called Laureen M. Ryan, Managing

Director, Alvarez & Marsal ("A&M"), B.S. (Accounting), CPA, ABV, CDVB, CIRA, CFE ("Ms.

Ryan").[41] Defendant called Gregory Cowhey, Principal, Financial Investigations and Dispute

Services, RSM US LLP ("RSM"), B.S. (Finance), MBA (Accounting), ASA, IBA, CVA, CFE,

NAFE ("Mr. Cowhey").[42] Ms. Ryan proffered an opinion on Rising/Aceto's Lost Profits and also

gave rebuttal testimony regarding Mr. Cowhey's opinion concerning Sigmapharm's audit of

"Audit Period II" (defined as the period from April 1, 2016 to April 30, 2020). Mr. Cowhey

proffered an opinion regarding his firm's audit of Rising/Aceto's records for Audit Period II.

Sigmapharm did not present any rebuttal opinion testimony by Mr. Cowhey at trial (or

otherwise) relating to Rising/Aceto's alleged Lost Profits. Instead, Sigmapharm relied on the

cross-examination of Ms. Ryan and the testimony of Mr. Kremer.

### (c) Post-trial Submissions

At the conclusion of the trial, the Court directed the parties to submit written Proposed

Findings of Fact and Conclusions of Law and to file replies. Over the objection of Sigmapharm,

the Court permitted limited further responses pursuant to a Second Amended Joint Order

---

[37] Day 13, Roof, 13:11-15.
[38] Day 14, Hazaray, 14:9-16.
[39] Day 26, Katz, 133:12-13.
[40] Day 17, Kremer, 6:10-7-13; 21:6.
[41] Day 24, Ryan, 43:9-18. The Court finds that Ms. Ryan's credentials combined with her detailed analysis regarding Lost Profits and testimony at trial render her more than qualified to provide her expert opinions. Accordingly, Sigmapharm's *Daubert* motion is denied.
[42] Day 27, Cowhey, 11:1-4, 13-19.

Scheduling Post-Trial Briefing.[43] The parties submitted the following: (1) Plaintiffs' Post-Trial Proposed Findings of Fact and Conclusions of Law ("Pl's FoF"); [44] (2) Defendant's Findings of Fact and Conclusions of Law ("Def's FoF");[45] (3) Defendant's Reply Brief to Rising-Aceto's Proposed Findings of Fact and Conclusions of Law ("Def's Reply Brief");[46] (4) Plaintiffs' Response to Defendant's Post-Trial Proposed Findings of Fact and Conclusions of Law ("Pl's Response");[47](5) Plaintiffs' Further Response Pursuant to the Court's Second Amended Joint Scheduling Order ("Pl's Further Response");[48] and (6) Defendant's Response to Rising-Aceto's December 3, 2024 Further Reply Brief ("Def's Further Response").[49]

## IV. FACTUAL BACKGROUND

### A. Entering into the Agreement

Sigmapharm and Rising entered into the Agreement at the center of this dispute on June 22, 2006.[50] That was approximately three and one-half years before Rising was acquired by a wholly owned subsidiary of Aceto (Sun Acquisition Corp.) in or about December 2010. That subsidiary then changed its name to Rising, which assumed "old" Rising's obligations under the Agreement.[51]

Under the Agreement, Sigmapharm and Rising contracted to collaborate on the development of generic pharmaceuticals, with Sigmapharm manufacturing, developing and obtaining FDA approvals of the Products, and Rising doing the marketing and accounting for

---

[43] Dkt. No. 261.
[44] Dkt. No. 253.
[45] Dkt. No. 255.
[46] Dkt. No. 256.
[47] Dkt. No. 257.
[48] Dkt. No. 263.
[49] Dkt. No. 266.
[50] CC-1.
[51] CC-2.

essential matters, such as "Net Sales" and "Net Profits" and serving as exclusive distributor of "Co-Owned Products" (all as such terms are defined in the Agreement) for Sigmapharm.[52]

The Agreement generally provided that: (i) Sigmapharm would be paid the cost of manufacture plus 55% of the Net Profits; and (ii) Rising/Aceto would be paid for the cost of distribution plus 45% of the Net Profits, all calculated in accordance with the Agreement.[53] Additionally, Rising/Aceto was entitled to an administrative fee for its services under the Agreement pursuant to section 1.52 (the "Rising Fee"), which was subsequently amended.[54]

## B. Key Provisions of the Agreement

The crux of this dispute revolves around the requirements in Sections 1.37 and 8.6 of the Agreement (the "Audit Provisions"), which mandate that Rising maintain "complete and accurate records" and that its books and records "be transparent and readily available for independent audit purposes." Section 1.37 of the Agreement states:

> 1.37 **"Net Sales"** shall mean, with respect to any Calendar Quarter, the gross amounts invoiced by Rising or its Affiliates for Products sold to any Third Parties during such Calendar Quarter less the sum of: (i) subject to Section 5.7 below [discounts/rebates], chargebacks, cash and quantity discounts, returns, invoice adjustments, rebates (e.g. customer and government) and other credits taken by customers or granted by Rising with respect to such Product sales other than as a result of recalls; (ii) invoice adjustments made for errors on invoiced sales included in previous calculations of Net Sales and not yet accounted for; (iii) Freight; and (iv) marketing and advertising expenses (e.g., trade journals, direct marketing, physician detailing, etc.) directly related to the marketing of the Products. Subject to Section 8.6 [audit] below, all deductions listed in the above articles (1.36 and 1.37) ***shall be transparent and readily available for independent audit purposes***. (emphasis added)

Section 8.6 of the Agreement states:

> 8.6. **Maintenance of Record; Audits**. During the term of this Agreement and for a period of at least seven (7) years after the date of termination of this Agreement, each Party shall ***keep complete and accurate records of all expenses incurred by it under this***

---

[52] CC-1.
[53] CC-1 §§ 1.37, 1.53, 8.3, 8.6.
[54] CC-1 § 1.52.

*Agreement*, which expenses are to be reimbursed by one or both of the other Parties. The cost of audits shall be borne by each Party…, provided, however, that in the event such audit by one Party of the other Party's records shows a discrepancy in excess of five percent (5%)   of the amount reported by such Party, the Party responsible for the discrepancy will reimburse the auditing Party for the reasonable cost of such audit. Any audit or inspection of books and records by a Party shall be conducted upon reasonable written notice to the other Party, be conducted during normal business hours and will not interfere materially with the business operations of the Party being audited or whose books and records are being inspected …. (emphasis added)

Relatedly, the term "Net Profits" is defined in Section 1.36 of the Agreement as follows:

1.36 **"Net Profits"** (or losses as the case may be) shall mean, with respect to any Calendar Quarter, the Net Sales obtained from the sale of Products in the Territory during such Calendar Quarter, less the sum of: (i) Cost of Goods; (ii) Rising's Fee; (iii) amounts repaid or credited by reason of recalls; (iv) pre-approved consulting and legal fees; (v) Litigation Expenses; (vi) the cost of all Product(s) that are unsaleable or no longer marketable; and (vii) any other costs or expense approved by the Parties.

The 55/45 division of the "Net Profits" is calculated and documented in accordance with Sections 1.36, 1.37, 8.3, and 8.6 of the Agreement. Section 8.3 (Distribution of Net Profits), required Rising to provide Sigmapharm with a profit-share statement 45 days after the end of each quarter setting forth the calculation of Net Sales and Net Profits from the sale of Products ("Profit Share Statement").[55] That calculation was performed using formulas that take into consideration multiple factors and components based on the definitions described above, as well as the gross-to-net accounting process utilized by Rising/Aceto.

Rising/Aceto maintained its books and records on an accrual basis and most of Rising/Aceto's "partners" were provided Profit Share Reports that were calculated on an accrual basis. However, Sigmapharm and at least one other partner, ThinQ, were on a cash basis.[56] While the Agreement itself is silent as to whether cash or accrual based accounting was to be used to

---

[55] Agreement § 8.3. The parties also sometimes refer to the Profit Share Statements as profit share accountings or profit share reports.
[56] Day 14, Hazaray, 184:2-185:20 (ThinQ's complaints regarding Rising/Aceto's profit share accounting were similar to Sigmapharm's); Day 14, Hazaray, 161:15-19.

calculate the profit share, both parties acknowledge that Sigmapharm's profit share was to be calculated on a cash basis under the Agreement.[57]

## C. Each Party's Roles Under the Agreement

Under the Agreement, the parties agreed to "jointly collaborate" in, *inter alia*, the manufacturing and marketing of certain generic pharmaceutical products ("Products" or "Co-Owned Products").[58] Sigmapharm assumed responsibility for developing, manufacturing, and securing regulatory approvals for Products.[59] Rising, in turn, assumed responsibility for marketing, distributing, and selling Products.[60] By its terms, the Agreement created a relationship that "is intended to and shall be exclusive to the Parties."[61]

### 1. Joint Ownership of Products

All Products subject to the Agreement were defined as "Co-Owned Products," meaning that Rising/Aceto and Sigmapharm jointly owned the Products, including Abbreviated New Drug Applications.[62]

### 2. Costs And Investments of Product Development

As co-owners of the Products, Rising and Sigmapharm agreed to share both the costs and investments necessary to bring Products to market, as well as the profits generated from their sale.[63] Sigmapharm manufactured and delivered Products to Rising, charging Rising a Transfer

---

[57] CC-27; Day 17, Kremer 85:20 - 90:21.
[58] CC-1 §§ 2.1.1, 5.1.
[59] *Id.*.
[60] *Id.*.
[61] *Id.* § 7.
[62] *See* PX-1328-1332, 1334-1335, Schedules to the Agreement for each Product, under heading "Schedule 4.2.1"; Agreement § 4.2.1; *id.* § 1.49; *see also* Day 1, Rogers, 69:25-70:7, 72:1-4, 73:17-20, 75:10-12, 129:2; Day 20, Kremer, 42:18-44:23. Notwithstanding this clear language, Sigmapharm contends that *it* owned the Products. The Court disagrees. Based on this plain language, the Products subject to the Agreement were "Co-Owned" by the parties.
[63] CC-1 §§ 5.1, 8.

Price at the time of delivery. The Transfer Price represented an amount set forth in the applicable

Product Schedule to compensate Sigmapharm for the expense to manufacture the Product,

including a 15% premium.[64]

The Agreement required Rising to pay to Sigmapharm 55% of the Net Profits realized

from its sale of Products, while Rising kept the remaining 45% as its share.[65] Thus, the allocation

applicable to the distribution of Net Profits (under which Rising received the lower amount,

45%) is different than the allocation applicable to the payment of Development Costs (under

which Rising had to pay the higher amount, 55%). As was noted above, the calculation of Net

Profits and the issuance of quarterly Profit Share Statements, reflecting the profit share

calculations, was Rising's responsibility under the Agreement.

### D. Sigmapharm's Initial Audit Request

During the relevant time period, Richard Kremer was Sigmapharm's Vice President of

Finance.[66] Mr. Kremer had extensive experience in accounting and finance matters generally and

particularly as to the generic pharmaceutical business.[67] He was the individual at Sigmapharm

primarily responsible for the accounting and financial aspects of Sigmapharm's business

relationship with Rising/Aceto.[68] Mr. Kremer learned shortly after he started working at

Sigmapharm in February 2015 that it had never performed an audit of its financial relationship of

Rising/Aceto, which had started in 2009.[69]

---

[64] Day 3, Hughes, 34:18-35:14, 115:6-9; 120:12-121:3; Day 4, Hughes, 21:6-14, 24:7-10; CC-1
§1.61; PX-1328-1332 (Product Schedules) §1.61.
[65] Day 3, Hughes, 115:2-17.
[66] Day 17, Kremer, 7:11-13, 21:6.
[67] Day 17, Kremer, 7:11-25:5.
[68] *Id.*.
[69] Day 17, Kremer, 38:21-40:21.

Mr. Kremer testified that he first began to think an audit was necessary in May 2015, when Rising/Aceto sent Sigmapharm calculations of the Net Profit splits that changed frequently and, in his view, began including line-item costs that were required to be part of the Rising Fee already deducted under the Agreement.[70] In fact, Rising/Aceto's profits share number changed four times in a 30-day period: on May 4, May 14, May 19, and June 1, 2015.[71] These changes impacted the Profit Share Statements by nearly $1.5 million.[72] Through Mr. Kremer, Sigmapharm's team discussed with Rising/Aceto's financial team, headed by Peter Licata (Rising's then CFO), that Rising/Aceto needed to review a "number of elements" in its profit share calculation.[73]

Sigmapharm first asked for an audit at a November 20, 2015 meeting with Rising/Aceto.[74] Mr. Kremer, Dr. Spireas, and their team at Sigmapharm were in attendance at the meeting along with Rising/Aceto's Satish Srinivasan and Mr. Licata to discuss the profit share accounting issues being raised by Sigmapharm. During this meeting, Mr. Kremer "stated we [Sigmapharm] wanted to perform an audit. Satish and Peter welcomed the opportunity."[75]

One of the areas of concern discussed at the November 2015 meeting was the way in which Rising/Aceto was calculating the COGS under the Agreement, which resulted in

---

[70] Day 17, Kremer, 54:14-25; *See* CC-363; CC-363.1; CC-364; CC-364.1; CC-365; CC-365.1; CC-366; CC-366.1; PX-1364.
[71] *Id.*
[72] Day 7, Hughes, 92:7-93:3; *compare* CC-363.1 at cell H57 ($2,873,102.63) to PX-1364 at cell Y62 ($1,358,744.71); compare CC-363.1 at cell 157 ($2,873,102.63) to PX 1364 at cell Y62 ($1,358,744.71); CC-364; CC-364.1; CC-365; CC-365.1: CC-366; CC-366.1.
[73] Day 17, Kremer, 50:18-21.
[74] CC-18; CC-356:1; Day 17, Kremer, 58:2-59:7. Exhibit CC-356.1 is Mr. Kremer's notebook that included a chronology of events between November 20, 2015 and 2017 relating to Sigmapharm's efforts to obtain the information it requested from Rising/Aceto.
[75] *Id.*.

Sigmapharm being underpaid by $1.1 million, according to Mr. Kremer.[76] Others areas of concern included a new issue identified by Sigmapharm – negative accruals – and the verification of profit share calculations.[77] Soon thereafter, Mr. Kremer indicated that it appeared that Rising/Aceto was calculating at least some aspects of the profit share on an accrual basis, rather than the cash basis both parties acknowledged was required under the Agreement.[78] Accordingly, the parties discussed a "twofold" audit: (1) the calculation of COGS and (2) verification of the profit share calculations. Sigmapharm indicated that it might seek an on-site review with independent auditors.[79]

On December 4, 2015, Sigmapharm's Mr. Kremer followed up with emails confirming in writing its request for an audit. In the emails, Mr. Kremer described in detail the information Sigmapharm needed to start the process "to keep our initial efforts confined to Bensalem," where Sigmapharm is located, before "visiting and reviewing hard copy samples."[80] Mr. Kremer explained at trial that when Rising/Aceto started providing information in the first fiscal quarter of 2015, it was in the form of an Excel spreadsheet with only total dollar and sales numbers. He wanted more detail, so this request was for a "list of every invoice, every date, every customer, every quantity, every SKU, and every invoice amount by or per unit that would support the total dollar value they've claimed in this gross sales figure."[81]

Mr. Kremer continued to seek information and send reminders in early 2016 (and thereafter).[82] During this period, Rising/Aceto, through Ms. Leslie Thomas, indicated that they

---

[76] CC-18; CC-356.1; Day 17, Kremer, 58:2-59:7, 63:17-66:23.
[77] Day 17, Kremer, 63:17-65:5, 65:6-67:18.
[78] CC-27; Day 17, Kremer, 85:20-90:21.
[79] Day 17, Kremer, 65:6-67:18, 66:17-66:23.
[80] CC-20; CC-25.
[81] Day 17, Kremer, 69:23-70:15, and 70:16-78:16 (for further explanation).
[82] *See, e.g.*, Day 17, Kremer, 94:7-101:19; CC-310; CC-31; CC-32.

16

would be available for an on-site audit the third week of any month.[83] However, Mr. Kremer did

not believe that he had received the necessary information and back-up necessary before moving

to an on-site audit.[84] As a result, Mr. Kremer indicated to Rising/Aceto that he first needed the

information electronically, and would then follow up with specific requests for hard copy

documents prior to a site visit.[85] Mr. Kremer also followed up with Ms. Thomas to let her know

that Sigmapharm wanted to audit the years from the inception of the relationship in 2009[86]

through 2015.[87]

Shortly thereafter, on February 25, 2016, Mr. Kremer again followed up with

Rising/Aceto. His inquiry focused on COGS, because he believed that Rising/Aceto owed $1.1

million for its previous incorrect method of calculation, and the profit share calculations, which

he believed were being made on an accrual basis rather than on a cash basis.[88] On March 1 and

again on March 9, 2016, Mr. Kremer followed up with emails asking when Sigmapharm would

receive the information that it had been requesting since November 2015.[89] After Mr. Kremer

followed up again with Rising/Aceto's Scott Elian on March 15, 2016, Ms. Thomas provided

information for 2009 through 2014, although it was still not sufficient in Mr. Kremer's view to

---

[83] CC-24.

[84] Day 17, Kremer, 94:7-101:19 and related exhibits.

[85] CC-23; Day 17, Kremer, 78:22-82:10; CC-26. Mr. Kremer testified that, in his view, the steps of an "independent audit" are (1) "identifying all of the level of detail that you need, accumulating that detail;" (2) "making sure that you have one hundred percent of the detail;" (3) "taking that detail and identifying sample selections that you want to support for," which he described as "best…. is third party support;" and (4) "going on site[, looking] at hard copy documents…" Day 17, Kremer, 24:2-20; CC-364.

[86] The Agreement was signed in June 2006, but the parties consider the beginning of the productive life of their business relationship to be April 2009.

[87] Day 17, Kremer, 82:15-83:17.

[88] CC-27; Day 17, Kremer, at 85:20-90:21.

[89] Day 17, Kremer, 92:12-94:6; CC-309; CC-29.

begin an audit because the information did not include key data fields he believed were necessary to properly analyze the data.[90]

Discovery and trial revealed that Rising/Aceto shared Mr. Kremer's concerns about the integrity of Rising/Aceto's profit share data. In fact, immediately after Ms. Thomas sent Rising/Aceto's historical data to Sigmapharm, Rising/Aceto's CFO Doug Roth asked Mr. Licata and Mr. Elian if they vetted the numbers and checked the data against the statements actually sent to Sigmapharm. Mr. Roth asked because he believed that "*i[t] would be a miracle [i]f they agreed or were in the same ballpark.*"[91] In the meantime, Mr. Kremer continued to follow up with his requests during the middle of 2016.[92]

By June of 2016, Sigmapharm was convinced that Rising/Aceto had been calculating and paying net profits on an accrual rather than cash basis, resulting in a potential underpayment to Sigmapharm of $2.5 million.[93] According to Mr. Kremer, Mr. Licata admitted that Rising/Aceto did, in fact, include accrued expenses in the Profit Share Statements which were supposed to be on a cash basis.[94] Sigmapharm then began seeking information relating to the accruals, as it had an obvious impact on the profit share to which Sigmapharm was entitled. Similarly, the accrual information was necessary for Sigmapharm to assess whether it should switch to accrual based partnership accounting, as requested by Rising/Aceto.[95] As discussed below, Rising/Aceto's outdated accounting software or "architecture" made it extremely difficult for Rising/Aceto to

---

[90] Day 17, Kremer, 94:7-101:19; CC-310; CC-31; CC-32.
[91] CC-33.
[92] *See, e.g.*, CC-34 (Kremer follow up email stating future requests would be for more insulated time periods, but that they could not "allow another four months to go by without receiving all the required information.").
[93] Day 17, Kremer, 117:17-119:4.
[94] *Id.* at 118:17-119:2.
[95] Day 17, Kremer, 102:7–103:8; 111:9-21; CC 356.1 at 4/20/16.

maintain two sets of books – one based on accrual accounting and the other based on cash. These deficiencies contributed significantly to the delays and errors in the information provided to Sigmapharm in response to its audit requests.

## E. Rising/Aceto's Responses to Sigmapharm's Information Requests

In response to Sigmapharm's complaints about delay and failure to provide the requested information, Rising/Aceto asserts that it ultimately provided Sigmapharm with all of the detail and information requested.  In fact, on March 18, 2016, Rising/Aceto delivered detailed listings of sales and credits in the form of Excel spreadsheets covering the period of 2009 to 2015.[96] After reviewing these spreadsheets, Mr. Kremer wrote back to request that Rising/Aceto provide additional fields in the exported data (*e.g.,*the date of invoice or credit memo; customer name, number, and facility; and quantity).[97] On direct examination, Mr. Kremer made much of these missing fields, claiming that these initial spreadsheets "didn't have enough information, enough fields for [him] to do anything" and were "grossly… inadequate" and "not complete."[98]

But that was not the full story, as Rising/Aceto worked to correct these issues. On March 31, 2016, Rising/Aceto provided revised spreadsheets containing the requested information for three years: 2013,[99] 2014,[100] and 2015.[101] As to the balance, Rising/Aceto advised that the older

---

[96] *See* PX-1387; PX-1388; PX-1389; PX-1390; PX-1391; PX-1392; PX-1393; PX-1394.
[97] CC-31.
[98] Day 17, Kremer, 97:8, 100:7-8; Day 23, Kremer, 69:9. At one point during his cross-examination, Mr. Kremer acknowledged that he did not know how to "pivot" to certain information that Rising/Aceto provided in electronic spreadsheet format and incorrectly thought that the information had not been provided. Day 22, Kremer, 118:3-11, 119:15-19, 130:11-20. (Mr. Kremer testifying that he had not heard of and did not know how to use pivot tables in an Excel spreadsheet). Thus, Rising/Aceto provided the information requested, but Sigmapharm simply did not know how to access it.
[99] PX-1422; PX-1423.
[100] PX-1425; PX-1426.
[101] PX-1427; PX-1428.

years (2009 through 2012) would require more time. On June 9, 2016, Rising/Aceto provided

revised spreadsheets for the period 2009 to 2012.[102] After confirming receipt of this data, Mr.

Kremer asked for the same data in the same detail for 1Q 2016.[103] Rising/Aceto delivered that

data a week later.[104] Thus, notwithstanding his protests to the contrary, by mid-June 2016 Mr.

Kremer had received all of the listings of sales and credits that he requested for Audit Period I.[105]

The spreadsheets provided Mr. Kremer with transaction-by-transaction detail regarding

the sale of each Product at the Gross Sale price and each credit given to that customer, including

chargebacks, rebates, and returns. For example, in the 1Q 2016 spreadsheet, Mr. Kremer received

a tab titled "1Q16 Sigmapharm Product Detail," showing each and every individual sale of

Product during the quarter, by National Drug Code number, name of Product, dosage form of the

Product, the customer who bought the Product, invoice number for the sale, date of the sale, and

amount of the sale (by units and by dollars).[106] The same spreadsheet tab identifies all returns,

rebates, and other credits recognized during the quarter, again providing the same information.[107]

Further tabs in the same spreadsheet[108] identify each and every chargeback and rebate provided

in the quarter.[109]

These spreadsheets provided Mr. Kremer with the detail he requested for his purpose of

comparing the transaction-level data to the Profit Share Statements. To aid that effort, Mr.

---

[102] *See* PX-1416; PX-1432; PX-1433; PX-1434; PX-1437; PX-1439; PX-1447; PX-1449; PX-1451; PX-1452; PX-1453.

[103] PX-1456. In fact, for subsequent information requests Mr. Kremer asked that the information be the same level of detail as that provided for 1Q 2016. PX-1509.

[104] *Id.;* PX-1457; Day 21, Kremer, 59:20-61:3.

[105] Day 21, Kremer, 61:4-14, 161:14-17.

[106] PX-1457, first tab, lines 2573 to 3922.

[107] *Id.* lines 4-2572.

[108] PX-1457.

[109] *Id..*

Kremer compiled the many Excel spreadsheets Rising/Aceto provided into a single, all-encompassing spreadsheet for the entire Audit Period I, which contained over 900,000 rows of data with multiple columns.[110] In this fashion, Mr. Kremer was able to determine whether there were any duplicate credit memos or transactions in the data.[111] And it allowed Mr. Kremer to compare the Gross Sales and deductions to Gross Sales against the figures Rising/Aceto reported in the Profit Share Statements.[112]

During his direct examination, Mr. Kremer stated that he also wanted to request backup documents on a sample basis to determine whether they corroborated the listings of sales and credits. He did do so, but his actual requests were limited. On June 6, 2016, Mr. Kremer requested six credit memos referenced in the underlying spreadsheets.[113] Rising/Aceto provided them and each of those credit memos supported the deductions listed in the spreadsheets, as Mr. Kremer admitted on cross-examination.[114] These six credit memos (plus an invoice) were the only "backup" documents Sigmapharm requested to corroborate the transactions during Audit Period I, as this Court recognized in its Summary Judgment Opinion.[115]

On cross-examination, Mr. Kremer conceded that he ultimately received what he requested through December 4, 2015 – specifically, the "listing[s]" of all invoices sent from Rising/Aceto to its customers, reported as Gross Sales; and the "listing[s]" of all credit memos or other customer credits, for each and every year in question.[116] After reviewing each of these

---

[110] PX-1837; Day 21, Kremer, 96:18-22.
[111] Day 21, Kremer, 94:4-95:8.
[112] Day 19, Kremer, 99:25-100:11.
[113] PX-1431; PX-1458.
[114] Day 21, Kremer, 68:9-86:1.
[115] Dkt. No. 72 at 41, 52, 56.
[116] *See* Day 21, Kremer, 42:20-24 (2009), 43:4-46:14 (2010), 46:15-47:22 (2011), 47:23-50:14 (2012), 50:15-53:12 (2013), 53:13-56:1 (2014), 56:2-59:19 (2015), and 59:20-61:3 (Q1 2016); s*ee also* PX-1451; PX-1452; PX-1453; PX-1447; PX-1416; PX-1449; PX-1439,;PX-1437; PX-

21

spreadsheets and supporting information in detail, Mr. Kremer acknowledged that Rising/Aceto answered his requests for the period 2009-2015.[117]

With respect to the third item requested by the December 4, 2015 email (linking deductions to the specific Products), Rising/Aceto provided to Sigmapharm underlying data that allocated all deductions (*e.g.*, chargebacks, rebates, returns, and cash discounts) to specific Products. According to Rising/Aceto, it did not claim any deductions (such as general overhead) that were not allocated to a specific Product. Thus, what Rising/Aceto produced in response to Mr. Kremer's requests was all it had. Sigmapharm did not prove otherwise.

With respect to the request addressed to inventory, Mr. Kremer wanted to compare the number of Product units that Sigmapharm delivered to Rising/Aceto with the Product units that Rising/Aceto sold to customers, to determine if any inventory was unaccounted for.[118] Because the listings of sales were reported on a unit basis, this would allow Mr. Kremer to compare the number of units sold against Sigmapharm's own records of the units it shipped to Rising/Aceto and identify any missing Product units or other discrepancies.[119] At trial, Sigmapharm did not demonstrate why this response was insufficient, although it continued to state that Rising/Aceto did not supply the requested information. But Sigmapharm certainly knew what Products it sold

---

1441; PX-1432; PX-1433; PX-1434; PX-1423; PX-1426; PX-1428; PX-1457; *see also* PX-1471 (Medicaid Spend).

[117] *See* Day 21, Kremer, 61:4-14 (conceding he received a "listing of the invoices" and "of the credit memos, payments, adjustments made to gross sales as part of the gross to net deduction process" during the period 2009 to 2015). In addition, Mr. Kremer received a spreadsheet detailing Medicaid rebates for the period 2009 to 2016 (PX-1471) and analyzing the cash discounts (PX-1742).

[118] Day 17, Kremer, 77:1-16.

[119] Day 21, Kremer, 39:3-16, 54:20-55:3, 66:15-18; PX-1837. Moreover, in September 2017, Mr. Hughes provided Mr. Kremer with further detail on Rising/Aceto's on-hand inventory as of June 30, 2017. PX-1505; PX-1506. Mr. Kremer agreed that this information allowed him to determine whether "some bottles went missing," by comparing bottles delivered by Sigmapharm to Rising/Aceto to bottles sold by Rising/Aceto to customers. Day 21, Kremer, 66:7-18.

to Rising/Aceto so it easily could have done the comparison that way, even without receiving the same information directly from Rising/Aceto.

Sigmapharm and Mr. Kremer also complained about not receiving source or original documents and not being able to do an "on-site" review.[120] However, the record reflects that Mr. Kremer received the few "original" documents he requested (as confirmed by the December 16 Letter itself) and that he was offered the ability to conduct an on-site inspection the third week of any month.[121] Thus, Sigmapharm could have performed its on-site inspection or requested any additional source documents during the six or so months from Sigmapharm's receipt of the underlying data until it issued the December 16 Letter, but it did not do so.[122]

## F. December 16 Letter

Mr. Kremer sent to Mr. Licata at Rising/Aceto an email attaching the December 16, 2016 Letter, which summarized the results of his review of the sales and credit information provided to him by Rising/Aceto.[123] The subject line of the email read: "Profit Share Calculation Audit/Review."[124] The attachment line of the email read: "Audit Results Letter with attachments Final 2016 12 16.pdf." The December 16 Letter itself contained the reference line "Review of Profit Share Payment Support" and consisted of a cover page and twelve pages of exhibits.[125]

Mr. Kremer began the cover page by stating that he had "***concluded*** [his] review of the documentation [Rising] provided to [Sigmapharm] in May, June and September 2016. The submitted documentation covers the parties' business relationship, pursuant to their agreement

---

[120] *See, e.g.,* Day 18, Kremer, 11:1-3.
[121] CC-24.
[122] Day 21, Kremer, 106:17-108:7, 109:1-17, 110:21-25.
[123] PX-1479; PX-1480; CC-52; CC-53.
[124] PX-1479; CC-52.
[125] PX-1480; CC-53.

dated June 22, 2006, and as amended subsequently ("Agreement"), from April 2009 through

March 2016."[126] Thus, Mr. Kremer himself referred to the results of his efforts as an audit/review

of Rising/Aceto's profit share calculation for this period (referred to in this Opinion as "Audit

Period I") and stated that his work in this regard had "concluded." In other words, Sigmapharm's

claims that this was not an audit and that his review was not completed are contradicted by Mr.

Kremer's words and his description of his own letter.

In the December 16 Letter, Mr. Kremer provided a list of the documents and information

that he had reviewed (including certain original or "actual" documents) and attached five

exhibits (lettered A through E). Exhibits A (Underpaid Profit Share) and C (amount owed based

on reduction of COGS) were demands, with calculations for payment of specific amounts of

alleged underpayments. Exhibit E was a demand for a previously unpaid equipment invoice.

These three  monetary demands (A, C, E) were reduced to new invoices. In sum, Sigmapharm's

monetary demands in the December 16 Letter were:

> $1,905,110.38 Underpaid profit share (Q2-2009 through Q1-2016) (Exhibit A)
> $1,109,491.91 Underpaid profit share based on reduction in COGS
> (Q2-2009 through Q1-2016) (Exhibit C)
> $225,000.00 Share of equipment cost for abandoned product (Exhibit E).

Exhibit B sought additional information as to cash discounts and CMS (Medicaid)

rebates, and Exhibit D sought additional information about a damaged shipment of Products.

Rising/Aceto provided the detailed information requested regarding the cash discounts and CMS

rebates.[127] As to the damaged Products, Rising/Aceto provided Sigmapharm a credit in the

amount of $9,192, which resolved that issue as well.[128] Rising also paid the $225,000,[129] leaving

---

[126] *Id.* (emphasis supplied).
[127] PX-1498 and related tabs. Day 3, Hughes, 214:3-217:21.
[128] PX-1498 and related tabs. Day 3, Hughes, 220:16-223:23. Day 14, Hazaray, 101:22-103:18.
[129] CC-53, Exhibit E.

open at this time only the invoices for allegedly underpaid profit share (Exhibits A and C).[130]

These two remaining claims are resolved by this Opinion.

### G. Post-December 16, 2016 Activities

Less than a week after the December 16 Letter, Mr. Kaczmarek of Rising/Aceto wrote to Dr. Spireas of Sigmapharm inviting him to a meeting to discuss Rising/Aceto's response. A month later, Mr. Kaczmarek followed that invitation up with a reminder email.[131] On May 17, 2017, five months after the initial invitation, Dr. Spireas responded by apologizing for the delay, but also indicating that the delay was the result of not receiving required data from Rising/Aceto. Dr. Spireas's letter further stated that the parties were coming to a "pivotal moment" in their relationship, that the issues outlined in the December 16 Letter "are unresolved since the end of last year," and that last accounting and profit share report that was sent by Rising/Aceto for Q1 2017 "is very alarming and rather unacceptable."[132] That report indicated to Sigmapharm that it was being substantially underpaid. This led to Rising/Aceto's substantial "recast" of the profit share described below.

On May 23, 2017, Mr. Kaczmarek and Mr. Hazaray on behalf of Rising/Aceto traveled to Sigmapharm's offices in Pennsylvania to meet with Dr. Spireas and Mr. Kremer. The meeting was supposed to focus on the December 16 Letter, but during that meeting Mr. Hazaray advised that Rising/Aceto had become aware of potential problems in the calculation of Net Profits for fiscal year ("FY") 2017 (July 1, 2016 through June 30, 2017), which lay outside of Audit Period

---

[130] CC-53, Exhibits A and C.
[131] CC-354; PX-1487.
[132] *Id.*; Day 22, Kremer, 38:4-16; Day 14, Hazaray, 146:12-16.

I.[133] Mr. Hazaray told the parties that Rising/Aceto planned to engage EisnerAmper as outside accountants to address Rising/Aceto's accounting issues.

On September 15, 2017, Rising/Aceto provided a file to Sigmapharm that contained the results of Rising/Aceto's review of the December 16 Letter and preliminary findings of the FY 2017 recast.[134] Those preliminary findings indicated that for FY 2017 Rising/Aceto should have paid Sigmapharm $12,351,723 (later corrected to $12,629,930) but had paid only $3,564,490.32, meaning Rising/Aceto owed Sigmapharm over $9 million. After this disclosure, Rising/Aceto fully paid Sigmapharm the difference in installments over a period of approximately two months.

About a week later, on September 21, 2017, Rising/Aceto representatives again traveled to Sigmapharm's offices for an in-person meeting to discuss Rising/Aceto's findings.[135] Mr. Hughes provided Sigmapharm with an updated version of the FY 2017 recast, which provided for an adjustment of $1,399,160 on a total profit share of $12,629,930.[136] In addition, Mr. Hughes explained his investigation into the December 16 Letter.[137]

After that, Sigmapharm continued requesting information. On November 14, 2017, Rising/Aceto representatives Mr. Kaczmarek, Mr. Hazaray, and Mr. Hughes once again travelled to Sigmapharm's offices for an in-person meeting.[138] The meeting was attended by Dr. Spireas, Mr. Kremer and others for Sigmapharm. The purpose of the meeting was to discuss historical financial issues and the future business relationship.[139] Rising/Aceto presented a PowerPoint to

---

[133] Day 14, Hazaray, 68:25-69:6.
[134] Day 3, Hughes, 195:11-18; PX-1497-1498.
[135] Day 3, Hughes, 196:15-197:2; Day 4, Hughes, 70:14-71:21; PX-1499.
[136] PX-1500, Tab: "Draft Recast V2 (9-21-17)," Col. BC, Row 70 & Col. AY, Row 70; PX-1501 (same).
[137] PX-1498, Tab "Summary"; Day 3, Hughes, 198:24-200:17.
[138] Day 4, Hughes, 109:2-14; Day 19, Kremer, 48:12-49:13.
[139] Day 4, Hughes, 109:16-110:1.

"review the entire portfolio" and discuss a business plan.[140] This meeting apparently did not go well because after it, Mr. Kaczmarek indicated to his colleagues that he thought Rising/Aceto should focus its resources in directions other than Sigmapharm going forward.[141] Subsequent to that meeting, in late 2017 and early 2018, there were certain limited exchanges between the parties that related principally to Audit Period II that Rising/Aceto admittedly did not fully respond to.[142]

That was the general state of affairs on March 23, 2018 when Sigmapharm sent Rising/Aceto a letter titled "Notice of Termination" purporting to terminate the Agreement for cause based on Rising/Aceto's failure to cure material breaches. As previously noted, on the same day it sent the Notice of Termination, Sigmapharm initiated the District Court Action against Rising/Aceto seeking various forms of relief, including damages for breach of contract, a declaration that the Agreement had been validly terminated, and to compel an audit.[143] As noted, the District Court litigation was stayed in favor of the Arbitration. The Arbitration was then stayed by Rising/Aceto's bankruptcy filing. Those issues were then rejoined, and new ones raised when Rising/Aceto filed this adversary proceeding.

## V.  SUMMARY OF RULINGS

In this case, both parties assert that the other materially breached the Agreement. As previously noted, Rising/Aceto alleged, and this Court found, that Sigmapharm breached that Agreement by terminating it on March 23, 2018, without giving Rising/Aceto the required prior

---

[140] *Id.* at 114:2-115:4; PX-1524A.
[141] CC-153; Day 16, Hazaray, 39:12-22.
[142] CC-156; CC-149; CC-117.1; Day 4, Hughes, 142:13-14; Day 19, Kremer, 92:8-94:17, 133:25-134:4, 126:19-17:2.
[143] Dkt. No. 5 (Sigmapharm Answer, Ex. A., District Court Action).

written notice and opportunity to cure.[144] By that same Order, this Court denied Sigmapharm's

Motion to Dismiss Rising/Aceto's Complaint in its entirety based primarily on Rising/Aceto's

alleged breach of the Audit Provisions of the Agreement because the underlying factual issues

could only be decided after trial.[145] The Court has now conducted the trial of these and other

disputed issues, including the quantum of Rising/Aceto's alleged damages, and finds that

Rising/Aceto materially breached the Audit Provisions of the Agreement. As to quantum of

Rising/Aceto's alleged damages, the Court finds that Rising/Aceto is entitled to recover a portion

of its claimed damages but the Court will reduce and limit Rising/Aceto's damages based on

Rising/Aceto's breaches of the Agreement. Those breaches include:

- Failing to "maintain transparent," "readily available" and "complete and accurate records of all expenses incurred" under the Agreement. *See* §§ 1.37 and 8.6 of the Agreement. Trial revealed that Rising/Aceto's records were anything but transparent, readily available or complete and accurate. Instead, in a process that was filled with delays and obfuscations by Rising/Aceto, the documents provided to Sigmapharm in its quest for an audit were often conflicting, inconsistent and opaque. The documents and information included negative credit memos, duplicate credit memos, negative accruals, and undefined "non-prod buckets" filled with millions of dollars of unallocated or improperly allocated entries that resulted in, among other things, a multimillion dollar "recast" of Sigmapharm's profit share.

- Repeatedly delaying and obstructing Sigmapharm's efforts to obtain an "independent audit," as permitted by the Agreement. After more than a year of pre-litigation delays, it took another three plus years of litigation and arbitration proceedings before the District Court in Pennsylvania, an arbitration tribunal, and this Court before Sigmapharm could conduct its audit of Audit Period II. Even then, this Court was required to enter the Audit Order to compel Rising/Aceto to allow the audit of Audit Period II.

- Failing to provide Sigmapharm with its profit share calculation on a cash basis, as both parties acknowledge was required by the Agreement.

- Failing to provide accrual balances and accrual calculation files that would allow Sigmapharm to analyze and evaluate: (i) the accrual and assertedly cash based Profit

---

[144] Dkt. No. 72 (SJ Opinion); Dkt. No. 69 (related Order).
[145] Dkt. No. 69 at ¶ 6.

Share Statements provided to Sigmapharm; and (ii) Rising/Aceto's request that Sigmapharm move to accrual based profit share accounting.

- Leading Sigmapharm to believe that Rising/Aceto engaged EisnerAmper to produce an independent audit or report of Rising/Aceto's partner share accounting that would be provided to Sigmapharm. After first telling Sigmapharm that the production of that report was delayed for various reasons, Rising/Aceto then unilaterally decided to abandon that independent review in favor of an "internal" one that was provided by Rising/Aceto, all without advising Sigmapharm of this material change in advance.

Having determined that both parties were in breach, the Court must decide how that impacts the parties' damage claims. In this regard, Rising/Aceto claims total damages of up to $26,945,848 as of August 19, 2024, plus post-judgment interest accruing thereafter, made up of the following:[146]

| CATEGORY | DAMAGES | | INTEREST* *(As of August 19, 2024)* | | TOTAL | |
|---|---|---|---|---|---|---|
| | Range (where applicable) | | Range (where applicable) | | Range (where applicable) | |
| Lost profits | $10,041,270 | $12,683,777 | $2,151,996 | $2,719,541 | $12,193,266 | $15,403,318 |
| Credits | $9,096,273 | $9,096,273 | $1,757,450 | $1,757,450 | $10,853,723 | $10,853,723 |
| Additional COGS | $616,779 | $616,779 | $72,028 | $72,028 | $688,807 | $688,807 |
| TOTAL | $19,754,322 | $22,396,829 | $3,981,474 | $4,549,019 | $23,735,796 | $26,945,848 |

For the reasons that will be discussed in more detail below, the Court determines that a fair and equitable result in these circumstances, with both parties in breach and Rising/Aceto in severe financial distress, is to award Rising/Aceto damages in the amount of $9,096,273 for "Credits" that Sigmapharm failed to provide as the result of its wrongful termination of the Agreement. This amount represented actual losses to Rising/Aceto resulting from increased and unreimbursed customer deductions incurred by Rising/Aceto after Sigmapharm improperly terminated and breached the Agreement. These are "hard" costs and numbers that would have

---

[146] Pl's FoF, Addendum A.

been shared with (and effectively reimbursed by) Sigmapharm if it had not improperly

terminated the Agreement. This amount will, however, be subject to a credit and offset based on

the COGS damages awarded to Sigmapharm, as described below.

The Court finds differently as to the "Lost Profits" claimed by Rising/Aceto, which is a

much "softer" calculation, especially for a failing business like Rising/Aceto, which declared

bankruptcy less than a year after the Agreement was terminated, immediately thereafter ceased

all ongoing business operations and did not include the Agreement in the assets it sold for a sharp

discount two months after filing for bankruptcy. Awarding Rising/Aceto 6 to 12 years of Lost

Profits damages in these circumstances would provide Rising/Aceto with what amounts to an

unwarranted windfall in the face of its own material and continuing breaches of the Agreement

and the imminent failure of its business. Accordingly, the Court will not award any damages to

Rising/Aceto for Lost Profits.

As to Sigmapharm's damage claims, the Court will not award any damages to

Sigmapharm for its claim in the amount of $1,905,110.38 based on what it asserted were

incorrect net sales and profit share calculations by Rising/Aceto for Audit Period I.  As was

shown by Rising/Aceto, this aspect of Sigmapharm's claim was not included in Sigmapharm's

Proofs of Claim, even though it asserted claims of over $37 million.[147] Additionally,

Rising/Aceto initially asserted that this claim was resolved by a payment of $277,101 to

Sigmapharm which Mr. Hughes calculated based on credits missing from Mr. Kremer's

analysis.[148] Sigmapharm did not dispute this amount (or that payment) until after it terminated

the Agreement, a fact Mr. Kremer did not refute at trial.[149]

---

[147] *See* Claim Nos. 155-2 and 162-1; *See also*, Dkt. No. 72 at 4-5 (SJ Opinion).
[148] Day 3, Hughes, 203:20 - 212:25; PX-1498.
[149] Day 3, Hughes, 218:17-219:2; Day 22, Kremer, 86:13- 89:16.

During trial, Rising/Aceto advised that the $277,101 amount was incorrect and that it actually owed Sigmapharm an additional $330,000 for Audit Period I. This error was the result of credits that Mr. Hughes later recognized were already included in Mr. Kremer's analysis and therefore should not have been included in Mr. Hughes' counter-analysis. Rising/Aceto's position is that it voluntarily addressed this error by crediting the $330,000 against its overall damages claims.[150] The Court recognizes that Sigmapharm does not agree that the $277,101 payment and the later $330,000 credit resolved this aspect of its claim. The Court finds otherwise based on the omission of this claim from Sigmapharm's Proofs of Claim, the testimony of Mr. Hughes, and the near match of the approximately $300,000 claim made by Mr. Kremer as to the double counting of certain credits with the $330,000 adjustment for this same issue made by Mr. Hughes.[151]

As to the COGS damages claimed by both parties, the Court determines that Mr. Kremer's calculation was correct, based on the terms of the Agreement itself and the parties' prior dealings. Accordingly, Rising/Aceto's "Credit" damages will be reduced by the $1,109,492 in COGS damages claimed by Sigmapharm and the pro rata interest on that amount. Rising/Aceto's claim for additional damages based on its version of the COGS calculation is therefore denied.

In sum, the Court awards judgment in favor of Rising/Aceto against Sigmapharm in the amount of $7,986,781 ($9,096,273- $1,109,492), plus interest at the Federal Judgment Rate from

---

[150] Pl's FoF ¶ 73 n. 10. Here, the Court notes that this number is very close to the additional approximately $300,000 Mr. Kremer claimed was owed from Audit Period I for duplicate credit memos. Day 19, Kremer, 153:1-154:10.
[151] Day 22, Kremer, 85:14-17; Day 3, Hughes, 213:1-22, 219:3-220:1.

March 23, 2018 (the date of Sigmapharm's breach) until fully paid.[152]

## VI. LEGAL ANALYSIS

### A. Rising/Aceto's Breaches of the Agreement

#### 1. Rising/Aceto Materially Breached the Agreement by Failing to Provide Transparent, Accurate, Complete and Readily Available Records

The Court finds that Rising/Aceto's protracted delays in responding to Sigmapharm's audit and document requests, and the information provided by Rising/Aceto in response to those requests, was in violation of the plain language and spirit of the Agreement's Audit Provisions. The Agreement required Rising/Aceto to maintain complete, accurate and transparent records that were readily available for independent audit. Instead, Sigmapharm got opaque, delayed, and inconsistent information that ultimately required years, motion practice, and expert testimony to obtain and decipher.

In other words, even if this Court were to find that Rising/Aceto maintained complete records, Sigmapharm established, by more than a preponderance of the evidence, that these records are neither accurate nor transparent, nor were they readily available for an independent audit. Additionally, Rising/Aceto's Profit Share Reports to Sigmapharm were marred by often inconsistent, confusing, constantly changing numbers, as well as documentation and information that were provided only after repeated requests, delays, and even deception (as noted with respect to EisnerAmper's involvement).

---

[152] The Court recognizes that Rising/Aceto's interest calculation is based on New Jersey state law and rules. *See* Addendum D. However, the New Jersey interest rate law and rules apply only to federal cases where the court's jurisdiction is based on diversity. *Freedom Mtg. Corp. v. Loan Care LLC*, 2024 WL 3226942 (D.N.J. June 27, 2024). This case is based on federal bankruptcy jurisdiction. 28 U.S.C. § 1334. Accordingly, this Court will utilize the Federal Judgment Rate to calculate pre- and post-judgment interest. *See In re Mall at the Galaxy*, 2022 WL 1299088 at *25-26 (Bankr. D.N.J. April 29, 2022).

**(a) Rising/Aceto's Outdated and Inadequate Accounting Systems Were Unable to Handle the Cash Based Accounting Required Under the Agreement**

Sigmapharm alleges that Rising/Aceto did not have adequate accounting systems, policies or procedures in place to provide transparent and readily available accounting records as required under the Agreement, particularly as pertains to cash based accounting. Rising/Aceto counters this argument with evidence that they maintained substantial accounting programs which included an enterprise resource planning system (ERP); a revenue management system (iContracts); and regular review by independent auditor, BDO USA, P.C. ("BDO").[153] However, when asked for copies of the written accounting policies and procedures it maintained, all Rising/Aceto could point to was a flow chart that was actually produced by BDO (rather than Rising/Aceto).[154] A flow chart produced by an outside accounting firm does not constitute internal accounting policies and procedures. The Court finds that Rising/Aceto did not have any such written policies or procedures.

Even more significantly, the record is replete with evidence of Rising/Aceto's accounting systems being unable to handle cash based accounting. Similarly, trial exposed the negative accruals, non-prod issues, and duplicate and negative credit memos that led to ever-changing accountings from Rising/Aceto and incomplete and delayed responses to Sigmapharm's information requests.

The reasons for Rising/Aceto's accounting issues were varied but related in large part to the outdated Great Plains accounting system Rising/Aceto used at the time and the fact that Sigmapharm's profit share accounting was to be performed on a cash basis, while Rising/Aceto was generally on an accrual basis. Rising/Aceto's witnesses, Mr. Hughes and Mr. Hazaray (both

---

[153] Pl's FoF at ¶¶ 21, 22, 25.
[154] Day 7, Hughes, 40:17-41:4; Day 12, Hughes, 73:5-77:25; Day 27, Cowhey, 109:3-13.

in Finance), candidly acknowledged the limitations in the Great Plains system, especially when it came to maintaining its books on both an accrual and cash basis.[155] In fact, during the latter part of this period, after Rising/Aceto acquired certain product lines from Citron Pharma, LLC and Lucid Pharma, LLC in December 2016 (the "Citron/Lucid Acquisition"), Rising/Aceto switched to a more advanced and capable system called SAP in May 2018. However, the transfer took longer than expected and was not completed until May of 2018, two months *after* Sigmapharm terminated the Agreement.[156]

Recognizing the deficiencies and difficulties they were facing in providing a cash basis profit share to Sigmapharm, Rising/Aceto understandably asked Sigmapharm to move to accrual based accounting. Sigmapharm indicated a willingness to consider this switch, but Mr. Kremer repeatedly advised Rising/Aceto that he needed to "establish, audit and verify the beginning balances of the accrued refunds and allowances figures" in order to do so.[157] The Court agrees that these beginning balances were necessary. However, as was acknowledged by Mr. Hughes, these balances were never provided to Sigmapharm, even though Sigmapharm specifically asked for them as part of the process to determine whether to make the switch to accrual accounting (and its other information requests).[158]

Relatedly, Rising/Aceto did not produce during the parties' relationship (or this litigation) the "large partnership files" which would have included the beginning and ending estimates

---

[155] CC-111 (Hughes internally advising Rising/Aceto that its accounting infrastructure could not handle keeping two sets of books); Day 14, Hazaray, 165:5-166:13 (Great Plains had system limitations); Day 3, Hughes, 97:15-98:23; Day 4, at 89:3-8, 133:17-134:2 (certain data had to be manually gathered by Rising because Great Plains could not maintain data by "SKU" or product level).
[156] Day 3, Hughes, 84:4-85:7, 22:8-16, 24:25-25:3, 85:12-13, 95:20-99:20.
[157] Day 17, Kremer, 102:7-103:8, 111:9-21; CC-356.1.
[158] Day 8, Hughes, 24:4-12; Day 10, Hughes, 89:10-18; CC-34.

made by Rising/Aceto of its accrual balance with partners.[159] According to Mr. Hughes, those "large partnership files" also included information as to when accruals were reversed and a checklist of "controls."[160] Mr. Hughes also acknowledged that Sigmapharm would have to review these files and Rising's related workpapers to audit Rising/Aceto's accrual calculations.[161] As noted, that did not happen, resulting in a breach of the Agreement.

In response to this admitted deficiency, Rising/Aceto argues that these documents were produced during trial, and were referenced in an EisnerAmper report, and by Mr. Hughes in his deposition.[162] Rising/Aceto then characterizes this as a discovery dispute and argues that trial was too late for Sigmapharm to raise this issue. But that argument misses the point. Sigmapharm's position is that it needed those files while the parties were proceeding under the Agreement in order to evaluate Rising/Aceto's proposal to switch to accrual accounting, as well as part of Rising/Aceto's record-keeping obligations under the Agreement's Audit Provisions.[163] Rising/Aceto does not claim Sigmapharm received those files at that time, and Mr. Kremer's unrebutted testimony was that Sigmapharm did not. Production of those records at trial was too late and a passing reference to them in a deposition or report (that Rising/Aceto did not produce) was not enough. Therefore, the failure to produce the "large partnership files" was another breach of the Agreement.

Rising/Aceto also argues in response to these glaring and admitted deficiencies that: (i) the accrual figures are irrelevant because Sigmapharm was on a cash basis and that as a result, Sigmapharm's audit rights under the Agreement were limited to cash accounting; and (ii) in any

---

[159] Day 7, Hughes, 133:16-135:24.
[160] *Id;* Day 9, Hughes, 64:17-21.
[161] Day 8, Hughes, 32:16-33:2, 66:12-71:20.
[162] Pl's Response at ¶ 92; CC-335, Hughes Dep. Tr. 36:8-17, 42:16-43:2.
[163] CC-140 at 7.

event, Rising/Aceto "provided a complete cash basis accounting for the *parties' entire relationship*."[164] The Court disagrees.

As to the first argument, because Rising/Aceto's books were admittedly prepared on an accrual basis, those accruals had to be reviewed by Sigmapharm to determine whether the alleged cash basis accounting Rising/Aceto provided was accurate. That need is obvious and is further highlighted by the fact that in many instances, Rising/Aceto provided Sigmapharm with accrual based profit share reporting. Put simply, Sigmapharm needed and was entitled to the accrual information in exercising its audit rights, and to consider the proposed switch to accrual accounting. The Court finds that these accruals, their reversals, and how the accrual/reversal process was handled by Rising/Aceto was extremely relevant and, indeed, essential to Sigmapharm's audit. That need was further highlighted by the many errors and deficiencies in the information Rising/Aceto did ultimately provide, including negative accruals, negative credit memos, duplicate credit memos, the non-prod buckets, the lack of policies and procedures, and insufficient accounting software. In the context of this relationship in particular, Sigmapharm's audit rights were not and could not be limited to cash accounting. In other words, there was no way for Sigmapharm to determine whether Rising/Aceto's profit share accountings were correct without having the underlying information that Rising/Aceto used to arrive at the allegedly cash basis accountings it provided to Sigmapharm.

As to Rising/Aceto's assertion that it provided a complete cash basis accounting for the parties' entire relationship, the Court again disagrees based on Rising/Aceto's candid acknowledgements (through Mr. Hughes) that: (i) Rising never provided a cash basis accounting for 2017; (ii) Rising/Aceto did not have sufficient processes and controls to allow Rising/Aceto

---

[164] Pl's Response ¶ 21(emphasis in original).

to identify whether there were accounting and informational errors in the past profit share accountings it provided, particularly as relates to accrual accounting; and (iii) that even attempting to do so (which it did not) would be "very difficult."[165]

Here, the Court notes that Mr. Hughes came to Rising at a time when it was in crisis, and he was faced with multiple serious accounting and finance issues. Those issues included not only the deteriorating relationship with Sigmapharm, one of its most "important" partners, and the audit Sigmapharm requested, but also the failed transaction with Citron/Lucid that resulted in a charge off of more than $250 million by Rising/Aceto and all the related accounting, audit, and company-wide issues that had to be dealt with on an urgent basis. As the emails produced by Rising/Aceto confirm, Mr. Hughes "was too busy doing the recast" and "too busy with the fire hose pointing toward the building."[166] Mr. Hughes simply had too much to do otherwise and could not go back to review and correct Rising/Aceto's past accounting.[167] Thus, contrary to Rising/Aceto's argument, it did not provide Sigmapharm with a cash based accounting for the parties' entire relationship and was simply unable or unwilling to do so prior to termination of the parties' relationship. This is another breach of the Agreement's Audit Provisions.

### (b) Accounting Issues

#### (i) Negative Credit Memos

Rising/Aceto produced various documents during the course of this litigation and in response to Sigmapharm's sampling requests in connection with the audit ordered by this Court. The productions included multiple negative credit memos that showed, on their face,

---

[165] Day 7, Hughes, 148:4-150:6.
[166] Day 9, Hughes, 82:22-83:20. These emails were frequent and sent at all hours of the day and night.
[167] *Id.*.

Rising/Aceto seeking payment from the customer, rather than the customer receiving a credit. [168]

According to Mr. Cowhey, 28% of the audit samples included negative credit memos, which is

certainly a cause for concern and "doesn't make any sense … at all."[169] In fact, Mr. Hughes

could not explain why over 28% of the samples had negative credit memos, nor why, if these

negative credit memos were the result of a printing error, no one checked or tried to correct

them.[170]

These negative credit memos instructed the customer to "Please Remit To" Rising/Aceto

a payment in a negative amount.[171] Mr. Hughes explained that the credit memos were printed on

an incorrect template and should have stated "remit to" the customer, *i.e.*, a printing error.[172] Yet,

at the same time, Rising/Aceto argues that a negative credit memo is an accurate way of

reflecting a credit owed to a customer. The Court disagrees. A "negative" credit memo that calls

for payment by a customer, but is really a credit to a customer, is not a complete, accurate or

transparent record.

Additionally, while Rising/Aceto did eventually produce evidence (in the form of a

general ledger) that indicated that the negative credit memos were actually properly accounted

for as credits and not debits, that was only after this Court ordered Rising/Aceto to do so at trial.

The facially contradictory and undeniably confusing negative credit memos produced during the

course of this litigation plainly did not comply with the Agreement's requirement to maintain

---

[168] CC-359; CC-360; CC-361.

[169] Day 29, Cowhey, 123:3-7.

[170] *Id.*.

[171] *See, e.g.,* PX-421.

[172] The Court further notes that even though both Mr. Hughes and Ms. Ryan explained that the
negative credit memos were the result of printing errors, they also testified that the negative
credit memos were correct, even though they obviously were not. Day 33, Ryan, 18:7-20:24;
Day 12AM, Hughes, 43:11-16; Day 11, Hughes, 133:20-134:1; 179:15-180:3.

complete and accurate records that are transparent and readily available for an independent audit. Further, even giving credence to Rising/Aceto's printing error explanation, Rising/Aceto's failure to print (or re-print) the credit memos on the proper template further evidences its failure to maintain complete, accurate, and transparent records, as well as flaws in its accounting systems.

### (ii) Duplicate Credit Memos

Sigmapharm's review of a Rising/Aceto spreadsheet which was presented as audit information to Sigmapharm at the September 17, 2017 meeting contained hundreds of thousands of dollars of double counting of check payments and credit memos.[173] Both RSM, Mr. Cowhey's firm, and Rising/Aceto's litigation expert, A&M, found numerous instances of duplicate credit memos which resulted in improper reductions against Sigmapharm's profit share.[174] In fact, A&M discovered (and Rising/Aceto reviewed) over $1.8 million dollars in duplicate and improper credits in the second audit package.[175] At trial, Mr. Hughes attributed the errors to transactions incorrectly being entered as invoices rather than credit memos.[176] Mr. Hughes claimed the data was accurate in the general ledger, but when pulled from the system, some invoices had negative signs creating the duplication.[177] Mr. Hughes admitted he did not identify the duplication error that A&M found in the first two iterations of the audit package (and which Rising/Aceto removed from the third package, thereby reducing Rising/Aceto's Credit Refund claim by that amount). Mr. Hughes also testified that no one checked the data further for other

---

[173] CC-117.1; Day 18, Kremer, 137:15-141:14; 142:8-143:1.
[174] Day 27, Cowhey, 56:11-18; CC-383.
[175] CC-230.
[176] Day 9, Hughes, 20:10-22:9.
[177] Day 9, Hughes, 42:22-43:8.

duplications.[178] These many instances of duplicate and unaccounted for credit memos also resulted in breaches of the Agreement's Audit Provisions.

### (iii) Negative Accruals

In July of 2016, Rising/Aceto's accountants sent a letter asking Sigmapharm to confirm the amount owed from Rising/Aceto as of June 30, 2016.[179] Sigmapharm responded that it was owed $3,429,019.09 on a cash basis; however, Rising/Aceto's final balance showed an amount due of only $1,009,741, a difference of approximately $2.4 million.[180] This gap obviously needed to be reconciled, particularly for purposes of Rising/Aceto's profit share calculation.

Mr. Kremer testified credibly that he believed this difference was quite significant and indicated that Rising/Aceto was actually erroneously including approximately $4 million in chargebacks to its customers. This $4 million amount, which divided by the approximately 50% profit share split between the parties, would roughly account for the approximate $2 million difference between Sigmapharm's and Rising/Aceto's numbers. This deficiency again indicated that Rising/Aceto was accounting for Sigmapharm's profit share on an accrual basis.[181]

In Mr. Kremer's view, a negative accrual is improper terminology, as it is really an adjustment or change in accruals. As was explained at trial, accruals are initially and necessarily estimated based on historical expenses and then adjusted when the expense is actually paid. Thus, according to Mr. Kremer, accruals should never be negative, a position with which Mr. Hughes agreed.[182] Rising/Aceto also acknowledged that millions of dollars in negative accruals

---

[178] Day 9, Hughes, 20:10-22:9, 38:25-39-14, 42:22-43:8.
[179] CC- 41.
[180] *Id.*.
[181] Day 17, Kremer, 139:12 – 143:23.
[182] *Id.;* Day 18, Kremer, 52:2-53:11; Day 8, Hughes, 15:2-9 (Rising/Aceto acknowledging that accruals should never be negative).

would be material and raise questions for a Rising/Aceto partner.[183] Mr. Kremer also credibly testified that these large "negative accruals" led him to conclude that outside independent accountants were needed to complete the audit.[184]

Because Sigmapharm's profit share was supposed to be calculated on a cash basis, these accrual charges, which Rising/Aceto referred to as negative accruals, were understandably alarming to Sigmapharm. Then in 2017, when Rising/Aceto belatedly acknowledged millions of dollars of underpayments to Sigmapharm (totaling over $9,000,000 of approximately $12,000,000 owed) those alarms and concerns were heightened, and Sigmapharm continued to push for its audit.[185] This issue is further highlighted in CC-9, a spreadsheet created by Mr. Kremer from Rising/Aceto data, in which Rising/Aceto showed a reduction in the accrual balance of over $11.5 million.[186] This means that Rising/Aceto "adjusted" their accruals by over $11.5 million, which is obviously a very significant sum.

After considering these developments and what Sigmapharm viewed as the lack of a complete or satisfactory response to Mr. Kremer's December 16 Letter, Sigmapharm's CEO, Dr. Spireas, sent an email on May 16, 2017 to Rising/Aceto requesting a meeting because they were arriving at "a pivotal moment" in their relationship.[187] That email went on to describe the last profit share report for Q1 2017, in which the substantial negative accruals were included, as "very alarming and rather unacceptable."[188] The parties then arranged a May 23, 2017 meeting,

---

[183] Day 8, Hughes, at 20:16-25.
[184] Day 18, Kremer, 53:12-57:6; PX-1600; Day 18, Kremer, 52:2-65:7.
[185] Day 19, Kremer, 10:10-11:17.
[186] Mr. Kremer also testified that he created CC-9 to facilitate the work of the outside accountants he was considering engaging to "get to the bottom of … the negative accruals." Day 18, Kremer, 53:12-54:6; PX-1600.
[187] CC-354.
[188] *Id.*.

where Rising/Aceto, represented by Mr. Hazaray and Mr. Kaczmarek (Mr. Licata, Rising's

former CFO, had left by then), stated that:

- Rising/Aceto "could very easily have had duplicate credit memos" that resulted in "negative accruals";

- outside accountants would be retained to review the Sigmapharm profit share calculations, as well as Rising/Aceto's procedures that led to the duplicate credit memos;

- Rising/Aceto acknowledged that the negative accruals were alarming; and

- Rising/Aceto would "get to the bottom of this" and that Mr. Licata had not advised upper management of these issues.[189]

At that same meeting, Mr. Hazaray also told Sigmapharm about a new "non-prod" issue

(referring to a non-product bucket where Rising/Aceto posted unallocated expenses) that would

be reviewed by the independent accounting firm they were retaining.[190] Subsequently (on

January 19, 2018), Rising/Aceto's own internal auditor stated in a report that Rising ***"over the***

***past few years had been calculating Partner Shares incorrectly, an error which resulted in***

***lower than actual partner share payments."***[191]

As will be discussed in more detail below, Rising/Aceto did retain EisnerAmper for

various purposes relating to partnership accounting, including with specific respect to

Sigmapharm. However, that independent review was never concluded and no EisnerAmper

reports were provided to Sigmapharm by Rising/Aceto at that time or at any time during the

course of this litigation. In any event, the multimillion dollar "negative accruals" booked by

Rising/Aceto, the apparent accrual based profit share reporting and calculations, the duplicate

credit memos, and the non-prod issues were all very legitimate concerns voiced by Sigmapharm

---

[189] No testimony or other evidence was introduced by Rising/Aceto to counter these statements.
[190] Day 14, Hazaray, 68:7-71:2; Day 18, Kremer, 64:2-65:7, 81:11-82:24; CC-325.
[191] CC-158 at 3 (emphasis supplied).

and were never adequately addressed by Rising/Aceto until it was forced to do so in this litigation. They also evidence Rising/Aceto's failure to keep accurate and complete books and records, as well as a lack of transparency that resulted in a breach of the Agreement by Rising/Aceto.

### (c) The "Non-Prod" Issue

Rising/Aceto asserts that the "non-prod" issue that contributed to the multi-million dollar FY 2017 "recast" was the result of accruals and reversals that should have been allocated to partners (such as Sigmapharm), but were being inadvertently allocated to a "non-prod category."[192] Rising/Aceto further states that reversal transactions were improperly placed in an "unallocated" bucket so that Sigmapharm did not receive the benefit of the reversal.[193] The first problem here appears to be that accruals were included in the Sigmapharm accounting even though it was on a cash basis. The next problem is that the accruals had to be reversed for Sigmapharm, but instead were placed in this unallocated "non-product" bucket that apparently resulted in no allocation to any partner, including Sigmapharm.

This non-prod issue led to the 2017 recast which was briefly identified at the parties' May 17, 2017 meeting and then again discussed at a subsequent September 21, 2017 meeting. Shortly before that meeting, on September 15, 2017, Rising/Aceto sent Sigmapharm a spreadsheet that previewed the recast.[194]

In his responding email, Mr. Kremer observed that the 2017 "recast" figure was a new one that Sigmapharm had not previously seen. He also noted that the recast number had changed

---

[192] Pl's FoF at ¶ 66; Day 3, Hughes, 151:22-152:3, 159:11-15, 168:23-169:24; Day 7, Hughes, 67:7-68:7.
[193] CC-84 at 1-2; Day 3, Hughes, 153:20-155:10.
[194] CC-117; CC-117.1; PX-1497; PX-1498.

from $1,120,953 to $1,399,160 and then to $1,565,440.[195] Mr. Kremer understandably requested

an explanation for the changes. He did not get one.[196] Instead, Mr. Hughes' response was a

summary table that was titled "FY 2017 Recast Accrual Method" that was calculated on an

accrual rather than a cash basis, as its title plainly indicates.[197]

Rising/Aceto attempts to minimize the impact of these significant errors by noting that

the overall recast (which included all its partners) resulted in a total adjustment of approximately

$1.5 million. In turn, this resulted in certain partners owing Rising/Aceto money, while

Rising/Aceto owed money to others (like Sigmapharm). Rising/Aceto further argues that the $1.5

million number was a small percentage (.25%) of its overall gross sales of $600 million.[198]

However, while that total "net" of the partnership recast may have been relatively small when

considered as to all Rising/Aceto's partners, the $9 million or so that was apparently not properly

allocated to Sigmapharm in one fiscal year was undeniably material to Sigmapharm. Just as

obviously, this was a very "alarming" issue that was never sufficiently or adequately explained to

Sigmapharm at any time prior the termination of the Agreement.

At trial, Mr. Hughes testified that the actual "recast" number or total adjusted amount

owed to Sigmapharm for FY 2017 was *approximately $12 million*, rather than the $3 million or

so Sigmapharm had been paid.[199] This calculation was consistent with Mr. Hughes' internal

---

[195] CC-141, November 1, 2017 email.
[196] Day 20, Kremer, 10:19-23.
[197] CC-141.
[198] Pl's FoF at ¶ 67.
[199] Day 9, Hughes, 162:10-168:13; Day 7, Hughes, 109:7-10, 109:17-110:3; Day 9, Hughes, 12:8-16.

analysis, made a month earlier, in which he determined that Rising owed Sigmapharm $11 million (ultimately increased to more than $12 million) on an accrual basis.[200]

In sum, while it is true that Rising/Aceto ultimately paid the more than $12 million owed to Sigmapharm as the result of its recast, it is also true and this Court finds that the payment was late and based on accrual accounting. The Court also finds that the need for the "recast," which was continually being revised upward, the non-prod issue, and the many other issues Sigmapharm and EisnerAmper found with regard to Rising/Aceto's partnership accounting all failed to satisfy the "transparency" and "complete and accurate" requirements of the Agreement, resulting in its breach by Rising/Aceto.

### (d) Misleading Sigmapharm About the EisnerAmper Report Resulting in Further Delays, Confusion and Breaches of the Agreement

There is no dispute that Rising/Aceto repeatedly told Sigmapharm, beginning in May of 2017, that it had engaged EisnerAmper to independently audit and/or review Rising/Aceto's partnership share accounting, including as it related to Sigmapharm.[201] Notably, a May 23, 2017 internal Rising/Aceto email stated that:

> We [Rising/Aceto] are in the process of engaging Eisner Amper and Grant Thornton to review data feeds and buildup of partnership file, and specifically look at Sigmapharm and ThinQ [another Rising/Aceto partner on a cash basis].[202]

---

[200] CC-112; Day 7, Hughes, 103:8-106:15. When Rising/Aceto finally recognized this substantial error, it made several catch up or "good faith" payments (as characterized by Rising/Aceto) in the amounts of: (i) $2.5 million on August 29, 2017 (PX-1496); (ii) $3.5 million on September 21, 2017 (PX-1499; PX-1505); and (iii) $1.5 million on October 13, 2017; (PX-1513), and ultimately paid the entire amount Rising/Aceto claimed Sigmapharm was due, but once again on an accrual basis.

[201] *See e.g.*, Day 14, Hazaray, 68:7-71:2; *see also* Day 18, Kremer, 83:10-24.

[202] CC-65 (bracketed material added).

To that end, Rising/Aceto entered into (or exchanged drafts of) a series of engagement letters with EisnerAmper to, among other things, "analyze/verify one of our partner's [December 16] audit of us (dates back to 2009 …)."[203] The work was also to include a review of Rising/Aceto's gross-to-net process and, if necessary, to recast partnership accounting profit share calculations.[204] Another engagement letter related to developing a report specific to the Sigmapharm relationship and the December 16, 2016 audit review.[205]

EisnerAmper's work was originally to be completed in four to six weeks, *i.e.*, by the middle or end of June 2017.[206] Consistent with that timeline, on June 2, 2017, Rising/Aceto confirmed to Sigmapharm that it had engaged EisnerAmper, who would "***finish the audit***" and have the results to Sigmapharm in "two to three weeks."[207]

Mr. Hazaray acknowledged that both Rising and Sigmapharm wanted EisnerAmper, an independent accounting and auditing firm, to provide its "stamp of approval" on the analysis of Rising/Aceto partnership share accounting.[208] As was testified by Mr. Kremer, Rising/Aceto's engagement of an outside, independent accounting firm to conduct that analysis was extremely important as it would provide the independent review Sigmapharm had been seeking.[209] As a result of this commitment by Rising/Aceto, Sigmapharm decided not to engage their own accountants.[210]

---

[203] CC-63 (referring to Sigmapharm's December 16 Letter).
[204] CC-63 and CC-73.
[205] Day 15, Hazaray, 15:1-12, 35:7-19; CC-253; Def's FoF at ¶ 67.
[206] Day 14, Hazaray, 163:19-25.
[207] Day 18, Kremer, 83:10 – 84:10; CC-136-1; CC-326 (emphasis supplied).
[208] Day 14, Hazaray, 89:6-90:1.
[209] Day 18, Kremer, 64:13-65:7; 81:14-22.
[210] PX-1600; Day 18, Kremer, 59:21-60:25, 62:22-65:7, 83:10, 84:9; CC-65.

Despite Rising/Aceto's repeated promises, Sigmapharm never received the "stamp of approval" both parties were seeking or any other report from EisnerAmper through Rising/Aceto at any time before, during or after this litigation or after. In fact, Rising/Aceto produced no discovery relating to EisnerAmper or its contemplated reports. As a result, Sigmapharm was required to subpoena those documents from EisnerAmper itself, which produced many documents relating to its work for Rising/Aceto in these regards, including specifically its relationship with Sigmapharm.[211]

Sigmapharm (through Mr. Kremer) followed up frequently as to the status of the EisnerAmper report and was repeatedly told that EisnerAmper was working on it, but needed more time.[212] When Mr. Kremer followed up on June 27, 2017,[213] Mr. Hazaray said "another seven to ten days" were needed "for [EisnerAmper] to complete their study."[214] On July 6, 2017, the date was again pushed back to the "end of July to complete the study and respond to all open items."[215] At the end of July, after another follow-up, Mr. Hazaray reported that progress was being made with EisnerAmper, but that they "are a bit away from the final conclusions."[216] On September 6, 2017, Mr. Kremer followed up again, but no EisnerAmper report was forthcoming.[217]

Relatedly, in an August 14 email, Mr. Kremer also asked when Sigmapharm could expect to receive the 2017 Second Quarter profit share payment.[218] Mr. Kremer followed up again on

---

[211] Day 18, Kremer, 102:4-12; 105:18-23.
[212] *See, e.g.*, CC-78 (6/12/17 email from Hazaray estimating two or three more weeks was needed to review the December 16 Letter, among other things).
[213] CC-81.
[214] CC-356.1.
[215] *Id.*.
[216] CC-93.
[217] CC-116.
[218] CC-100

August 22. On August 25, Mr. Hughes responded that Mr. Kaczmarek had verbally promised
Sigmapharm that Rising/Aceto would wire an advance of $2.5 million while they "finalize our
analysis."[219] Tellingly, during this time period, Rising/Aceto executives emailed each other
internally.[220] Mr. Hazaray stated to Messrs. Kaczmarek, Hughes, CEO Sal Guccione and Mr.
Roth that:

> I am a bit skeptical about sending out new statements and checks *without
> accompanying it with an Eisner report* (unless Eisner is going to take another
> 2-3 weeks to deliver these reports) I think we should follow up with John and
> get an expedited timeline commitment for key partners (Sigma, ThinQ, Biopharm).
> Also, as regards Sigma Pharm, we need to address the outstanding issues that they
> had raised after their audit. Eugene, do you have all the data you require from
> Rick yet?[221]

At some point during or after this time period, Rising/Aceto apparently determined that it
would not proceed with the EisnerAmper report or audit and that it would instead be handled
internally by them working with EisnerAmper. Rising/Aceto did not advise Sigmapharm of this
significant change in direction for months, at least. At trial, Mr. Hughes, who joined
Rising/Aceto in July of 2017, and Mr. Hazaray attempted to explain this undisclosed material
change by testifying they did not proceed with the audit or review because it would involve
"agreed upon procedures" that would require EisnerAmper to go to Rising/Aceto's customers;
the cost of the audit; and because only a few partners were interested but none of this was
conveyed to Sigmapharm. Another excuse was that Sigmapharm terminated the Agreement.[222]
But that termination occurred in March of 2018, long after the decision not to provide any
EisnerAmper report to Sigmapharm was made.

---

[219] PX-1496.
[220] CC-110 (emails from August 22 and 23, 2017).
[221] *Id.* (emphasis supplied).
[222] Day 4, Hughes, 194:5-195:1; 197:5-198:19; Day 9, Hughes, 42:12-43:23.

Neither Mr. Hughes nor Mr. Hazaray was able to say who at Rising/Aceto made the determination not to proceed with the EisnerAmper audit or report.[223] Nor did anyone at Rising/Aceto recall advising Sigmapharm of its decision or its reasoning, according to the testimony of Messrs. Hughes and Hazaray.[224] In response, Rising/Aceto could only argue that the switch should have been obvious based on the use of certain pronouns and their indication that Mr. Hazaray was going to "spearhead the review of the audit results letter."[225] The Court disagrees. As noted above, Rising/Aceto made numerous statements that EisnerAmper was proceeding with the audit/review in the context of advising Sigmapharm when EisnerAmper would complete its work. The emails in no way state or even suggest, explicitly or implicitly, that EisnerAmper was no longer preparing or providing to Sigmapharm a report relating to Rising/Aceto's profit share accounting for Sigmapharm.  Rising/Aceto financial employees would be necessarily and understandably involved in the preparation of any such report, but that certainly does not mean that EisnerAmper would not be issuing any report.

Although the Court generally found Mr. Hughes' testimony to be credible and detailed, his inability to answer who made this decision with such an "important" customer at this crucial phase of the parties' relationship was not convincing.[226] As for Mr. Hazaray, his testimony on this point was simply not credible or consistent, as he explicitly referred to EisnerAmper's work as an "audit" and also stated, for example, that EisnerAmper was being hired by Rising/Aceto to obtain its "stamp of approval." Obviously, that "stamp of approval" would provide the

---

[223] Day 15, Hazaray, 138:3-22.
[224] Day 15, Hazaray, 26:6-37:3, 85-86; Day 8, Hughes, 168:24-170:11; Day 9, Hughes, 91:18-92:21.
[225] Pl's Response at ¶ 24; Day 22, Kremer, 48:6-49:25.
[226] Day 14, Hazaray, 104:13-105:7 (Mr. Hazaray referring to Sigmapharm as an important customer to Rising/Aceto).

independence and comfort Sigmapharm was requesting. It would also avoid the need for

Sigmapharm to proceed with its own independent audit, which this Court finds Rising/Aceto was

seeking to avoid (and delay) whenever possible.

Further, as noted above, despite EisnerAmper's extensive involvement with these issues,

and Sigmapharm's requests for discovery relating to EisnerAmper, Rising/Aceto did not produce

in this litigation any report, emails or any other documentation involving EisnerAmper, even

though emails and reports (in draft form or otherwise) obviously existed.[227] In sharp contrast,

EisnerAmper produced various and numerous documents in response to Sigmapharm's

subpoena, including at least one report regarding Rising/Aceto's gross-to-net process that was

apparently never finalized (the "Eisner Report").[228]

Significantly, the Eisner Report that was produced, whether or not provided to

Rising/Aceto or Sigmapharm, was critical of various aspects of Rising/Aceto's "Gross to Net and

Partnership Payment Process," among many other things.[229] The Eisner Report also noted

inconsistent allocation of gross-to-net deductions at the SKU level; inadequate review of

partnership payable process results, with significant variances and inadequate explanations for

"significant swings;" many inefficiencies, including manual undertakings that yielded

inconsistent results; and insufficient accounting software, to name a few.[230]

---

[227] Rising/Aceto's response here is that they objected to the production of the EisnerAmper documents, that Sigmapharm did not file a motion to compel, and that Sigmapharm received the documents anyway from EisnerAmper. The Court finds this response lacking. The EisnerAmper communications were obviously relevant to this case and discoverable and should have been produced without the need for any motion. *See*, Fed. R. Bankr. P. 7026.

[228] *See* CC-104 and many other related EisnerAmper documents.

[229] CC-104.

[230] CC-104.

Rising/Aceto also makes much of the fact that the engagements contemplated by various engagement letters that were produced by EisnerAmper were never completed. But that was between Rising/Aceto and EisnerAmper. None of that was known by (or disclosed to) Sigmapharm. Rising/Aceto also argues that it never said EisnerAmper was going to "audit" anything[231] – apparently attempting to draw a fine distinction between an audit and a review or other analysis. However, that ignores the testimony and statements of its own officers that specifically referred to EisnerAmper's work as an "audit" and/or "review" that EisnerAmper was performing to independently analyze Rising/Aceto's partnership accounting, including as it related to Sigmapharm and the December 16 Letter. It similarly ignores the essentially unrefuted evidence showing that Rising/Aceto was going to provide the results of the analysis to Sigmapharm, along with its "stamp of approval." That never happened.

Finally, Rising/Aceto also argues that EisnerAmper's work in support of the profit share analysis and muti-million dollar "recast" was included in the information Rising/Aceto ultimately provided through Messrs. Hughes and Hazaray. But that argument misses the point, as it does not provide the independent "stamp of approval" that Rising/Aceto knew Sigmapharm was looking for.

In sum, the Court finds that Rising/Aceto repeatedly represented that Sigmapharm would be provided with a report and/or audit from EisnerAmper that independently analyzed its partnership accounting with Sigmapharm and the December 16 Letter. It did not do so. This course of conduct is the opposite of transparency and the maintenance of records that are readily available for independent audit purposes. Instead, it is delay, deception, and the active withholding of information which resulted in Sigmapharm being unable to conduct the

---

[231] *See, e.g.*, Dkt. No. 257 (Pl's Response at ¶ 34).

independent audit it was entitled to until this Court ordered Rising/Aceto to provide it in this

litigation – years after Sigmapharm's repeated requests for that audit.[232] This is another breach of

the Agreement.

### (e) Rising/Aceto's Failure to Provide Cash Basis Profit Share Reports to Sigmapharm

Besides the difficulties maintaining two sets of books would generally create, the

difficulties Rising/Aceto encountered in attempting to do so were particularly acute because

Rising/Aceto's systems could not accommodate maintaining its books on both a cash and accrual

basis. In an August 17, 2017 email to his CEO, COO and Aceto's CFO, Mr. Hughes, then

Rising/Aceto's Senior VP of Finance, confirmed that Sigmapharm was on a cash basis, and that

Rising/Aceto was not able to produce accurate cash basis reports because of deficiencies in its

accounting systems, stating as follows:

> Sigmapharm is on the cash basis, not the accrual basis as most of the other partners
> are. A big driver for the issues and difficulties for this account is the fact that Sigma-
> pharm has elected and as I understand has not wanted to migrate away from being on
> the cash basis. This causes finance to maintain two sets of books and *our systems are
> not able to handle this*.[233]

Thus, to the extent that Rising/Aceto argues that the Agreement did not provide for cash

accountings, the Court disagrees. Both sides acknowledged and agreed that Sigmapharm was on

a cash basis. Even if it were not part of the Agreement, the parties' course of conduct and

testimony confirmed that Sigmapharm's profit share accounting was to be calculated on a cash

basis.[234] Further, while Rising/Aceto asserts that it provided a sufficient cash basis accounting to

---

[232] *See, e.g.*, CC-356.1.
[233] C-111, August 24, 2017 email chain involving Mr. Hughes and his CEO, COO, and Aceto's
CFO (emphasis supplied).
[234] *See, e.g.*, *Elliott & Frantz, Inc. v. Ingersoll-Rand Co.*, 457 F.3d 312 (3d Cir. 2006) (New
Jersey courts will supply a missing contract term based on parties' course of dealing, usage, and

Sigmapharm for Audit Period I, it also at least indirectly acknowledges that it did not provide a

cash basis accounting to Sigmapharm for Audit Period II until at least January of 2022.[235] But

even that was years late - nearly four years after Sigmapharm terminated the relationship (albeit

wrongfully). In any event, and as noted, Mr. Hughes and others at Rising/Aceto acknowledged

that it was unable to accurately account for the parties' relationship on a cash basis in performing

the 2017 recast or otherwise.

In fact, and contrary to Rising/Aceto's arguments, Mr. Hughes admitted that the cash

basis Profit Share Statements Rising/Aceto sent to Sigmapharm while the Agreement was in

effect were wrong.[236] Mr. Hughes also acknowledged it would be "very difficult" to verify the

prior allegedly cash based accounting after the fact, due to the insufficient capacity of

Rising/Aceto's accounting systems, which led to "a lot of errors."[237] Then, even though

Rising/Aceto argues that it provided a cash basis accounting to Sigmapharm in 2017, the report

Rising/Aceto delivered to Sigmapharm describing its multimillion dollar "recast" of

Sigmapharm's profit share is titled "<u>FY 2017 Recast **Accrual** Method</u>," confirming that this

report was prepared on an accrual basis.[238] During his trial testimony, Mr. Hughes also admitted

that even at the time of trial Rising/Aceto did not know what they owed Sigmapharm in FY 2017

on a cash basis and that it did not perform that calculation because it would require a "large

---

course of performance). *See also*, Agreement § 14.9 ("This Agreement shall be governed by and
interpreted in accordance with the substantive laws of the State of New Jersey").
[235] Pl's FoF at ¶ 116 (January 2022 package contains only actual transactions and no accruals and
includes "true up" of all credits).
[236] Day 9, Hughes, 165:15-168:13; Day 10, Hughes, 10:11-12:20, 87:1-22; *but see* ¶ 27 of Pl's
Reply.
[237] Day 15, Hazaray, 169:3-170:16; Day 7, Hughes, 148:4-150:6.
[238] CC-141 (emphasis supplied); Day 9, Hughes, 167:9-169:23.

effort."[239] The Court thus rejects Rising/Aceto's argument that it provided the cash basis Profit Share Reports to Sigmapharm that were required by the Agreement.

Finally, the Court also rejects Rising/Aceto's argument that it provided Sigmapharm with the underlying data with which Sigmapharm could have performed its own profit-share accounting on a cash basis. Providing that underlying data and performing the profit share accounting were Rising/Aceto's obligations under the Agreement. It failed to provide that accounting, resulting in yet another breach of the Agreement while the parties' relationship was ongoing.

In sum, the Court finds that Rising/Aceto did not provide Sigmapharm with the cash basis reporting that both parties acknowledge was required under the Agreement, principally because it was unable or unwilling to do so.

## 2. The "Audit Packages" Did Not Satisfy Rising/Aceto's Obligations Under the Agreement

In this case, Rising/Aceto often referred to the packages of information it provided to Sigmapharm during Audit Period II in January 2019, May 2020 and January 2022 (after the termination of the Agreement) as "audit packages."[240] The Court intentionally places the words "audit packages" in quotation marks because these packages of information are not and were not complete audits, as contemplated by the Agreement or Sigmapharm. In other words, calling something an "audit package" does not make it an audit or, more precisely, sufficient to constitute all the information required for an audit.

---

[239] Day 9, Hughes, 169:18-23; Day 7, Hughes, 117:7-20. There was also unrefuted testimony that Rising/Aceto's accountings sometimes showed that Sigmapharm was owed more on a cash basis than on an accrual basis, when that situation would typically and logically be in reverse, as expenses are deducted before they are actually paid when accounted for on an accrual basis. *See* Day 27, Cowhey, 39:12-40:12. This deficiency was not addressed by Rising/Aceto at trial.
[240] PX-1749; PX-1750; PX-1751-1751.7; See Pl's FoF at ¶ 102-103, 113-116.

Rising/Aceto argues that in the arbitration, Sigmapharm requested and Rising/Aceto agreed to provide Sigmapharm with an audit in the form of Rising/Aceto's own detailed review of its profit share calculations for Audit Period II based on the information Rising/Aceto provided.[241] But, once again, that is not an audit, and certainly not an independent one, as the Agreement permitted and Sigmapharm requested. Instead, it is an initial compilation of data from which the audit process may begin. And, of course, the data was compiled by Rising/Aceto, without any input from Sigmapharm or other third party. Additionally, the fact that Rising/Aceto may have prepared similar "packages" for other partner audits [242] does not mean that this package was sufficient under the Agreement or for Sigmapharm's purposes, which included the right to conduct an independent audit. As noted, Rising/Aceto did not provide that independent audit until ordered to do so by this Court.

In fact, based on the numerous delays and substantive issues that had occurred by the time of the parties' November 17, 2017 meeting, and the delay in responding to Sigmapharm's follow-up information requests, Sigmapharm had determined to engage an independent audit firm, RSM, LLP ("RSM"), where Mr. Cowhey was a member, to assist Sigmapharm in proceeding with an audit. As Mr. Kremer testified, that audit would have included additional information requests, sampling selections, and on-site visits.[243] Consistent with that contemplated audit, Mr. Kremer's January 12, 2018 follow up information request described "additional information to be received prior to SPL visiting Rising and performing an *on-site*

---

[241] Pl's FoF at ¶ 101. Rising/Aceto states that Sigmapharm requested an audit in this form, but tellingly does not cite any record evidence for that proposition. As is discussed later, Sigmapharm argues that the audit packages are not admissible or reliable. Thus, it plainly does not agree that the audit packages satisfied Rising/Aceto's obligations under the Agreement.
[242] Pl's FoF at ¶ 102.
[243] Day 19, Kremer, 94:18-95:15.

*audit* of physical documents."[244] Sigmapharm's November 14, 2017 and January 12, 2018

information requests described what information Sigmapharm was looking for to proceed with

its audit.[245] Mr. Hughes, who admitted he was dealing with various other pressing issues at the

time, acknowledged that Sigmapharm did not receive the information described in the January

12, 2018 information request.[246]

Relatedly, on February 16, 2018, Sigmapharm notified Rising/Aceto that the Fourth

Quarter 2018 profit share payment was late and that it had still not received a response to the

November 17, 2017 and January 12, 2018 Information Requests.[247] Rising/Aceto made a

payment the next day. However, Rising/Aceto realized almost immediately that it had made a

$262,000 error in that payment and another $319,000 error in the 2017 Third Quarter payment.[248]

Then, on February 17, 2018, Rising/Aceto emailed another summary profit share calculation that

added exactly $500,000 to a previous $1,392,293 calculation for the same period, increasing it to

$1,892,293.[249] That number then changed *again* to $2,211,764.[250] Mr. Kremer summarized his

frustrations with the ever changing and often unsupported numbers as follows:

> That's how they made their calculations. They would make calculations, they
> would change them, they would modify them. I never received reconciliations
> from one to the next. That seems like a repeat theme which is why we wanted
> an audit, which is why we wanted to see all of the figures, which is why we
> wanted to make sure that we had all of the data so that we could then create
> sample testing, go onsite, look at hard copy evidence and all the normal things

---

[244] CC-156 (emphasis supplied).

[245] CC-149; CC-156.

[246] Day 6, Hughes, 135:1-12, 143; Day 10, Hughes, 157:18-158:17.

[247] CC-159; Day 19, Kremer, 137:17-140:5

[248] PX-1812; CC-160; Day 19, Kremer, 140:8-148:16.

[249] That $500,000 number is the same amount Rising/Aceto pronounced it would pay
Sigmapharm at the November 14, 2017 meeting. Day 20, Kremer, 19:17-22:6; 49:10-50:22. The
Court notes that the $500,000 amount is about $100,000 less than the sum of the $262,000 and
$319,000 errors on payment made by Sigmapharm, as noted above.

[250] Day 20, Kremer, 17:21-18:20.

that one would do in an audit.[251]

The Court agrees that Rising/Aceto's ever-changing numbers (and financial department personnel) amply demonstrated the need for a full-fledged audit of Audit Period II – not an "audit package" prepared by Rising/Aceto that was not independently reviewed by an auditor and tested through appropriate protocols and procedures. Thus, although admissible as evidence (as the Court finds in the next section), the "audit packages" did not satisfy Rising/Aceto's document production obligations under the Agreement's Audit Provisions. Those packages may be the beginning but are certainly not the end of a process that would include further agreements on samplings, protocols, and the like.

Finally, and as previously noted, Rising/Aceto resisted Sigmapharm's repeated efforts to obtain that independent audit through litigation in the District Court, the subsequent arbitration proceeding, and this litigation. Even then, Rising/Aceto did not allow the audit by Sigmapharm until it was ordered to so by this Court in June of 2021,[252] almost four years after Sigmapharm's multimillion dollar "recast" in 2017. Thus, Sigmapharm was unnecessarily required to go to great lengths to obtain the independent audit specifically permitted under the Agreement, resulting in its breach.

### 3. The Audit Packages/Profit Share Reports Prepared by Rising/Aceto Are Admissible Evidence

Rising/Aceto delivered three (3) post-termination Profit Share Reports (also called audit packages by Rising/Aceto from time to time).[253] The first was in January 2019, before the

---

[251] Day 20, Kremer, 23:4-24:1.

[252] Dkt No. 64.

[253] *Compare* Pl's FoF at ¶ 32 (referring to Profit Share Statement being provided by Rising/Aceto to Sigmapharm) with ¶ 191 (referring to the same as an audit package).

Chapter 11 case was filed (in February 2019), but after the Agreement was wrongfully

terminated by Sigmapharm in March of 2018, and covered the period from April 1, 2016 (the

start of Audit Period II) to December 31, 2018.[254] This document and the next two audit

packages were prepared by Mr. Hughes and his team at Rising/Aceto.[255]

The second audit package was prepared and delivered to Sigmapharm in May 2020.[256] As

Rising/Aceto's customers continued to take credits against prior sales of Products, this updated

document included transactions from January 1, 2020 to April 30, 2020.[257] The third and final

"package" from Rising/Aceto's point of view was provided and then delivered to Sigmapharm in

January 2022.[258] This last document removed transactions that were "inadvertently coded in the

earlier version as a credit rather than a debit."[259] Rising/Aceto represents that a relatively small

percentage of transactions (72 transactions out of thousands) were required to be recoded.[260]

Of course, the need to recode credits as debits is further evidence of the problems with

Rising/Aceto's bookkeeping; however, according to Rising/Aceto, these corrections resulted in a

*reduction* in the amount Sigmapharm owed Rising/Aceto of approximately $900,000.[261] Thus,

this also represents a later correction of Rising/Aceto errors years after the Agreement terminated

and the necessary updating of the records produced by the Debtors during the course of this

litigation. Second, Rising/Aceto removed from the January 2022 "package" all transactions after

the Shore Suven closing on April 19, 2019. Rising/Aceto states that it did so because these

---

[254] PX-1749.
[255] Day 5, Hughes, 53:23-54:22.
[256] Day 5, Hughes, 93:16-94:6.
[257] PX-1750; Day 5, Hughes, 93:16-94:6; 96:15-97:11.
[258] PX-1751-1751.7; Day 5, Hughes, 106:2-9.
[259] Pl's FoF at ¶ 114, citing Day 5, Hughes, 109:3-111:25, 115:2-5.
[260] Day 5, Hughes, 110:25-111:7.
[261] *Id.* at 114:8-115.1.

transactions were processed and addressed (but not necessarily fully paid for) by Shore Suven
after the closing. Those also necessarily reduced the amount due Sigmapharm.

As Mr. Hughes testified at trial, he and his team were responsible for all accounting
audits and profit share accountings at Rising/Aceto.[262] These audits/accountings included the
preparation of profit share or audit packages for all Rising/Aceto partners requesting or entitled
to them.[263] Mr. Hughes testified that he utilized Rising/Aceto's business records, principally in
the form of electronic data that was entered into Excel spreadsheets with thousands of rows and
multiple columns reflecting individual transactions. Those transactions were then aggregated into
a summary spreadsheet.[264] Mr. Kremer prepared his summary spreadsheets for Audit Period I in
the same fashion.[265]

Sigmapharm claims these profit share or quarterly statements or audit packages are
inadmissible hearsay and "litigation tools."[266] The Court disagrees and finds that they are
admissible as business records maintained by Rising/Aceto in the ordinary course. By Order and
Opinion entered on November 22, 2022,[267] this Court preliminarily denied, without prejudice,
Sigmapharm's Motion *In Limine* to Preclude Rising-Aceto's "Audit Packages."[268] The Court
deferred its final ruling on this issue until trial based principally on the substantial precedent to
the effect that the determination of admissibility of business records should await trial.[269] Now

---

[262] Day 3, Hughes, 10:17-20, 25:4-26:11.
[263] Day 5, Hughes, 54:8-55:10; 42:5-20; PX-1379-1390, 1381-1382 (profit share quarterly
statements).
[264] Day 5, Hughes, 54:9-15.
[265] PX-1837; Day 5, Hughes, 54:9-15 and Day 21, Kremer, 93:3-94:25.
[266] *See, e.g.*, Def's FoF at ¶ 176, 179; Def's Reply Brief at ¶ 98.
[267] Dkt. No. 150 (Order denying); Dkt. No. 151 (Opinion).
[268] Dkt. No. 117 (Motion).
[269] Dkt. No. 151 at 8-9. For similar reasons, the Court denied without prejudice various other
motions *in limine* made by Sigmapharm, but ultimately found that Sigmapharm failed to preserve
the issues raised in those motions at trial. *See*, Opinion at 7, n.33.

that trial has occurred, the Court will deny Sigmapharm's Motion to Preclude with prejudice, as the Court finds that the audit packages/Profit Share Statements are admissible as unquestionably relevant "business records" under FRE 803(6) and as "summaries to prove content" under FRE 1006.[270]

As was noted above and as was testified competently and candidly by Mr. Hughes, he and his team prepared the "audit packages" in the regular course of business using Rising/Aceto's business records maintained substantially contemporaneously and in the same normal course of business. The packages included a master or lead sheet summarizing the underlying information that included the profit and loss calculations shown in the Profit Share Statement[271] and an additional eight spreadsheets with the underlying transactional data supporting the master spreadsheet.[272] This was the same kind of transactional level detail Sigmapharm requested – and was satisfied with – as part of its audit of Audit Period I.[273]

At trial, Mr. Hughes explained in detail how the package was created using mostly electronic data derived from Rising/Aceto's accounting systems that were maintained and utilized in the normal course of Rising/Aceto's business[274] and from various other sources also maintained in the ordinary course of its business.[275] He further testified as to how gross-to-net deductions were treated and managed in Rising/Aceto's accounting systems in the normal

---

[270] Fed. R. Evid. 1006.
[271] PX-1749.
[272] PX-1749.1-1749.11; Day 5, Hughes, 60:16-22.
[273] *Id.*.
[274] Day 5, Hughes, 76:1-9; 78:15-22.
[275] *See*, Pl's FoF at ¶ 104.

course.[276] These packages included hundreds of thousands of rows of individual transactions.[277] The audit packages or Profit Share Statements are therefore admissible as business records.

As to the lead sheets summarizing this extremely voluminous data in the Profit Share Reports, the Court finds those were also prepared in the normal course.[278] In this Court's view, this summary was not only appropriate, but also necessary based on the extremely voluminous data being presented. Accordingly, the summary information in the packages is also admissible under FRE 1006.

As to the business records exception and summary rule, and Court's ruling that the packages are admissible as such, the Court relies on Mr. Hughes' essentially (or completely) unrebutted testimony and cases such as *United States v. Leo*[279] in which the Third Circuit held that summaries of data prepared in connection with an audit are admissible as business records, and *United States v. Blackwell*[280] in which the District Court found that a company's audit was admissible as business record, even though it was part of an investigative report.

The Court also rejects Sigmapharm's argument that the audit packages are inadmissible because they were prepared after the litigation started (in 2018 in District Court, then moved to arbitration, and finally this adversary proceeding). There is no such rule and, if there were, it

---

[276] Day 5, Hughes, 85:12 – 99:24.

[277] Day 5, Hughes, 129:19-20.

[278] *Id.* at 60:16-22; 129:19-20.

[279] 941 F.2d 181, 187, 191, 194 (3d Cir. 1991).

[280] 954 F. Supp. 944, 974 (D.N.J. 1997). Similarly, summaries of such voluminous data maintained in the ordinary course are admissible under FRE 1006. *See, e.g., Trustees of the Chicago Plastering Inst. Pension Trust v Cork Plastering Co.*, 570 F.3d 890, 900-01 (7th Cir. 2009) (finding that report prepared for purposes of litigation that "tabulates data" from company payroll records was admissible as a summary of business records); *Chicago Regional Counsel of Carpenters Pension Fund v. Woodlawn Community Development Corp.*, 2011 WL 6318605 at 8 n.11 (N.D. Ill. Dec. 15, 2011) ("adjusted audit report" prepared for litigation was admissible as a summary of business records under FRE 1006).

would render a party such as Rising/Aceto, which was out of business but still involved in
litigation, unable to prove damages because the underlying Agreement was terminated
(wrongfully, as the Court has held) and the breaching party (Sigmapharm) commenced litigation.
That would not be fair or appropriate in this Court's view. As the Third Circuit held in *United
States v. Casoni*, FRE 803(6) itself does not limit the admissibility of business records to those
prepared before litigation begins.[281]

In sum, Rising/Aceto satisfied its burden of showing at trial that the audit packages/Profit
Share Reports were admissible as business records, with the lead sheets also admissible as
business records and summaries. Thus, *Sigmapharm's Motion In Limine To Preclude Rising-
Aceto's "Audit Packages"*[282] is now dismissed with prejudice. To the extent not waived,
*Sigmapharm's Motion In Limine To Preclude Documents Rising-Aceto Created Post-Litigation*[283]
is now also denied with prejudice.

### 4. The Remaining In Limine Motions Are Also Denied With Prejudice

The parties made several other *in limine* motion that the Court denied without prejudice
pending trial. They include: (i) *Plaintiffs' Motion In Limine To Exclude Video Recording Of
Deposition Of Plaintiffs' Expert (the "Exclude Video Motion")*;[284] (ii) *Sigmapharm's Motion In
Limine To Preclude Evidence Of "Lost Profits" After Rising-Aceto Rejected The Master
Agreement And Sold Its Assets To Shore Suven* (the "Preclude Evidence of Lost Profits
Motion");[285] and (iii) *Sigmapharm's Motion For Sanctions For Spoliation Of Evidence And For

---

[281] 950 F.2d 893, 911 n.10 (3d Cir. 1991); *See, also, Federal Trade Comm'n v. Hackensack
Meridien Health*, 2021 WL 4145062 at 23 (D.N.J. Aug. 4, 2012) *aff'd* 30 F.4th 160 (3d Cir. 2022)
(to same effect).
[282] Dkt. No. 117.
[283] Dkt. No. 119.
[284] Dkt. No. 115.
[285] Dkt. No. 118.

*An Evidentiary Hearing* (the "Spoliation Motion").[286] Except for the Spoliation Motion, the

parties did not press these motions at trial or in their post-trial submissions; therefore, any further

challenge based on these motions is waived.[287] Even if not waived, the Court will also deny these

motions on the merits.

As to Plaintiffs' Exclude Video Motion, neither party sought to use that video testimony

at trial. Therefore, that motion is now moot. As to Sigmapharm's Preclude Evidence of Lost

Profits Motion, the Court has determined not to award Lost Profits to Sigmapharm for the

reasons stated in this Opinion. Therefore, that Motion is also moot. However, the Court also

found that the evidence of Lost Profits submitted by Rising/Aceto was admissible; therefore, the

to the extent the Lost Profits Motion sought to exclude this evidence, it is denied.

As to Sigmapharm's Spoliation Motion, Sigmapharm argues that while Rising/Aceto may

not have destroyed evidence, it failed to retain certain evidence relating to its return transactions

and did not produce the "large partnership files" referred to earlier or its general ledger.[288] As to

the return transactions, Rising/Aceto admittedly was able to recover only three years of records.

However, there was no evidence of destruction of the prior years' records. Further, as this Court

previously found, those returns were amply supported by other records Rising/Aceto did retain

and produce.

---

[286] Dkt. No. 133.

[287] *United States v. Khoury*, 901 F.2d 948, 966 (11th Cir. 1990), *opinion modified on denial of reh'g*, 910 F.2d 713 (holding that parties must reraise objections with particularity when the issue becomes ripe, otherwise the objection raised *in limine* is waived); *Guijosa-Silva v. Wendell Roberson Farms, Inc.*, 2013 WL 2181086, at *2 (M.D. Ga. May 20, 2013) ("a party must restate any evidentiary issue with particularity during trial to preserve an objection.") (citing *Khoury,* 901 F.2d at 966).

[288] Dkt. No. 256 at ¶ 117 – 122 (Def's Response).

Central to a finding of spoliation is a determination that a party acted in bad faith.[289]

Here, there was no showing at trial of bad faith or even gross recklessness by Rising/Aceto

relating to these documents. In fact, as Rising/Aceto notes, the general ledger that was produced

confirmed its profit share calculations. Further, these categories of information were objected to

by Rising/Aceto during trial and were not made the subject of a motion to compel by

Sigmapharm. Thus, the bad faith element is missing as Sigmapharm could have made that

motion. And finally, the Court has found Rising/Aceto in breach of the Agreement for failure to

preserve documentation such as the large partnership files and denied Rising/Aceto's Lost Profits

claims based on that breach. In this Court's view, that is the appropriate remedy for

Rising/Aceto's failure to produce documentation it was required to produce pursuant to the

Agreement.

### 5. Rising/Aceto Ultimately Provided Sigmapharm With All the Information It Requested or Required for Audit Period I

For the reasons stated in the Factual Background, this Court determines that Rising/Aceto

answered in full, or at least sufficiently, all of the requests made in Mr. Kremer's December 4,

2015 letter. As noted, this information allowed Mr. Kremer to prepare his detailed December 16

Letter describing Sigmapharm's claims against Rising/Aceto and describing the additional

information he requested. Thus, the Court disagrees with Sigmapharm's assertions that it never

concluded its audit of Audit Period I or that Rising/Aceto failed to provide Sigmapharm with the

information it requested for that period. As to the latter argument, Mr. Kremer was forced to

acknowledge on cross-examination that he was provided with all the information he requested in

his December 4, 2015 audit request.[290] Thus, as previously stated, while Mr. Kremer referred to

---

[289] *Bull v. United Parcel Service, Inc.*, 665 F.3d 68, 79 (3d Cir. 2012).
[290] PX-1383.

the data produced by Rising/Aceto on March 16, 2016 as "grossly inadequate" and "incomplete,"[291] Rising/Aceto corrected those deficiencies over the next three months.

The proofs at trial and Sigmapharm's subsequent activity further support the conclusion that Sigmapharm was provided with the information it requested (or required) to complete its audit for Audit Period I. First, with this information, Mr. Kremer was able to prepare his December 16 Letter which he called an "Audit Results Letter" and noted that he had "concluded" his review of the information provided.[292] Additionally, Mr. Kremer referred to the information contained in the latest Audit Period I "spreadsheets" as the standard by which Rising/Aceto should provide future information and which allowed Mr. Kremer to preface his own cumulative spreadsheets.[293] Finally, Mr. Cowhey's sampling requests and expert opinions were limited to Audit Period II.[294] This limitation at least implicitly confirms that the audit of Audit Period I was complete.

In sum, the record reveals that Sigmapharm did ultimately receive the information it requested or required for Audit Period I, albeit only after Mr. Kremer repeatedly followed up on prior requests that had not been fully answered and many months had passed. As to Audit Period II, however, Sigmapharm requested an independent audit, but as previously noted, that was never provided to Sigmapharm until Rising/Aceto was ordered to do so by this Court.

**B. The Long-Delayed Audit of Audit Period II**

    **1. Sigmapharm's Expert, Mr. Cowhey**

---

[291] Day 17, Kremer, 99:9-100:7-8; Day 23, Kremer, 69:9.

[292] PX-1479-1480; CC-53. For certain information Mr. Kremer says was not provided, Mr. Kremer may have made assumptions in Sigmapharm's favor. Day 21, Kremer, 102:2-12. Thus, Sigmapharm could only benefit from such assumptions.

[293] PX-1509; Day 21, Kremer, 96:18-22.

[294] Day 28, Cowhey, 188:16 -189:25.

Sigmapharm retained Mr. Cowhey, of the RSM firm, to conduct the court-ordered audit of Audit Period II. Mr. Cowhey is not a CPA, but has been retained as an expert in similar matters many times and has extensive experience in conducting similar audits. Initially, the Court notes that Rising/Aceto seems to challenge Mr. Cowhey's expert qualifications, but stops short of actually doing so. Nor did Rising/Aceto move to preclude his proposed expert testimony as to the audit or otherwise disqualify him.[295] The Court will not credit this implicit argument and will consider Mr. Cowhey's testimony as to the audit his firm conducted.

Rising/Aceto also challenges Mr. Cowhey's independence. This is significant for various reasons, including that the Agreement allows for an "independent audit." Rising/Aceto's challenge is based at least in part on Mr. Cowhey's testimony that he participated in privileged strategy sessions with legal counsel as early as November 2017, which was four months before Sigmapharm improperly terminated the Agreement and began the District Court litigation.[296] Further, he was hired by counsel, not Sigmapharm directly. The Court agrees that this pre-litigation involvement causes concerns about Mr. Cowhey's independence and has considered this involvement in evaluating Mr. Cowhey's opinions. With this background, the Court will analyze Mr. Cowhey's audit and related testimony as to Audit Period II.

### 2. Audit Protocol and Sampling Requests

Following the entry of the Audit Order, Rising/Aceto continued its efforts to collect and produce the information identified by Sigmapharm and also sent subpoenas to its customers.[297]

---

[295] This Court's October 22, 2022 Order that granted in part and denied in part Rising/Aceto's motion to preclude Mr. Cowhey's opinion or expert testimony did not preclude this line of testimony from Mr. Cowhey. [Dkt. No. 135].

[296] Day 28, Cowhey, 140:11-141:8; PX-1699 (Mr. Kremer's redacted notes from 11/29/2017 (Bates No. 027985)).

[297] *See, e.g.*, Certification of Business Records, PX-1762 – 1767, 1794.

Sigmapharm did not make any supplemental document requests or sampling requests after the entry of the Audit Order.[298]

On June 10, 2020, Sigmapharm served its Audit Protocol, through which Mr. Cowhey sought to sample transactions in the audit package.[299] The Audit Protocol and sampling requests were limited to Audit Period II.[300] It identified 393 transactions to test from six categories of gross-to-net deductions (*i.e.*, chargebacks, CMS, rebates, returns, product costs, and Rising Fee).[301] Cowhey later added an additional category seeking three credit memos from Audit Period I.[302] He determined not to audit sales for reasons that are not clear to the Court.[303] In any event, the audit proceeded. On October 1, 2020, Sigmapharm identified the specific transactions it wished to sample for its audit.[304] Sigmapharm did not send any formal document requests with its sampling requests; however, in an email from counsel, Sigmapharm indicated that the support "may take the form of original source documents, contracts, screenshots from iContracts, etc."[305]

By this time, Rising/Aceto was no longer operating. Therefore, Rising/Aceto engaged A&M, including Ms. Ryan and her staff, all of whom were CPAs, to address the sampling requests.[306] Mr. Hughes assisted in the process.[307] Both A&M and Mr. Hughes were involved in responding to the sample requests by collecting documents, including third-party documents

---

[298] Day 30, Cowhey, 65:16-66:5.
[299] PX-1778 § 1; Day 28, Cowhey, 188:2-15.
[300] *Id*, 188:16-189:25. The fact that Sigmapharm initiated its sampling requests to Audit Period II further confirms that its audit of Audit Period I was concluded.
[301] PX-1778 at 4; Day 28, Cowhey, 190:16-191:8.
[302] PX-1754, Tab "Credit Memo Selections." Mr. Cowhey apparently made this request to test whether the credit memos were counted in Audit Period II and found that they were not.
[303] Day 28, Cowhey, 191:9-12.
[304] PX-1753-4; Day 28, Cowhey, 192:24-193:7; Day 5, Hughes, 187:7-23.
[305] PX-1753.
[306] Day 31, Ryan, 97:24-98:12, 129:19-130:1.
[307] Day 5, Hughes, 173:11-16, 188:7-9; Day 6, Hughes, 8:19-9:4.

(some of which were obtained by subpoena), and reviewing other information relating to the

sampling transactions to determine whether they could be validated.[308]

### (a) Rising/Aceto Reasonably Validated All the Sampling Transactions

### (i) Independent Audits Look for Reasonable Assurance that a Transaction Occurred, Not Perfection

When conducting an audit under a contract like the Agreement, parties normally agree

upon the governing procedures and documents that will be produced to support samples.[309] In

this case, that happened only after the Audit Order was entered, although perhaps without all the

details and protocols that would typically be agreed upon in this type of audit.[310] As a result, the

parties and the Court look to the applicable professional accounting standards to evaluate the

audit.

In the absence of an agreement, CPAs operate under the consulting standards

promulgated by the American Institute of Certified Public Accountants ("AICPA"), which

require auditors to obtain "sufficient relevant data to afford a reasonable basis" for opinions.[311]

Mr. Cowhey testified he was applying a standard similar to Generally Accepted Auditing

Standards ("GAAS") for audits, under which auditors look for "reasonable assurance."[312] As

both Mr. Cowhey and Ms. Ryan testified, the standard in either case is one of reasonableness, not

perfection.[313] The GAAS guidelines provide that "'[r]easonable assurance is not an absolute level

of assurance,'" with "'most of the audit evidence on which the auditor draws conclusions and

---

[308] Day 31, Ryan, 125:11-131:13; Day 5, Hughes, 188:10-193:3, 195:23-196:12; Day 6, Hughes, 8:16-10:17, 12:24-16:2.
[309] Day 31, Ryan, 123:3-124:3.
[310] Day 31, Ryan, 102:5-7, 124:4-5; Day 30, Cowhey, 65:16-66:5
[311] Day 31, Ryan, 102:8-103:15.
[312] Day 28, Cowhey, 154:12-25.
[313] *Id.* at 157:8-11; Day 31, Ryan, 105:23-107:8.

bases the auditor's opinion being persuasive rather than conclusive.'"[314] Given these standards,

the ultimate goal of the sampling process is to "reasonably validate that the sample transactions,

the sample credits, actually occurred[.]"[315] Mr. Cowhey advanced a similar conclusion, saying he

wanted to "verify the transaction occurred."[316]

### (ii) Rising/Aceto Reasonably Validated the Sampling Transactions

Through Ms. Ryan and Mr. Hughes, Rising/Aceto provided substantial evidence in

various forms that the Court finds were more than sufficient to reasonably validate the sampling

transactions.[317] Mr. Hughes helped Rising/Aceto prepare the demonstrative exhibit that identified

the supporting documents for the sample requests (the "Audit Demonstrative") and confirmed its

accuracy.[318] Ms. Ryan prepared graphic charts regarding the samples.[319]

Ms. Ryan and Mr. Hughes provided substantial testimony based on various forms of

supporting evidence that validated the seven categories of sampling transactions.

Notwithstanding the legitimate issues Mr. Cowhey raised about things like duplicative or

negative credit memos and negative accruals, Mr. Cowhey acknowledged that Rising/Aceto

validated four of the seven categories of deductions he sampled, specifically CMS rebates, Cost

of Goods, Rising's Fee, and credit memos from Audit Period I (admitting those credits were

properly billed during Audit Period I).[320] Thus, there is no need for the Court to further analyze

those categories of credits or their validity.

### (iii) Rising/Aceto Reasonably Validated the Remaining Three Categories -- Chargebacks, Rebates, and Returns -- that Mr. Cowhey Challenged

---

[314] Day 28, Cowhey, 156:1-12.
[315] Day 31, Ryan, 124:16-19.
[316] Day 31, Cowhey, 12:6-8.
[317] Day 31, Ryan, 101:2-14.
[318] Day 6, Hughes, 17:9-19:20; Pl Dem. #1.
[319] *See* Pl. Dem. #15.
[320] Day 28, Cowhey, 196:1-199:5.

### (a) Chargebacks

To identify documents to reasonably support a transaction, auditors consider the processes employed by the company and documentation maintained in the ordinary course of business.[321] Chargebacks came into Rising/Aceto daily through a process that was mostly electronic from start to finish.[322] Rising/Aceto's transactions with the Big 3 wholesalers (McKesson Corporation, AmerisourceBergen Corporation, and Cardinal Health) were conducted via Electronic Data Interchange ("EDI"), which was often the primary or exclusive evidence of a transaction.[323]

Customers made chargeback claims to Rising/Aceto directly via an EDI feed into iContracts, which validated the claim.[324] Once validated, Rising/Aceto sent a credit memo to the customer via EDI feed.[325] The EDI feeds are strictly electronic data.[326] Additionally, chargebacks were paid when the customer deducted those charges from payments; no check was issued.[327] When customers remitted monies to Rising/Aceto, they included Excel spreadsheets that identified the gross-to-net charges (*e.g.*, chargebacks, rebates, etc.) that were being deducted from the payment ("Cash Application Documents").[328] Some customers, including McKesson, uploaded Cash Application Documents to their portal, allowing Rising/Aceto to download and save them onto its network.[329]

---

[321] Day 31, Ryan, 108:25-109:14.
[322] Day 3, Hughes, 44:8-9.
[323] Day 3, Hughes, 37:24-38:9, 40:1-6; Day 29, Cowhey, 34:8-13.
[324] Day 29, Cowhey, 34:8-35:15; Day 3, Hughes, 44:4-45:2.
[325] Day 3, Hughes, 45:10-16.
[326] Day 3, Hughes, 45:8-9.
[327] Day 29, Cowhey, 37:25-38:5; Day 3, Hughes, 46:21-47:3.
[328] Day 6, Hughes, 14:13-15:17, 138:24-139:25.
[329] *Id.* at 136:21-137:4.

Using chargebacks sample number 1 as an example, Rising/Aceto produced internal and third-party documents to support the essential components of the charge and process, including documents proving the following facts:

a. <u>The customer requested the chargeback</u>. This was demonstrated by extracts from iContracts with EDI data showing the customer's chargeback claim ("iContract Reports").[330] Mr. Cowhey admitted that iContract Reports are third-party documents that consist of EDI data.[331]

b. <u>The chargeback amount was accurate</u>. This was shown by pricing documents with customers.[332] These also are third-party documents.[333] Rising/Aceto also provided iContracts historical pricing tables that confirmed the accuracy of the information.[334]

c. <u>Rising/Aceto validated and authorized the chargeback</u>. This was shown by credit memos that also confirmed the accuracy of the information.[335]

d. <u>The customer deducted the chargeback from payments made to Rising/Aceto</u>. This was shown by Cash Application Documents.[336] Mr. Cowhey acknowledged that a Cash Application Document for a sample evidences the customer deducting charges. [337]

e. <u>Rising/Aceto's general ledger also confirmed the transaction</u>. After this Court ordered their production, Rising/Aceto also produced general ledgers to corroborate that the chargebacks were requested, validated, and given.[338]

Additionally, Rising/Aceto demonstrated that certain documents produced directly from the customers in response to subpoenas, which are third-party documents, supported the validity

---

[330] PX-1226; Day 6, Hughes, 107:14-108:5, 113:10-116:24.
[331] Day 29, Cowhey, 40:2-41:17; Day 31, Ryan, 134:17-136:5.
[332] PX-1306; PX-358; Day 6, Hughes, 118:9-120:24.
[333] Day 6, Hughes, 119:8-11, 123:21-22; Day 31, Ryan, 149:25-151:13.
[334] PX-415, Rows 1,121, 3,461; Day 6, Hughes, 142:2-145:14.
[335] PX-421; Day 6, Hughes, 108:8-109:7; Day 31, Ryan, 152:3-8.
[336] PX-796, Tab Orig, Row 6; Day 6, Hughes, 133:5-139:25.
[337] Day 29, Cowhey, 209:7-9; *see, e.g.*, Day 31, Ryan, 202:13-203:9.
[338] CC-361, Cowhey's Audit Demonstrative showing general ledger support for every sample; *see, e.g.*, Day 31, Ryan, 202:1-12; Pl. Dem. #15 at 37.

of the credit.[339] This same level of overall proofs, or substantially similar proofs, were provided by Rising/Aceto as to each of the chargeback and other transactions tested through the audit. The Court is satisfied that these proofs provided reasonable assurances that the transactions occurred as reported by Rising/Aceto.

### (b) Rebates

To make a rebate claim, Rising/Aceto's customers sent invoices.[340] Some customers sent invoices by email (*e.g.*, AmerisourceBergen), while others uploaded invoices into a portal (*e.g.*, McKesson and Cardinal).[341] The invoices usually included a summary document in PDF format and an itemization of charges in Excel format.[342] Once validated, Rising/Aceto authorized a credit via a credit memo.[343] Customers generally deducted rebate charges from payments.[344] Here, Rising/ Aceto again produced internal and third-party documents to support the essential components of this process, as illustrated by the Audit Demonstrative.

Using rebate sample number 1 as an example,[345] Rising/Aceto produced documents proving the following facts:

a.  The accuracy of the rebate claim. This was shown by the invoice from the customer.[346] This is a third-party document. Mr. Cowhey admitted customer invoices and the Excel support are third-party evidence of the customer claiming rebates.[347]

b.  The accuracy of the rebate price calculation. This derives from the contract with the customer.[348] This is also a third-party document.[349] Rising/Aceto also provided the

---

[339] PX-1291, Row 8,858; Day 6, Hughes, 147:18-150:16; Day 31, Ryan, 203:10-204:17.
[340] Day 3, Hughes, 46:5-14; Day 6, Hughes, 157:21-23.
[341] *Id.* at 72:22-25, 74:4-13.
[342] *Id.* at 18-73:16.
[343] *Id.* at 47:24-48:9.
[344] *Id.* at 73:16; Day 29, Cowhey, 187:12-189:7
[345] Day 6, Hughes, 156:7.
[346] PX-1017; PX-1015, Row 31; Day 6, Hughes, 157:24-160:15.
[347] Day 29, Cowhey, 195:24-196:9; *see* Day 31, Ryan, 170:1-172:19, 209:10-11.
[348] PX-1724; Day 6, Hughes, 160:18-162:11; *see, e.g.*, Day 31, Ryan, 209:12-23
[349] *Id.*.

iContracts Rebate Master Report to confirm the transactions.[350]

    c.  <u>Rising/Aceto validated and authorized the customer to take the rebate</u>. This appears in Rising/Aceto credit memos.[351]

    d.  <u>The customer deducted the rebate from the payments made to Rising/Aceto</u>. This appears in the Cash Application Document.[352] This is also a third-party document.[353]

    e.  Rising/Aceto also produced general ledgers to corroborate the rebate was requested, validated, and given.[354] In fact, Mr. Cowhey's demonstrative exhibit showed ledger support for every sample.[355]

The Court is satisfied that these and similar proofs Rising/Aceto submitted in support of the rebate sampling transactions provided reasonable assurances that the sampled transactions occurred as reported by Rising/Aceto.

## (c) Returns

Rising/Aceto's returns were handled by third-party vendors, first Inmar and then Qualanex.[356] Rising/Aceto received information concerning returns from those vendors, *i.e.*, return reports confirming customers returned products to the vendor.[357] Initially, Rising/Aceto received return reports from the vendor via EDI feed. Then, Qualanex created a portal from which Mr. Hughes' team downloaded return reports onto Excel.[358] Rising/Aceto did not pay returns with a check; instead, Rising/Aceto issued credit memos.[359]

---

[350] PX-416, Row 112; Day 6, Hughes, 164:11-165:18; Day 31, Ryan, 209-24:210:13.
[351] PX-290; Day 6, Hughes, 108:8-109:7.
[352] PX-903, Tab: 20440422 1-4-16, Row 329; Day 6, Hughes, 162:19-165:19.
[353] *Id.; see, e.g.*, Day 31, Ryan, 211:19-212:5.
[354] CC-359.
[355] *See, e.g.*, Day 31, Ryan, 210:25-211:18; Pl. Dem. #15 at 48.
[356] Day 30, Cowhey, 137:9-16; Day 3, Hughes, 48:22-50:14.
[357] Day 6, Hughes, 176:14-19.
[358] Day 3, Hughes, 51:17-52:8; Day 6, Hughes, 166:15-18, 177:13-23; Day 30, Cowhey, 137:24-138:11; Day 31, Ryan, 178:14-179:18.
[359] Day 30, Cowhey, 141:16-142:13; Day 3, Hughes, 56:20-57:6.

Rising/Aceto produced internal and third-party documents to demonstrate the essential components of this process and its accuracy, including documents proving the following facts:

    a. <u>The customer made the return claim</u>. This was shown by the return reports from the vendors. In 2021, Mr. Hughes downloaded all available return reports directly from Qualanex's portal. Nearly half of the sampling transactions were supported with return reports downloaded directly from Qualanex.[360] For prior periods, Rising/Aceto produced the individual return reports available on its systems.[361] The return reports are third-party documents.[362]

    b. <u>Rising validated and authorized the customer to take the return credit</u>. This was shown by Rising/Aceto credit memos.[363]

    c. <u>The customer deducted the return credit from payments due Rising/Aceto</u>. This was shown by the Rising/Aceto general ledgers.[364]

As illustrated by the Audit Demonstrative chart, this process and evidence was repeated for other sampling transactions in this category. Based on this evidence and the testimony of Ms. Ryan and Mr. Hughes, the Court is satisfied that Rising/Aceto also appropriately and reasonably validated the sampling requests as to returns.

### (iv) Cowhey's Audit Standards Were Too High and Essentially Required Perfection

In his analysis, Mr. Cowhey failed every chargeback, rebate, and return transaction he sampled.[365] In reaching these conclusions, Mr. Cowhey not only appeared to demand perfection, which is not the standard, but also failed to credit the persuasive evidence and the testimony provided by Ms. Ryan and Mr. Hughes that provided various forms of support for these

---

[360] Day 6, Hughes, 166:24-168:10, 178:5-18; *see, e.g., re: support for sample 37*: PX-715, Row 32,648; Day 6, Hughes, 173:15-176:17; PX-868, Row 585; Day 6, Hughes, 176:20-178:18. Day 6, Hughes, 168:22-169:7.

[361] *See, e.g., re: support for sample 6*, PX-1036, Row 994; Day 6, Hughes, 181:16-183:17.

[362] Day 31, Ryan. 179:22-182:7; Day 32, Ryan, 8:1-15.

[363] *See, e.g., re: support for sample 37*: PX-457; Day 6, Hughes, 172:11-173:14; *see, e.g., re: support for sample 6*: PX-398; Day 6, Hughes, 179:20-181:14.

[364] CC-360, Cowhey's demonstrative confirming general ledger support; *see, e.g.*, Day 32, Ryan, 17:4-18:3; Pl. Dem. #15 at 56.

[365] Day 29, Cowhey, 20:11-17, 189:19-21; Day 30, Cowhey, 143: 11-13.

transactions. Mr. Cowhey's position was that if Rising/Aceto did not provide every document identified on his Audit Demonstrative, the transaction failed his audit.[366] Mr. Cowhey asserted that he did not consider the alternative support offered by Rising/Aceto because that would modify the audit protocol.[367] However, the AICPA and GAAS guidelines cited by both sides require an audit or to perform alternative procedures.[368] Mr. Cowhey did not do this.

In his trial testimony, Mr. Cowhey often did not credit even third-party evidence, including documentation that came directly from customers in response to subpoenas.[369] In fact, none of the documents customers produced in response to subpoenas are identified in his Audit Demonstrative.[370] In this Court's view, Mr. Cowhey's refusal to consider alternative support, including third-party evidence, detracted materially from Mr. Cowhey's opinions and conclusions that each of these categories of transactions failed on every occasion. Accordingly, the Court rejects his conclusions.

The Court also rejects Mr. Cowhey's claim that Rising/Aceto did not produce certain documents he requested regarding the sampling transactions.[371] For example, the testimony and evidence at trial showed that neither he nor Sigmapharm requested the "WAC" (Wholesale Acquisition Cost) Invoices to Rising/Aceto customers and that this information was publicly available in any event.[372] Rebate Sample 63 is telling in these regards. Mr. Cowhey failed this transaction because Rising/Aceto did not provide the WAC invoice, even though Sigmapharm

---

[366] Day 29, Cowhey, 20:18-21:6; Day 27, Cowhey, 165:3-6.
[367] Day 29, Cowhey, 21:7-22:2.
[368] Day 29, Cowhey, 22:3-23:9.
[369] Day 29, Cowhey, 163:7-15; 125:14-24; *Cf.* Day 33, Ryan, 79:3-80:1, when Ms. Ryan noted that she confirmed that McKesson produced support for every chargeback.
[370] CC-359-361.
[371] CC-361-369.
[372] *See generally* Day 29, Cowhey, 91:24-108:21; Day 30, 53:5-66:5 (after repeatedly challenges, ultimately, admitted WAC invoices were not requested).

did not ask for it and Rising/Aceto provided: (i) an email from the customer attaching an invoice for the rebates that included an itemized breakdown of the credits, including the rebates; (ii) a Rising/Aceto credit memo authorizing the credit; and (iii) a remittance form from the customer showing it took the credit.[373] Further, Mr. Cowhey acknowledged that he reviewed external calculation files that came directly from the customer, which are also third-party documents.[374] As Ms. Ryan explained, with that third party information (and the other evidence supporting the transaction) there would be no need for an "internal" calculation to reasonably validate the transaction.[375]

A similar problem arose with Mr. Cowhey's complaints about missing documents such as WAC invoices or Internal Pricing Letters relating to chargebacks, even though Sigmapharm did not ask for them.[376] In this regard, chargeback sample 10, which Mr. Cowhey failed, is illustrative. At trial, Mr. Cowhey testified that he failed this transaction because Rising/Aceto did not provide an Internal Pricing Letter. However, on cross-examination, Mr. Cowhey confirmed that Rising/Aceto *did* provide the actual pricing letter signed by a customer – a third-party document.[377] Yet, even that was not good enough. It was, however, sufficient for Ms. Ryan along with the other support provided.[378]

Similarly, for returns, the evidence showed that Sigmapharm did not request customer Contracts, Internal Calculation Files, WAC Invoices, or confirmed Customer Payments.[379] Yet

---

[373] Day 30, Cowhey, 62:23-66:5; Day 29 at 210:3-21.
[374] Day 29, Cowhey, 219:13-220:1.
[375] Day 31, Ryan, 206:10-17.
[376] PX-1755 at ¶ 2, Sigmapharm's proposed order on the Audit Compliance Motion.
[377] Day 29, Cowhey, 90:12-91:20.
[378] Day 31, Ryan, 194:23-195:9; Rising Demonstrative #15 at 21, 24, 26.
[379] Day 30, Cowhey, 155:19-159:23.

these transactions were failed because Rising/Aceto did not provide them, and even though

alternative support was available for those transactions.[380]

In sum, the Court rejects Mr. Cowhey's failure of all the rebate, chargeback, and return

transactions that he audited. Based on the testimony of Ms. Ryan and Mr. Hughes, and the

supporting evidence they relied on, this Court finds that these categories of credits were amply

supported in the course of the audit and provided at least reasonable assurances that the

underlying transactions did in fact occur.[381]

## C. Sigmapharm's Failure to Provide Notice and Opportunity to Cure to Rising/Aceto Does Not Preclude Its Breach of Contract Claim and Defenses

### 1. Sigmapharm Failed to Prove That Giving Notice of the Breach Would be Futile

As noted by this Court's Opinion and October 6, 2021 Order,[382] Sigmapharm unlawfully

terminated and breached the Agreement on March 23, 2018 by failing to provide the prior notice

and an opportunity to cure required under the Agreement.[383] In seeking to avoid or reduce any

recovery by Rising/Aceto, Sigmapharm argues that its failure to comply with the termination

provisions should be excused because providing notice and opportunity to cure would have been

futile.[384] However, as is set forth in more detail below, Sigmapharm did not provide any persuasive

evidence (as opposed to speculation) that Rising/Aceto's breaches were "impossible" to fix[385] or

---

[380] Day 29, Cowhey, 219:13-220:1; Day 31, Ryan, 206:10-17.

[381] The Court's finding that Rising/Aceto ultimately complied with Sigmapharm's information requests for Audit Period II and that the information provided validated Rising/Aceto's profit share calculations disposes of Sigmapharm's claim for audit fees for Audit Period II as the Agreement's five percent (5%) threshold for the assessment of such fees was not met.

[382] Dkt Nos. 69 (Order), 72 (Opinion).

[383] Def's FoF ¶ 234-241; The issue of what damages Rising/Aceto may recover as a result of that breach was reserved for trial. Doc 69 ¶1-2.

[384] Doc 255 ¶ 234-9; Under New Jersey law, "it [is] a fact question as to whether a contract provision for termination by notice prevent[s] a party from terminating for material breach." *Young Travelers Day Camps, Inc. v. Felson*, 118 N.J. Super. 304, 314 (Dist. Ct. 1972).

[385] *Id.*.

"incurable."[386] To the contrary, as is noted elsewhere in this Opinion, the Court is persuaded that Rising/Aceto's breaches of the Audit Provisions were curable and that some (but by no means all) were, in fact, ultimately cured, albeit after years of delays, obstruction and litigation.

As Rising/Aceto has pointed out, the Agreement provides for an initial cure period of 90 days for termination based on material breach which may be extended for an additional 90 days.[387] A key component of notice and cure provisions is that it gives the breaching party the right to cure a default, as well as identifying the default that needs to be cured.[388] In arguing that giving notice would have been futile, Sigmapharm is asking the Court to speculate that Rising/Aceto could *never* have cured its breaches, without offering any persuasive evidence in support. Contrary to Sigmapharm's arguments, it is entirely possible that once formally notified of a breach, Rising/Aceto may have taken advantage of the up to six-month cure period to do so. Mr. Hughes demonstrated Rising/Aceto's desire to cure the FY 2017 discrepancy by saying "this needs to get resolved ASAP, this is my focus."[389] Further, as is found elsewhere in this Opinion, Rising/Aceto did ultimately provide the underlying data needed to audit Rising/Aceto's profit share accounting, even though it required longer than Sigmapharm wanted with respect to Audit Period I and years of litigation as to Audit Period II.[390]

---

[386] *Twin Crest Group v. Delaware Valley Urology, LLC*, 2013 WL 6508242 at *10 (D.N.J. 2013).
[387] CC-1 § 12.2
[388] *In re 4Kids Entm't, Inc.*, 463 B.R. 640, 682, 685-86 (Bankr. S.D.N.Y. 2011) (proper notice of alleged breach is necessary to alert the allegedly breaching party "that a cure period is being triggered" and that "drastic legal repercussions will result from a failure to cure"); *Young Travelers Day Camps*, 118 N.J. Super. 304, 314 (Dist. Ct. 1972).
[389] CC-111, August 24, 2017 email.
[390] As noted elsewhere in the Opinion, as to Audit Period I, the Court finds that Rising/Aceto's delay of many months in fully responding to Mr. Kremer's information requests was a material breach of the Agreement. As to Audit Period II, the Court finds that Rising/Aceto's failure to provide Sigmapharm with the independent audit it was requesting was a material breach, as it required several years of requests and litigation to obtain that audit.

*Young Travelers Day Camps, Inc. v. Felson*,[391] the primary case Sigmapharm relies on for

its futility argument, and cases that follow it, are based on breaches that went to the essence of the

parties' agreement and rendered the requirement to give notice futile and inapplicable.[392] In *Young*

*Travelers*, the initial breaching party was "as close to anticipatory repudiation of the contract as

possible," and then failed to perform, rendering a cure immaterial or impossible, *i.e.*, futile.[393] The

other cases cited by Sigmapharm for this proposition (often franchise cases) also found that the

breach went to the essence or fundamental purpose of the parties' agreement.[394] While the Audit

Provisions were certainly material terms of the Agreement, they did not go to the Agreement's

essence or purpose. That essence was the development, marketing and sale of generic

pharmaceuticals. Therefore, the *Young Travelers* line of cases is distinguishable on this basis.

Further, as noted above, the Court is not at all convinced that Rising/Aceto could not have cured

any breaches within the time limits of the Agreement.

Next, as Rising/Aceto argues, compliance with the Agreement's notice provision was not

optional; thus, the "futility" exception does not apply.[395] Rather than being a mere "formality,"

---

[391] 118 N.J. Super. 304 (Dist. Ct. 1972).

[392] *See also, e.g.*, *Twin Crest Grp. v. Del. Valley Urology, LLC*, 2013 U.S. Dist. LEXIS 175036, at *30 (D.N.J. Dec. 12, 2013) ("The Court finds that reasonable minds could conclude that TCG's obligation to obtain a valid CLIA license was so "vital" to the operation of DVU's laboratory that it went to the "essence" of the Agreement") (quoting *Young Travelers*).

[393] *Young Travelers*, 118 N.J. Super. at 314.

[394] *See, e.g.*, *7-Eleven, Inc. v. Kapoor Bros. Inc.*, 977 F. Supp. 2d 1211, 1225 (M.D. Fla. 2013) (franchise case where the court found the "fraudulent activity went to the essence of the parties' agreement, destroyed all sense of trust between Defendants and 7–Eleven and [could not] reasonably be cured"); *Larken, Inc. v. Larken Iowa City Ltd. P'ship*, 589 N.W.2d 700, 704 (Iowa 1998) ("Larken's breach of its implied duty of honesty and fidelity went to the heart of the contract."); *Southland Corp. v. Mir*, 748 F. Supp. 969, 983 (E.D.N.Y. 1990) (franchise case where the court focused on the nature of the violation in relation to "the root of the matter or essence of the contract") (citing *Olin Corp. v. Central Indus., Inc.*, 576 F.2d 642, 647 (5th Cir. 1978).

[395] Agreement at ¶12.1 (Agreement continues in effect "until terminated by either Party as provided for below.").

the notice provisions of the Agreement were obviously material terms, as there were "two tiers" of notice and the breaching party was given a period of up to six months to cure a material breach *after* proper notice was issued. As was argued by Rising/Aceto, and found by this Court, the purpose of these carefully crafted provisions was to give notice of the alleged breach and a potentially extended opportunity to cure.[396] Thus, compliance was not optional.

Additionally, even though this Court has found that Rising/Aceto was in breach of the Audit Provisions of the Agreement, Sigmapharm waived the "futility" defense and argument by continuing to perform under the Agreement for more than a year after it issued its alleged "Notice of Breach" on December 16, 2016. The New Jersey Supreme Court has held that following a breach "any action indicating an intention to perform will operate as a conclusive choice, *not indeed depriving him of a right of action for the breach which has already taken place, but depriving him of any excuse for ceasing performance on his own part.*"[397] Thus, by continuing to perform, Sigmapharm waived its right to terminate the Agreement based on Rising/Aceto's alleged breach. It did not, however, waive its right to sue for damages based on that breach. For all these reasons, the Court rejects Sigmapharm's futility argument.

### 2. Effect of Sigmapharm's Failure to Comply with the Notice and Cure Provisions of the Agreement When Both Parties Are in Breach

The parties' arguments regarding the effect, if any, of Sigmapharm's failure to provide the required notice and an opportunity to cure required under the Agreement also inform the Court's decision as to whether Sigmapharm can assert a breach of contract claim or defense against Rising/Aceto notwithstanding that failure. Rising/Aceto argues that this failure precludes such a

---

[396] Dkt. No. 72 at 47-49 (SJ Opinion)

[397] *Frank Stamato Co. v. Borough of Lodi*, 4 N.J 14, 21 (1950) (quoting 5 Williston on Contracts (Rev.Ed.) 3749) (emphasis supplied).

claim or defense. Sigmapharm disagrees. Both parties focus on cases where the issue was

whether one party's failure to comply with an agreement's notice provisions precluded that party

from terminating the contract.[398] As these authorities indicate, there is a fairly wide split of

authorities and diverging views on this issue.

While these cases certainly provide some guidance on certain of the issues before it, the

Court finds that they are distinguishable because they did not generally involve scenarios where

the issue was the appropriate remedy when parties were in breach; instead, the focus was on

whether notice was required before terminating. Here, the Court has found that both parties are

in breach and that Sigmapharm waived its right to terminate based on Rising/Aceto's breach.

However, the Court did not and does not find that Sigmapharm waived its breach of contract

claim or defenses when it failed to give the required notice. Accordingly, this Court looks to the

cases cited by the parties (and others) not for the proposition that a party that elects to continue to

perform waives its right to terminate their agreement, but rather for the corollary of that

proposition; *i.e.*, the party that elects to continue to perform in the face of the other party's breach

loses its right to terminate, but retains its right to sue for damages or seek other appropriate

relief.[399]

For example, Rising/Aceto cites to *Aetrex Worldwide, Inc. v. Sourcing for You, Ltd.*,[400]

which involved alleged breaches by both parties. The *Aetrex* court determined (in the context of a

preliminary injunction application) that even though both parties may have been in breach,

because both continued to perform under their agreement rather than electing to terminate, the

---

[398] *Compare* Def's FoF at ¶ 234-241 (Dkt. No. 255) with Pl's Response at ¶ 97-105 (Dkt. No. 257).
[399] *See, e.g., Stamato,* 4 N.J. at 21.
[400] 2013 WL 1680258 (D.N.J. Apr. 16, 2013).

plaintiff was not precluded from seeking damages against the defendant notwithstanding the

plaintiff's alleged breach of the agreement.[401] In so holding, the *Aetrex* court relied on the

language of the New Jersey Supreme Court in *Stamato*, where the Court held that:

> The fact that the defendant has been guilty of substantial breaches of essential
> obligations under the contract would ordinarily give the plaintiff the right to deem
> itself discharged from further performance and to sue the defendant for damages
> under the contract. *But this is not always the injured party's only course of action.*
> In a case of 'a material breach of contract which does not, however, indicate
> any intention to renounce or repudiate the remainder of the contract … the injured
> party has a genuine election offered him of continuing performance or of ceasing to
> perform, and any action indicating an intention to perform will operate as a conclusive
> choice, *not indeed depriving him of a right of action for the breach which has already
> taken place, but depriving him of any excuse for ceasing performance on his own part.*'[402]

Here, the issue is not about continuing performance but rather about whether a breaching party is

foreclosed from seeking damages for the other party's breach.

In *VoterLabs, Inc. v. Ethos Grp. Consulting Servs., LLC*,[403] a case analogous to this one,

the plaintiff argued that the defendant was foreclosed from countersuing for breach of contract

because it had failed to provide the notice and opportunity to cure required by the parties'

agreement.[404] After noting that Delaware courts generally enforce pre-suit notice provisions, the

District Court still permitted the breach of contract claim to go forward because the parties'

agreement did "not address consequences for failure to comply or otherwise tie the parties' right

to sue for breach of contract to the requirement for notice and opportunity to cure."[405] By

---

[401] *Id.* at *4-5 and *8.

[402] *Frank Stamato & Co. v. Borough of Lodi,* 4 N.J. at 21 (emphasis supplied; citing Williston on
Contracts (Rev. Ed. 1937) § 1334 at 3749-50). *See also City of Jersey City v. Jersey City Cmty.
Hous.*, 2023 WL 115520 (N.J. Super. Ct. App. Div. Jan. 6, 2023), *certif. denied*, 256 N.J. 210,
307 A.3d 545 (2024) (plaintiff's failure to strictly comply with the contract's notice provisions
did not preclude plaintiff from seeking affirmative relief).

[403] 2021 WL 11959616 (D. Del. Nov. 10, 2021).

[404] *VoterLabs,* 2021 WL 11959616 (D. Del. Nov. 10, 2021).

[405] *Id.* at *2 n. 2.

contrast, when a contract does expressly limit remedies when a party fails to comply with notice and cure provisions, then courts will enforce that term of the contract. For example, in *Ophrys LLC v. OneMain Fin. Inc.*,[406] the Third Circuit enforced a notice of claim provision that it found to be clear and unambiguous. The provision in *Ophrys* provided that "failure to provide a Notice of Claim with respect to any claimed breach ... shall terminate and waive any rights [a party] may have to any remedy for breach."[407] No such clear and unambiguous provision was contained in the Agreement at issue here.

Where, as here and as in *VoterLabs*, a contract does not expressly provide that there must be compliance with the notice and cure provisions prior to bringing an action for breach, then "compliance with the notice provision is not a precondition to maintaining suit."[408] Nothing in the Agreement tied either parties' rights to sue for damages or to any other remedy to compliance with the notice and cure provisions of the Agreement. So, Sigmapharm is not precluded from bringing its counterclaim and defenses for breach of contract despite its failure to properly notify Rising/Aceto of the alleged breaches of the Agreement.

## D. In Light of the Parties' Mutual Breaches, Allowing Rising/Aceto's Credit Refund Claims and Disallowing its Lost Profits Damages Provides a Balanced and Fair Remedy

The Court has found that Rising/Aceto breached the Audit Provisions of the Agreement and that Sigmapharm is not precluded from asserting its breach of contract claims and defenses as the result of its own breach. The Court must now determine what the remedy is for that breach. As a court of equity, a bankruptcy court is directed to reach a fair and equitable result,

---

[406] 846 F. App'x 133 (3d Cir. 2021).
[407] *Ophrys*, 846 F. App'x at 137.
[408] *VoterLabs* at *2 citing *WyPie Invs., LLC v. Homschek*, 2018 WL 1581981 at *13-14 (Del. Sup. Ct. March 28, 2018) and *Anvil Holding Corp. v. Iron. Acq. Co.*, 2013 WL 2249655, at *10 (Del. Ch. May 17, 2013)).

which of course must be guided by appropriate legal principles.[409] Included among those

principles is the ability to fashion an appropriate remedy based on the particular facts and

circumstances of the case.[410] For the reasons that follow, the Court will award Rising/Aceto

Credit Refund damages in the full amount sought ($9,096,273), less the award the Court is

granting to Sigmapharm on the COGS issue ($1,109,492), for a total award of $7,986,981, plus

post-judgment interest at the Federal Judgment Rate from March 23, 2018 (the date of

Sigmapharm's breach). The Court will not, however, award Rising/Aceto any Lost Profits.

As detailed in this Opinion, Rising/Aceto's books and records were not complete and

accurate, nor were they transparent and readily available for independent audit. As the result of

those issues, Sigmapharm understandably determined (internally) that Rising/Aceto was in

breach of its obligations under the Agreement and decided to terminate its relationship with

Rising/Aceto as a result. Unfortunately for Sigmapharm, it did so prematurely, without giving

Rising/Aceto notice of breach and an opportunity to cure. The issue for the Court is how to

address Rising/Aceto's breaches in the face of Sigmapharm's own breach.

In this case, Sigmapharm argues that as the result of its breaches, Rising/Aceto should be

denied any recovery at all as to the Lost Profits and Credit Refund damages.[411] In sharp contrast,

Rising/Aceto also argues that Sigmapharm should not be allowed any recovery based on its

---

[409] *Off. Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 567 (3d Cir. 2003) ("The Supreme Court has long recognized that bankruptcy courts are equitable tribunals that apply equitable principles in the administration of bankruptcy proceedings."); *United States v. Price*, 688 F.2d 204, 211 (3d Cir. 1982) ("A court of equity has traditionally had the power to fashion any remedy deemed necessary and appropriate to do justice in the particular case.") (citing *Hecht Co. v. Bowles*, 64 S.Ct. 587, 591(1944)).
[410] *Id.*; *See also T & H Bail Bonds, Inc.*, 2013 WL 3934992 at *21 (Del. Ch. July 24, 2013) (court of equity grants remedy that avoids windfall to non-breaching party; party in breach entitled to restitution of any benefit conferred on non-breaching party by part performance).
[411] Dkt. No. 256 at ¶ 7 (Def's Reply Brief); Dkt. No. 255 at ¶ 224 (Def's FoF).

breach of the notice provisions of the Agreement and urges the Court to award more that $26

million (with interest) in damages, including Lost Profits of $12 million to $15 million.

However, those asserted Lost Profits would be awarded to an entity that was not only in material

breach of the Agreement, but also on the path to bankruptcy, cessation of operations, and

complete liquidation approximately one year after Sigmapharm wrongfully terminated the

Agreement in March of 2018.[412] In this Court's view, awarding the full relief sought by each

party would result in an unjustified windfall and unfair advantage to one breaching party and the

equivalent of a forfeiture by the other. This Court will not countenance such inequitable results.

Instead, what the Court believes is fair is to award each party a portion of the relief that they

seek.

### 1. Credit Refund Damages

Notwithstanding Rising/Aceto's notice to its customers that it was terminating their

agreements relating to Sigmapharm Products, Rising/Aceto's customers continued to claim

credits from pre-termination sales (*e.g.*, chargebacks, returns and rebates) and deduct them from

payments made to Rising/Aceto.[413] Thus, Rising/Aceto had to effectively finance or pay

Sigmapharm's share of the credits after the wrongful termination, even though they were

Sigmapharm's responsibility.[414] While disclaiming any liability, Sigmapharm knew that "there

was an accumulating debt based upon the various credits Rising/Aceto had to honor on a cash

---

[412] Rising/Aceto and related entities filed for protection under Chapter 11 of the Bankruptcy Code on February 19, 2019. They quickly sold all their assets and business (the Pharma Assets to Shore Suven in April 2019; the Chemical Plus assets on April 29, 2019) and ceased allowing operations. Pl's FoF at ¶107. Disclosure Statement, Lead Case No: 19-13448 (Dkt. No. 748) at 39.

[413] Day 5, Hughes, 42:5-20.

[414] *Id.* at 52:21-23.

basis after termination which were not offset by ongoing sales."[415] As Mr. Kremer acknowledged, Rising/Aceto was left "holding the bag" on these credits, but nonetheless "expected" Rising/Aceto to continue to honor them.[416] Sigmapharm's financial expert, Mr. Cowhey, also acknowledged this.[417]

Rising/Aceto's Credit Refund damages (also sometimes referred to as "Credit" damages in this Opinion) are discreet, readily ascertainable and expected costs of doing business that were built into the profit share calculation under the Agreement. They were also fully supported by the testimony of Mr. Hughes, Ms. Ryan and the evidence on which they relied. Rising/Aceto actually incurred those costs or credits without Sigmapharm paying or contributing its share. At the same time, after the wrongful termination, Sigmapharm was selling Co-Owned Products without paying shared expenses or deductions owed to Rising/Aceto and keeping the profits for itself. Precluding Rising/Aceto from recovering these "hard," liquidated costs would result in an unwarranted and substantial windfall to Sigmapharm, which also materially breached the Agreement. Thus, for these reasons and those that follow, Rising/Aceto is entitled to recover the Credit Refund costs.

Rising/Aceto argues, and this Court agrees, that Sigmapharm was obligated to pay its share of the expenses under section 8.3 of the Agreement, notwithstanding its improper termination. According to the January 2022 audit package/profit share accounting provided to Sigmapharm by Rising/Aceto, the portion of these credits paid by Rising/Aceto that should have been paid by Sigmapharm was $9,096,273.[418]

---

[415] Day 22, Kremer, 157:11-14.
[416] *Id.* at 156:11-16, 157:11-15.
[417] Day 28, Cowhey, 153:3-154:11.
[418] PX-751.

Sigmapharm's arguments in response to this claim are essentially tri-fold. First, that the audit packages/profit share accounting provided by Rising/Aceto are inadmissible hearsay as "litigation fueled" documents that this Court may not rely upon. Next, that even if the Court finds them admissible, they should not be credited for various reasons, including Mr. Cowhey's opinion testimony as to the deficiencies in Rising/Aceto's profit share accounting. Next, Sigmapharm appears to argue, though not as forcefully or clearly, that Rising/Aceto is not entitled to recover any actual damages because of Rising/Aceto's breach of the Audit Provisions of the Agreement. The Court rejects each of these arguments.

The Court already addressed the first two arguments and found that the "audit packages" provided by Rising/Aceto were admissible business records and summaries. Further, the Court found that the Credit Refund amounts as set forth by Rising/Aceto were accurate and fully supported by the testimony of Ms. Ryan and Mr. Hughes and the evidence they relied on. In contrast, the Court found Mr. Cowhey's testimony on the reasonableness of those calculations and numbers based on his audit to be unpersuasive. The Court also previously addressed Sigmapharm's third argument and finds that Rising/Aceto's breach of the Audit Provisions of the Agreement does not prevent it from recovering the Credit Refund damages.

Finally, this Court finds it would be unfair for Sigmapharm to obtain an unwarranted windfall in the form of not paying for its share of millions of dollars of credits that Rising/Aceto paid to its customers in the form of Credit Refunds, and also retain all the profits from the Co-Owned Products sold after the wrongful termination of the Agreement.

### 2. Lost Profits Damages

Rising/Aceto seeks Lost Profits that it was projected to have earned over a 6-12 year period.[419] However, at the time the Agreement was wrongfully terminated in March 2018, Rising/Aceto was in the throes of the disastrous Citron/Lucid transaction.[420] Less than a year later, Rising/Aceto filed for bankruptcy protection, ceased all ongoing operations, and liquidated all its assets. Accordingly, the Court believes that awarding Rising/Aceto Lost Profits over an extended 6-12 year period would result in an unfair and unwarranted windfall to Rising/Aceto, particularly when Rising/Aceto was also in breach of the Agreement. In making this determination, the Court simply cannot ignore and will consider the significant events that were occurring at and around the same time the Agreement was wrongfully terminated by Sigmapharm and in the 12-13 months thereafter. Nor can this Court ignore Mr. Hughes' candid testimony that the profit share accountings provided to Sigmapharm were calculated (mostly, if not exclusively) on an accrual basis, rather than on a cash basis as required. These material breaches go directly to Audit Provisions of the Agreement and the profit share accountings it required.

In this regard, the Court agrees with Rising/Aceto's citations to case law to the effect that expectation damages are generally measured as of the date of the breach[421] and that the rights of the parties to a "deemed" rejected contract are generally preserved; *i.e.*, the Debtor retains its

---

[419] *See* Plaintiff's Demonstrative Exhibit 8 at 52

[420] For example, in March 2018 – the same month Sigmapharm wrongfully terminated the Agreement – Rising/Aceto issued a 10-Q report that disclosed its stock price was declining dramatically and that it had written off approximately $250 million based on the failure of the Citron/Lucid Acquisition. CC-164; CC-166; CC-167 at n.12.

[421] Dkt. No. 253 at ¶ 177-180 (Pl's FoF).

claims and defenses, as does the counterparty to the rejected contract.[422] However, those

principles are not as absolute or clear as Rising/Aceto argues.

For example, Rising/Aceto relies on the Delaware Supreme Court case of *SIGA Techs., Inc. v. PharmAthene, Inc.*[423] for the general proposition that damages are incurred as of the date of breach or "*ex ante.*" According to *Black's Law Dictionary,* "*ex ante*" means "based on assumption and prediction, on how things appeared beforehand, rather than in hindsight."[424] However, the Delaware Supreme Court in *SIGA* approved of the Chancery Court using post-breach evidence on remand "to aid in its determination of the proper expectations as of the date of the breach."[425] Other cases cited by Rising/Aceto reach the same conclusion and find that limited use of post-breach events is proper in determining the reasonable expectations regarding future profits at the time of the breach.[426] Thus, pre- and post-breach events may be considered in defining the parties' expectations at the time of breach.

Relatedly, the rejection of an agreement in bankruptcy undeniably impacts the underlying rights and obligations of the partes (*e.g.*, debtor rejecting a lease cannot assert a continued right to possession), but "it does not rescind the lease or defeat any pending claims or defenses that the debtor had in regard to that lease."[427]

---

[422] *Id.* at ¶ 183- 87.

[423] 132 A.2d 1108 (Del. 2015).

[424]  Black's Law Dictionary (12th ed. 2024).

[425] *Id.* at 1133.

[426] *PharmAthene, Inc. v. SIGA Techs., Inc.,* 2014 WL 3974167, at *9 (Del. Ch. 2014) (quoting *Comrie v. Enterasys Networks, Inc.,* 837 A.2d 1, 17 (Del. Ch. 2003)). *Cf. Stopford v. Boonton Molding Co.*, 56 N.J. 160, 188-89 (1970) (cited by Rising/Aceto for the same principle, but distinguishable because there was no issue in that case, which involved a lifetime pension agreement, as to the parties expectations as of the date of the breach).

[427] *In re Onecast Media, Inc.,* 439 F.3d 558, 563 (9th Cir. 2006); *See also Mission Prod. Holdings, Inc. v. Tempnology, LLC,* 139 S. Ct. 1652, 1658 (2019) (after rejection, "all the rights that would ordinarily survive a contract breach, including those conveyed here, remain in place;" however, the Debtor's right to possession under the lease is ended.).

In this case, the events surrounding and soon after Sigmapharm's March 2018 breach are significant and certainly would impact Rising/Aceto's profit expectations as of the time of the breach. These events include the approximately $250 million write-off driven by the failed Citron/Lucid transaction, the negative guidance being provided to the public and the retention of bankruptcy/restructuring professionals. All of these events occurred at or around the time period Sigmapharm terminated the Agreement, and all served to dim if not shatter Rising/Aceto's future expectations of not only profits, but even of remaining in business. In fact, Rising/Aceto filed for bankruptcy protection in February 2019, less than a year after the termination, and sold the Pharma Business in April 2019 for a fraction of what it paid. The Court will not and cannot ignore these realities[428] in assessing Rising/Aceto's Lost Profits claims and finds that Rising/Aceto's expectations at the time Sigmapharm breached were bleak and worsening, with its long-term prospects limited at best.

For all these reasons, the Court finds that awarding Rising/Aceto Lost Profits that would have been earned over a 6-12-year period (depending on the Product and its estimated remaining life),[429] would be contrary to Rising/Aceto's reasonable and realistic expectations at the time of Sigmapharm's breach and would result in an unwarranted windfall to Rising/Aceto. Precluding Rising/Aceto from recovering these projected profits is also, in this Court's view, an appropriate (and proportionate) remedy for Rising/Aceto's breach of the Audit Provisions of the Agreement, particularly when considered in connection with the Court's award of the Credit Refund damages

---

[428] As the Supreme Court found long ago, if years have gone by at the time evidence of lost profits for breach of contract is presented then what happened during those years is "a book of wisdom that courts may not neglect. We find no rule of law that sets a clasp upon its pages, and forbids us to look within." *Sinclair Ref. Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 697–98 (1933).

[429] *See* Plaintiff's Demonstrative #8 at 52.

to Rising/Aceto, even though it was also in breach. The same is true in the opposite direction as

the award of Credit Refund damages to Rising/Aceto prevents Sigmapharm from obtaining a

windfall (in the form of the hard and measurable costs Rising/Aceto incurred and Sigmapharm

did not pay), even though Sigmapharm was also in breach.

### 3. Rising/Aceto's Lost Profits Claims Would be Limited to One Year in any Event

The Court also notes for the record that it was generally satisfied with the manner in

which Ms. Ryan calculated Lost Profits, notwithstanding Sigmapharm's challenges to her

credibility (the Court finds her to be credible) and forecasting methodology. Those calculations

were fully supported by detailed testimony describing the methodology she used and the

conservative sales assumptions that were made based on past sales history. Further, those

assumptions were at least roughly borne out by Sigmapharm's actual sales *after* its wrongful

termination of the Agreement. With the assistance of Mr. Hughes and other A&M employees,

Ms. Ryan was able to gather the necessary supporting data, make adjustments and corrections

where appropriate, and make reasonable and adequately supported projections on Rising/Aceto's

profit share.[430] However, even accepting Ms. Ryan's projections, if this Court were to award lost

profit damages (and it is not) this Court would limit Rising/Aceto's Lost Profits damages to one

year after the March 2018 termination, for the following reasons, as well as those described

above.

First, as this Court previously found, the Agreement was executory at the time

Rising/Aceto filed for bankruptcy protection and deemed rejected under Rising/Aceto's Plan.[431]

---

[430] *See e.g. Totaro, Duffy, Cannova & Co., L.L.C. v. Lane, Middleton & Co., L.L.C.,* 191 N.J. 1, 4
(2007) (in determining whether and how much lost profits to award, reasonable certainty and not
absolute precision is the standard).
[431] Dkt. No. 149 at 19-24 (Memorandum Opinion Denying Without Prejudice Sigmapharm's
Motion in Limine to Preclude Evidence of Lost Profits).

As a result, Rising/Aceto's breach was deemed to have occurred on February 18, 2019, the day before its bankruptcy filing.[432] That date is 11 months, just shy of a year, after the wrongful termination. Second, Rising/Aceto essentially stopped operating shortly after its bankruptcy filing in February 2019 and focused its efforts on liquidating all its assets. As noted, the Pharma Business was sold at a steep discount shortly thereafter, in April of 2019, which is thirteen months after the March 2018 termination. In other words, Rising/Aceto was in bankruptcy, no longer operating, and liquidating within 11-13 months of the Agreement's termination. This was no surprise, but rather a consequence that could have been reasonably expected by Rising/Aceto in March of 2018.

Thus, even if this Court would have determined that the award of Lost Profits to Rising/Aceto was appropriate (and it did not), the Court would have limited that claim to one year (at the low end of the range calculated by Ms. Ryan).

### E. Rising/Aceto is Not Entitled to Recover for the Alleged Reduction in the Shore Suven APA Purchase Price

Rising/Aceto's damages claims include $913,761 for the alleged reduction in the purchase price Shore Suven paid for the acquisition of Rising/Aceto's generic pharmaceuticals assets (the "Pharma Assets").[433] According to Rising/Aceto, this amount represents Sigmapharm's 55% share of the $1,490,939 total "dollar for dollar" reduction in the purchase price attributable to the return of Rising/Sigmapharm Co-Owned Products.[434] The Court rejects this aspect of Rising/Aceto's damages claim for several reasons.

---

[432] *Id.*; 11 U.S.C. 365(g)(1) (the rejection of an executory contract of the debtor constitutes a breach of such contact "immediately before the date of the filing of the petition").
[433] Dkt. No. 253 at ¶¶ 107-112 (Pl.'s FoF).
[434] *Id.* at ¶ 111.

First, Rising/Aceto asserts that in its original letter of intent dated January 15, 2019,

Shore Suven offered a gross purchase price for Rising/Aceto's pharmaceutical business of $89.28

million, without the assumption of any liabilities.[435] Here, the Court notes that pursuant to the

Citron/Lucid Acquisition in December 2016, Rising/Aceto acquired certain product lines from

Citron and Lucid for $260 million in cash, plus a deferred payment to the seller of $50 million in

December 2021 and the issuance of 5.122 million shares of Aceto common stock beginning in

December 2019.[436] These assets were a substantial portion of the assets that were the subject of

the January 15, 2019 letter of intent and that were sold back to Shore Suven for $15 million in

cash along with the assumption of certain unspecified and unliquidated liabilities in April

2019.[437]

As the greatly diminished sale price for the Pharma Assets shows, the Citron/Lucid

Acquisition quickly proved disastrous for Rising/Aceto. This significant disparity in price in

such a short period (about two years) by itself demonstrates that there were multiple factors that

may have contributed to the reduced purchase price besides any Rising/Aceto liabilities Shore

Suven may have assumed.

As was stated by Rising/Aceto in an April 2018 press release, soon after this acquisition,

it began experiencing "persistent adverse conditions in the generics market" and was forced to

negotiate financial covenant waivers from its lenders.[438] That same press release advised the

public that Rising/Aceto's financial guidance issued on February 1, 2018 should no longer be

relied upon and that Rising/Aceto anticipated taking substantial "impairment charges, including

---

[435] *Id.* at ¶ 109.
[436] Main Case Dkt. No. 19 at ¶¶ 22, 82 (Declaration of Rebecca A. Roof).
[437] PX-1696.
[438] Main Case Dkt. No. 19 (Declaration of Rebecca A. Roof) (referring to an April 2018 press
release, which was issued less than a year and a half after the Citron/Lucid Acquisition).

goodwill, in the range of *$230 million to $260 million*" relating to the generic products business, a substantial portion of which came about as the result of the Citron/Lucid Acquisition.[439] Additionally, Rising/Aceto received notice from the U.S. government that 11 generic products Rising/Aceto acquired in the Citron/Lucid Acquisition were not in compliance with certain important Federal Trade Agreement Act country-of-origin provisions in the government supply contracts acquired from Lucid.[440] Finally, in a press release issued in May 2018, Rising/Aceto advised that it was taking a "goodwill and intangibles" charge "in the third quarter of fiscal 2018 (ended March 31, 2018) of $256.3 million, all of which related to Rising."[441]

Returning to Rising/Aceto's damages claim, Rising/Aceto relies on Ms. Roof's trial testimony where she stated "the purchase price would be reduced on a dollar-for-dollar basis for such liabilities," including customer returns, etc., and that after extensive negotiations Shore Suven agreed to assume all gross-to-net liabilities (e.*g*., chargebacks and returns) that Rising owed to customers.[442] But the purchase price that Shore Suven and Rising/Aceto ultimately agreed to on March 7, 2019, less than two months after the $89.28 million letter of intent, was just $15 million in cash with the assumption of certain of Rising/Aceto's accrued liabilities to customers, including gross to net reductions.[443] Here, it bears noting that these assets (and others) were sold back to an entity owned or controlled by the principal of Citron/Lucid, at a greatly reduced price, after a substantial portion of those assets had been sold to Rising/Aceto only two years before for $270 million or so.[444] That same principal was a member of Rising/Aceto's

---

[439] *Id.* (emphasis supplied).
[440] *Id.* at ¶ 91.
[441] *Id.* Third quarter of FY 2018 ended March 31, 2018.
[442] Day 13, Roof, 22:17-23; 23:11-13; 33:10-25; 36:21-24.
[443] Pl's FoF at ¶¶ 109-110.
[444] Main Case Dkt. No. 109 at ¶ 44.

Board of Directors until November 14, 2018, which was apparently when he began negotiating

for the repurchase – at a substantial discount – of many of the same assets he sold to

Rising/Aceto for about $270 million just two years before.[445]

Even Rising/Aceto had trouble defining the purchase price of the Pharma Assets.

Rising/Aceto's motion to approve the sale of those assets indicated that the purchase price was

$27 million, excluding Assumed Liabilities, plus Cure Costs that *could* total $125 million.[446] In

contrast, Rising/Aceto's Proposed Findings of Fact indicate that "Rising received only $15

million in cash for its assets," with "the most significant part of the consideration being Shore

Suven's agreement to assume Rising's liabilities to its customers."[447] This Court initially

understood this statement to refer to Cure Costs, not some undisclosed and undefined liabilities

not associated with Cure Costs, as Rising/Aceto now asserts.

As both parties repeatedly note, Cure Costs are not the same as the cost of assuming

Rising/Aceto's liabilities to its customers. Further, Rising/Aceto's Agreement with Sigmapharm

was *not* assumed by Shore Suven; therefore, there could be no "Cure Costs" associated with the

acquisition relating to Sigmapharm.[448] Thus, it appears that the assumption of Rising/Aceto's

liabilities to customers was a separate part of the transaction that was not fully disclosed to

Sigmapharm or the Court when it was approved. Based on that lack of disclosure and the frankly

inconsistent or conflicting information as to the nature and amount of liabilities being assumed

by Shore Suven, there is no way for this Court or Sigmapharm to determine how much, if any, of

the purchase price was directly attributable "on a dollar for dollar basis" (or otherwise) to Shore

---

[445] *Id.*.

[446] *Id.* at ¶ 57. "Cure Costs" generally refer to the amount needed to cure any monetary defaults in assumed agreements. See 11 U.S.C. § 365(b)(1).

[447] Pl's FoF at ¶ 110.

[448] Day 13, Roof, 84:16-85:4; 53:6-65:16; 87:18-88:25.

Suven's assumption of certain liabilities relating to Rising/Aceto's customers, including any individual customer such as Sigmapharm.

Additionally, the math here simply does not work. The difference between the $89.28 million letter of intent purchase price, without assuming any liabilities, and the $15 (or $27) million in cash Shore Suven paid cannot be reconciled for various reasons, even with the assumption of certain undefined and unliquidated liabilities. First, Sigmapharm was not Rising/Aceto's only partner in the pharmaceutical business, and there was no indication or evidence submitted at trial as to how much of these other liabilities Shore Suven assumed relating to other customers (if any) or how those liabilities were treated.

Similarly, any liabilities relating to Sigmapharm Co-Owned Products were not part of the Cure Costs, as noted above. So, there is no way to reconcile the $27 million plus up to $125 million in Cure Costs referenced in the Sale Motion with the $15 million plus unidentified and unliquidated amounts attributable to Shore Suven's agreement to assume Rising/Aceto's liability to certain of its customers, as referenced in Rising/Aceto's Proposed Findings of Fact.

Significantly, there were no documents that evidenced or described this dollar-for-dollar reduction. Thus, based on the evidence submitted at trial (or the lack thereof), there is no way for this Court to determine how much of any asserted reduction in the purchase price was attributed to any specific liabilities assumed by Shore Suven on a dollar-for-dollar basis (or otherwise). The fact that Ms. Roof may have attempted to "isolate" the accrued liabilities attributable to the Co-Owned Products is not sufficient evidence to connect those specific amounts to any specific reduction or adjustment of the purchase price. Instead, that reduction and the final purchase price were obviously subject to various and numerous other factors that make these types of precise calculations or attributions difficult, if not impossible. Finally, there was no testimony from

anyone at Shore Suven (or Rising/Aceto) that corroborated Ms. Roof's testimony or conclusions

in this regard (with any testimony as to what Shore Suven may have said about the dollar-for-

dollar reduction being inadmissible and unreliable hearsay in any event). The Court finds that

omission significant.

Further, as Sigmapharm points out, the APA between Rising/Aceto and Shore Suven

makes clear that any asset or liability not specifically assumed is excluded. This Court's Order

approving the Pharma Assets Sale confirms that exclusion.[449] No schedule attached to the filed

and approved APA listed any Sigmapharm liabilities assumed by Shore Suven. The schedule

Rising/Aceto refers to in support of its arguments to the contrary (Schedule 1.3(c)) was not

attached to the APA approved by the Court or made available to the other parties-in-interest, such

as Sigmapharm.[450] Neither was Schedule 1.1(b), which Rising/Aceto also refers to, attached to

the APA when it was submitted to and approved by this Court.[451] Nor was there any testimony as

to how and to what extent the purchase price was impacted by the specific Pharma Assets being

acquired or any other liabilities being assumed by Shore Suven (besides those allegedly relating

to Sigmapharm). Thus, neither Sigmapharm nor this Court had any notice of this purported

separate assumption of liabilities, as this Court found at trial.[452]

In sum, the amount and components of consideration that made up the reduced purchase

price for the Pharma Assets changed dramatically over a few short months and that purchase

price was necessarily based on a number of interrelated factors, such as the drastic decline in

---

[449] Main Case Dkt. No. 372 at ¶ 6.

[450] Schedule 1.3(c) was later produced in this litigation more than a year after the sale closed.
Def's Response at ¶ 63. That is not sufficient notice to Sigmapharm (or anyone else) as to which
liabilities were being assumed (or not).

[451] Additionally, the Court notes that those schedules do not evidence any dollar-for-dollar
reduction in the purchase price.

[452] Day 13, Roof, 53:6-65:16.

Rising/Aceto's Pharma business, the disastrous Citron/Lucid Acquisition, its regulatory issues

with certain contracts acquired from Citron/Lucid, and Rising/Aceto's general financial

condition, all of which led to its bankruptcy filing. The Court simply is not convinced that there

was such a direct correlation between the Pharma Assets purchase price and Shore Suven's

assumption of Rising/Aceto's liabilities related to Sigmapharm. Accordingly, this Court will not

award damages to Rising/Aceto based on the alleged reduction of the Shore Suven purchase

price as the result of Shore Suven's asserted assumption of certain undisclosed and unidentified

liabilities of Rising/Aceto to Sigmpharm customers.

## F. The COGS Dispute

As previously noted, at the November 20, 2015 meeting between Sigmapharm and

Rising/Aceto executives, Sigmapharm indicated its belief that Rising/Aceto had improperly

changed its COGS calculations and that, as a result, Rising/Aceto owed Sigmapharm

approximately $1.1 million.[453] At the time, it was also Sigmapharm's position that Rising/Aceto

was improperly calculating COGS on an accrual instead of cash basis.[454] Sigmapharm therefore

wanted its audit to include an inquiry into the COGS calculation, as well as verification of

Rising/Aceto's profit share calculations.[455]

Subsequently, in October 2016, a new Rising/Aceto employee, Lisa Matthews, began

calculating COGS based on the product's Transfer Price, without considering Rising/Aceto's

portion of the active pharmaceutical ingredient ("API"), which was inconsistent with the method

of calculating COGS that Mr. Kremer and Mr. Licata had agreed upon more than a year

---

[453] Day 17, Kremer, 63:17-66:23; CC-18; CC-356.1.
[454] CC-27; Day 17, Kremer, 85:20-90:21.
[455] Day 17, Kremer, 65:6-67:18.

earlier.[456] As a result, Sigmapharm's December 16 Letter included an invoice for $1,109,491.81 based on Rising/Aceto's assertedly improper calculation of COGS.[457] There, Mr. Kremer stated that "COGS should be the Transfer Price of product sold by Sigmapharm to Rising/Aceto, less Rising/Aceto's share of API cost where Rising has contributed to the purchase of a product's API," which was "consistent with Rising/Aceto's own calculation of COGS from April 2015 to current."[458]

At or around this time, Mr. Licata, who had been Rising's CFO, left Rising. In July 2017, Mr. Licata was replaced by Mr. Hughes. On August 2, 2017, Mr. Hughes asked Mr. Kremer to provide his support for his COGS calculation and invoice.[459] Mr. Kremer responded on August 14, 2017 by citing to various provisions of the Agreement, repeating that his calculation method was the same as Mr. Licata's and was the way which COGS was being calculated by Rising/Aceto at that time.[460] Both sides acknowledged that this issue was left open and unresolved at the time the Agreement was terminated, but was then being calculated as Mr. Kremer believed appropriate. However, Rising/Aceto subsequently changed the calculation to exclude Rising/Aceto's share of the API that was included it in its final profit share report in 2022.[461] Mr. Hughes acknowledged that he made this change after being told to do so by counsel.[462]

---

[456] Day 17, Kremer, 151:1-156:5; CC-45, 46.
[457] CC-52 and 53.
[458] CC-53.
[459] CC-100.
[460] Day 18, Kremer, 117:11-121:17; Day 4, Hughes, 54:17-56:6.
[461] Day 4, Hughes, 37:6-12; 79:10-80:21; Day 14, Hazaray, 104:6-105:1, 132; Day 15, Hazaray, 25:9-14; Day 8, Hughes, 89:2-91:8; Day 10, Hughes, 152:12-19.
[462] Day 11, Hughes, 42:9-19.

By email dated September 15, 2017, Rising/Aceto explained the basis of its disagreement

with Sigmapharm's COGS calculation. Rising/Aceto stated that: (i) the gross invoice amount

should include the entire API cost (not 50%) and (ii) since Rising paid for 50% of the API, the

credit is on the invoice as reimbursement for the advance payment of API.[463] In the September

17, 2017 email, Rising/Aceto also requested that Sigmapharm send to them the Schedules to the

Agreement that Mr. Kremer had referred in his August 14, 2017 email.[464] Thus, by definition,

Rising/Aceto had not reviewed the information contained in those schedules prior to reversing its

COGS calculations.

Sigmapharm argues that its calculation of COGS is not only consistent with the language

of the Agreement, but also the manner in which Rising/Aceto calculated COGS for the two years

prior to Mr. Hughes' arrival, and how it was being calculated at the time the Agreement was

terminated. In further support of its position, Sigmapharm cites to the "plain language" of the

Agreement which states that "COGS is the price contingently charged by Sigmapharm" for the

purchase of Products, "which amount shall not exceed Sigmapharm's Transfer Price."[465] Thus,

the price "contingently charged" by Sigmapharm could be the Transfer Price but could not

exceed it. Transfer Price is separately defined by the Agreement as "Sigmapharm's fully

absorbed manufacturing cost" which includes "the direct Unit Cost of Raw Materials."[466] Raw

Materials includes the "active pharmaceutical ingredients" for the Products. Sigmapharm argues

that since Transfer Price is a defined term, the Agreement would have said the COGS includes

the Transfer Price rather than the price contingently charged by Sigmapharm if that was what

---

[463] CC-117, CC-117.1.
[464] CC-100.
[465] CC-1 at ¶ 1.13.
[466] CC-1 at ¶ 1.61.

was intended.[467] Instead, it refers to a contingent charge to take into account things like the 50%

advance by Rising/Aceto for the active pharmaceutical ingredients. Sigmapharm also relies on

Mr. Licata's asserted agreement with the method of COGS calculation advanced by Sigmapharm.

In response, Rising/Aceto argues that its COGS calculation is appropriate as a matter of

common sense, is consistent with the plain language of the Agreement and that it should include

all raw material costs, without giving effect to the Rising/Aceto advance. According to

Rising/Aceto, this calculation results in an additional $616,779 owed to Rising/Aceto rather than

the $1,109,491.81 Sigmapharm says it is owed from Rising/Aceto for the period prior to March

31, 2016.[468]

The Court agrees with Sigmapharm's calculation and interpretation of the Agreement. In

this Court's view, the Agreement's language regarding the amount "contingently charged by

Sigmapharm" contemplates that there may be changes from the Transfer Price to the actual

amount ultimately charged by Sigmapharm.[469] That amount did change when Rising/Aceto paid

or advanced to Sigmapharm 55% of the cost to acquire API and later received a credit for that

advance against the Transfer Price upon delivery of the finished Products, as is acknowledged by

Rising/Aceto.[470] And that amount is not the Transfer Price. It is hornbook law that a contract is to

be interpreted so as to give effect to all its provisions.[471] If Rising/Aceto's interpretation is

---

[467] *Cf.* CC-1 at ¶ 1.13.

[468] Dkt. No. 253 at 70 ¶ 197 and n. 34 (Pl's FoF).

[469] In this regard, the Court notes that the amounts charged by Rising/Aceto to its customers changed dramatically from the initial "Wholesale Acquisition Cost" – also a defined term – to what the customer ultimately paid after chargebacks, audits, and rebates.

[470] Pl's FoF at 71 ¶ 198.

[471] *Heffron v. Adamar of New Jersey, Inc.*, 270 F. Supp. 2d 562, 572 (D.N.J. 2003) ("[A]n interpretation [of an agreement] which gives reasonable ... and effective meaning to all [of its] terms is preferred to an interpretation which leaves a part unreasonable ... or of no effect." (quoting Restatement (Second) of Contracts, § 203(a))).

adopted, the "contingently charged" language would have no meaning. Also, if the entire

Transfer Price was to be deducted, this defined term would (or should) have been used in the

COGS definition. Finally, including the entire API cost as initially charged by Sigmapharm

without acknowledging the credit Rising/Aceto received for the payment results in double-

counting of expenses and a reduction of the amount due Sigmapharm.

Accordingly, the Court will award Sigmapharm $1,109,491.81 in damages for the

improper calculation of COGS during the periods prior to March 31, 2016 based on its

calculation of COGS. This amount will be offset against Rising/Aceto's Credit Refund damages.

## VII. CONCLUSION

The Court finds that both sides materially breached the Agreement. Sigmapharm

breached the Agreement by improperly terminating it without providing notice and an

opportunity to cure. Rising/Aceto breached the Audit Provisions by failing to timely provide

Sigmapharm with "complete and accurate records" that were "transparent and readily available

for independent audit purposes." Based on these mutual breaches and the proofs at trial, the

Court awards judgment in favor of Rising/Aceto against Sigmapharm in the amount of

$7,986,781 for net Credit Refund damages after offsetting the award to Sigmapharm on the

COGS claim ($9,096,273 - $1,109,492), plus interest at the Federal Judgment Rate from March

23, 2018 (the date of Sigmapharm's breach) until fully paid. The Court will enter a Judgment in

accordance with this Opinion.

Dated: June 18, 2025

*Vincent F. Papalia*
VINCENT F. PAPALIA, U.S.B.J.